**THE UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**WINSTON-SALEM DIVISION**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **Product Quest Manufacturing, LLC,** *et al.,*[1] | ) | **Case No. 18-50946** |
| | ) | **(Joint Administration Pending)** |
| | ) | |
| **Debtors.** | ) | |
| | ) | |

**DECLARATION OF MICHAEL J. MUSSO IN SUPPORT OF**
**FIRST DAY MOTIONS AND APPLICATIONS**

MICHAEL J. MUSSO, being duly sworn, deposes and says:

1.      I am the interim Chief Executive Officer of Product Quest Manufacturing, LLC, the parent corporation of Scherer Labs International, LLC, Product Quest Logistics, LLC, JBTRS, L.L.C., PQ Real Estate LLC, and Ei LLC (collectively, the "Company" or the "Debtors"). In this capacity, I am familiar with the operations, business, and financial affairs of the Company.

2.      I am authorized to submit this declaration in support of the Debtors' First Day Motions (as hereinafter defined). Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs. If I were called upon to testify, I would testify competently to the facts set forth herein.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Ei LLC (6099); (ii) Product Quest Manufacturing, LLC (4401); (iii) Scherer Labs International, LLC (5258); (iv) Product Quest Logistics, LLC (6199); (v) JBTRS, L.L.C. (1249); and (vi) PQ Real Estate LLC (4569). The Debtors' service address is: 2865 N. Cannon Blvd., Kannapolis, North Carolina 28083.

## BACKGROUND

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are authorized to operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.      Prior to the Petition Date, the Debtors were engaged in the manufacturing of topical over-the-counter ("OTC") drugs, cosmetic products, as well as a limited number of prescription drugs and topical animal health products. As described in detail below, the Debtors have now ceased all going-concern manufacturing operations. The Company's executive offices are located at 2865 N. Cannon Blvd., Kannapolis, North Carolina.

**A.      Company History and Pre-Petition Operations**

5.      In 1995, John Regan, the former head of operations for Hawaiian Tropic, founded Product Quest Manufacturing, LLC ("PQM"). Regan, PQM's first chief executive officer, originally conceived of PQM as a contract manufacturer of sunscreens and other sun care products with a single production line. However, since its inception in 1995, the Company has expanded its product portfolio and production lines to encompass a variety of OTC drugs, prescription drugs, topical animal health products and cosmetics. The Company has also significantly expanded its private label production and contract manufacturing business.

6.      Currently, the Company has over 3,000 product formulas in its library. Prior to the Facility Closures (as defined below), the Company's 39 production lines had the capacity to produce approximately $125 million worth of units per year. Its OTC drugs accounted for a little over fifty percent of the Company's revenue, with its cosmetics and animal health product categories each representing the bulk of the remaining revenue.

7.     The Company traditionally focused its efforts on: (a) the production and sale of private label OTC drugs (e.g., sunscreen) and cosmetic products; and (b) contract manufacturing for third party suppliers of OTC drugs, cosmetics, prescription drugs and animal health products. The Company serviced over 140 customers and its products were sold primarily to regional and national grocery, drug store, and retail operators.  The Company was a sole source supplier for certain of its customers—including the ninth largest animal health company globally.  The Company's pharmacy retail customers included the largest pharmacy healthcare provider in the United States and the largest drug store chain in the United States.  Drug store retailers have historically accounted for approximately 50% of the Company's annual retail sales, with mass retailers, like Walmart and Target, making up approximately 14% of the annual retail sales and dollar retailers, like Dollar General, making up approximately 16% of the annual retail sales.

*Daytona Facility*

8.     Prior to 2013, the Company only had operations in Holly Hill, Florida, a suburb of Daytona Beach, Florida.  The Company's Holly Hill facility (the "Daytona Facility") was built in the 1950s and was acquired by PQM in 2001.  The Company's Daytona Beach operations take place on five separate (but adjacent) properties: (i) the Daytona Facility, a manufacturing facility with 67,922 square feet of operational area (located at 330 Carswell Avenue, Holly Hill, FL 32117), (ii) a warehouse/distribution building with 44,846 of operational area (located at 540 Carswell Avenue, Holly Hill, FL 32117) and an 850 square foot office, (iii) two office/office-warehouse buildings with 9,120 square feet of operational area (located at 343 Carswell Avenue, Holly Hill, FL 32117), (iv) a surface parking lot (located at 344 Carswell Avenue, Holly Hill, FL 32117), and (v) another surface parking lot (located at 331 Carswell Avenue, Holly Hill, FL 32117).

9.      Prior to the Petition Date, the operations at the Daytona Facility focused on accommodating the Company's customers' needs by providing batch manufacturing and filling, packaging and distribution of products.  The product lines at the Daytona Facility primarily consisted of sun care products and OTC sinus medications.  The Daytona Facility's key customers included L'Oréal, SunBum, CVS, Walgreen's, Rite Aid, Top Co. and Valeant.  The Daytona Facility also housed a research and development function focused on product formulation development and innovation.

10.     The Daytona Facility has been renovated several times since its acquisition but its advanced age has created significant ongoing challenges for the Company as described in further detail below.

### Kannapolis Facility

11.     In April 2013, PQM purchased Ei LLC ("EI"), which owned and operated a newer manufacturing facility in Kannapolis, North Carolina (the "Kannapolis Facility").

12.     Prior to the Petition Date, the operation at the Kannapolis Facility focused on three components: (i) batch manufacturing, (ii) filling and packaging and (iii) quality testing. The product lines at the Kannapolis Facility included topical OTC drugs, cosmetics, prescription drugs and animal health products.  With respect to its batching operations,[2] the Company provided cGMP[3] manufacturing from 10L to 9,500L batch sizes with the flexibility to process aqueous, anhydrous and emulsion-based formulations across a wide viscosity range and under an

---

[2] Batch production is a manufacturing technique that is common in pharmaceutical and skin care manufacturing, whereby the product is created through a step-by-step (as opposed to continuous) process.  Batch production affords the flexibility to produce a variety of different products (or product variations) on the same production system.  It also allows a single production system to be used for making different seasonal items.

[3] "cGMP" stands for current good manufacturing practices and these are the manufacturing regulations and practices mandated by the FDA to ensure proper design, monitoring, and control of manufacturing processes and facilities.

assortment of conditions including: multiple mixing options, vacuum/pressure, high temperature, inert gas blanketing, and light-sensitivity.

13.     The Company's filling and packaging operations catered to a range of production sizes ranging from small runs for new OTC and prescription drug products to mega-runs for established OTC drug or cosmetic brands.    The filling operations could accommodate fill capacities from 0.25 milliliter to one liter and the filling options offered at the Kannapolis Facility included: laminate tubes with shaped seal capabilities, metal tubes, with a variety of folding options, bottles / toddles, jars, dual chamber dispensing, sachets, pouches, packettes, unit doses, airless, cartooning, leaflets / inserts, tamper evidence and kit assembly.    Lastly, the Kannapolis Facility's quality testing operations offered the Company's customers a turnkey experience by completing most of a customer's required testing onsite, thus allowing the Company to manage timing and costs related to product production.

*Acquisition by Kainos Capital*

14.     In August 2015, the Company was acquired by Kainos Capital LLC pursuant to that certain Contribution and Unit Purchase Agreement (the "Acquisition Agreement"), by and among KPQ Holdings LP ("Holdings"), PQ Acquisition Corporation, an indirect wholly-owned subsidiary of Holdings ("PQA Corp"), PQM, the members of PQM (the "Members") and the Member's representative, Stephens Capital Partners LLC.    Pursuant to the Acquisition Agreement, Holdings and PQA Corp (affiliates of Kainos Capital LLC) acquired and purchased from the Members all of the equity interests of PQM (the "2015 Transaction"). In December 2016, William Smith ("Mr. Smith") was hired as Chief Executive Officer of the Company by Kainos Capital LLC.

B.    **Events Leading to Filing**

15.    These chapter 11 cases have been caused by ineffective senior leadership, employee turnover, extensive product quality issues and the subsequent recall of many products manufactured in the Daytona Facility due to stability and contamination issues and regulatory compliance issues affecting the Daytona Facility and the Kannapolis Facility.

16.    In the fall of 2017, the Company suffered from severe financial and operational difficulties, including, for example, key vendors placing the Company on credit hold. These issues were caused by poorly executed growth plans, which led to extensive inventory issues and significant subsequent write-offs. Additionally, the Company suffered from operational cost overruns, ineffective production standards and poor pricing practices leading to significant margin erosion. On September 13, 2017, the Agent (as defined below) for the senior lenders exercised its right (arising as a result of the occurrence of certain events of default under the Company's senior secured credit facility) to immediately remove all of the managers on PQM's Board of Managers (the "Board") and replaced them with independent individuals designated by the Agent. Prior to the Agent's exercise of its right to replace the members of the Board, the Company had been in default under its senior secured credit facility for at least twelve months. The current members of the Board are Lawrence Hirsch, L. W. Varner, Jr., and Joseph Thornton.

17.    Promptly after the appointment of the new members of the Board, the Board immediately took action to stabilize the Company by appointing a chief restructuring officer (Joe Geraghty of Conway MacKenzie, a nationally recognized restructuring consulting firm) and arranging for rescue financing from the lenders. Mr. Geraghty along with other advisors from Conway Mackenzie were tasked with developing a financial turnaround plan for the Company.

18.    In October 2017, the Company received a Form 483 notice from the United States Food and Drug Administration (the "FDA") regarding potential FDA violations at the

Kannapolis Facility. These violations were centered on potential cross contamination of human health and animal health products, cleaning validation practices and failure to effectively document investigations. In response, the Company, at the direction of the Board, retained a new law firm (King & Spalding LLP ("K&S")) to represent it in connection with FDA matters. The Company also provided for substantial additional investment in compliance, including the retention of third-party FDA compliance consultants. During that time, the Company also continued to focus on improving its operations and financial condition. The Company also replaced its chief financial officer and engaged Conway MacKenzie to provide an interim chief financial officer.

19.    In April 2018, the Company received a warning letter from the FDA stating that the Company's Kannapolis Facility was in violation of certain cGMP requirements for pharmaceutical products, and that as a result, the agency had concerns regarding potential cross contamination. The Company's chief executive officer at the time, Mr. Smith, conveyed to the Board that it would take approximately two to three months to remedy the issues cited in the FDA's letter and the remediation for the Kannapolis facility would cost around $3–$4 million. Mr. Smith had not disclosed the extensive nature of the quality issues and facility condition in Daytona. On May 21, 2018, the Company submitted its initial response to the FDA's warning letter, outlining the substantial and ongoing remediation efforts at the Kannapolis Facility. Subsequent updates were submitted to the FDA on June 21, 2018 and August 3, 2018, which stated that the remediation efforts for the Kannapolis Facility would not be completed until December 2018.

20.    Following receipt of the FDA's warning letter and continued deterioration of the Company's financial condition, the Board lost confidence in Mr. Smith's ability to improve the

financial condition of the Company and manage and oversee remediation of the FDA compliance issues. Among other things, it became clear that the compliance problems facing the Kannapolis Facility were much more severe than Mr. Smith had disclosed to the Board. Accordingly, on or about July 9, 2018, the Board terminated Mr. Smith as chief executive officer of the Company.

### *Appointment of Interim CEO; Investigation and Closure of Daytona Facility*

21.     On July 10, 2018, I was appointed by the Board as interim chief executive officer of PQM. Up to that point, most of the FDA compliance remediation efforts had been focused on the Kannapolis Facility. However, on July 11, 2018, I received information from the Company's vice president of quality control indicating that the Daytona Facility had widespread quality control issues that had not previously been disclosed to the Board. She expressed concerns that the Daytona Facility had an extraordinary amount of out of specification ("OOS") products including batches with microbial-contamination failures. She also shared with me the historical FDA audit documents, which indicated that these issues were historical. She conveyed to me that these issues had been brought up repeatedly by her to Mr. Smith and the facility general manager verbally and in writing. My experience in the industry accelerated my concern, and I immediately requested our regulatory and compliance counsel, K&S, conduct a site visit to the Daytona Facility to investigate the nature and extent of the product quality, regulatory and contractual compliance issues.

22.     K&S and their FDA consultant expert began the assessment of the Daytona Facility on or about July 17, 2018. During this investigation, K&S identified significant and widespread FDA compliance and cGMP issues. K&S also observed that the Daytona Facility was experiencing compliance and quality control issues because the Daytona Facility (i) did not have appropriate systems in place to identify these issues, (ii) was poorly configured, and (iii)

utilized older manufacturing equipment and improper cGMP manufacturing practices.  The facility also had environmental issues related to age and manual handling of materials.  Additionally, K&S verified that the Daytona Facility had a history of generally poor performance in FDA inspections, as well as failure to effectively remediate such inspections.  As far back as 2012, the FDA's inspections observed similar compliance and quality control issues K&S noted during its time at the Daytona Facility.[4]

23.    The K&S team verified the compliance deficiencies at the Daytona Facility resulted in the significant number of the Company's products testing "out of specification", including the stability failures and microbial-contamination.  Among other things, it was discovered that certain products that were shipped to customers had tested positive for *Staphylococcus aureus* and *Pseudomonas aeruginosa*.  In light of this discovery, the Company immediately implemented quarantines and commenced product recalls with respect to the affected products.

24.    Given the significant contamination and compliance problems facing the Daytona Facility, on July 30, 2018, the Company's Board, on my recommendation, decided to temporarily suspend operations at the Daytona Facility.  On or about August 1, 2018, the Company began terminating some of the Daytona Facility employees and issuing notices pursuant to the Workers Adjustment and Retraining Notification Act (the "WARN Act").

25.    On August 12, 2018, the Board decided to permanently close the Daytona Facility (the "Daytona Closure") based on the extent of the problems.   As a result of the Daytona

---

[4] K&S's investigation revealed that the Company's prior management, including the founder and former chief executive officer, Mr. Regan, and more recently, Mr. Smith, were aware of the serious issues with the Daytona Facility (in Mr. Regan's case, even prior to the 2015 Transaction), yet they failed to adequately or appropriately address the problems facing the Daytona Facility or appropriately inform the Board of these issues.

9

Closure, by on or about August 16, 2018, the Company had terminated and issued notices pursuant to the WARN Act to substantially all of its Daytona Facility employees (approximately 300 employees in total). During the period from the Daytona Closure to the Petition Date, the Company made certain payments under the WARN Act to its terminated employees. As a result of the bankruptcy filing, the Company ceased making WARN Act payments to its terminated employees.

26.    In addition to closing the Facility, on July 31, 2018, the Company alerted the FDA to the issues with the Daytona Facility and commenced a process with the FDA to voluntarily recall thirteen potentially defective and/or contaminated products manufactured at the Daytona Facility. The Company alerted affected customers by telephone, as the "out of specification" results and the shipment of the products were confirmed, on or about July 30-31, 2018. In addition, after the FDA approved the written communications to each customer on July 31, 2018, it is my understanding that the Company sent each affected customer a written notification, in keeping with the FDA's notification template, that (1) explained the Company was conducting a voluntary product recall, (2) explained which product was affected, (3) explained the reason for the recall, and (4) recommended that the product be immediately quarantined. Later, the Company recognized that one of the products identified for recall had been misidentified. The error resulted from the similarity of lot numbers, and the product that actually had the stability failure was never shipped. Thus, this recall ultimately involved twelve products.

27.    On August 7, 2018, at the request of the FDA, the Company issued a press release regarding one of the lots subject to recall (a CVS nasal spray product) after the press release was approved by FDA. The FDA did not request press releases related to the other recalled products.

On August 10, 2018, the Company met with representatives of the FDA, during which time the FDA encouraged the Company to evaluate expanding the scope of the initial recall.  On August 17, 2018, out of an abundance of caution, the Company notified the FDA that it was expanding the scope of the recall to include additional products, and on August 28, 2018, at the request of the FDA, the Company issued a press release that had been approved by FDA regarding the expanded recall, which included all in-market sinus sprays as well as a topical baby teething pain product.  No finished goods were shipped from the Daytona Facility after the Daytona Closure, and as of the Petition Date, no finished goods in the Daytona Facility are being shipped to customers.

### North Carolina Closure

28.     As problems with the Daytona Facility were uncovered and became public, the costs associated with the North Carolina FDA warning letter remediation efforts continued to increase and the financial condition of the Kannapolis Facility began to falter.  In mid-August, the Kannapolis Facility lost multiple key customers as a result of the FDA warning letter, and the Company determined that it was not generating sufficient cash to sustain its ongoing business operations in the normal course due to mounting expenses and loss of revenue from the Daytona Closure.

29.     The Company engaged in discussions with its senior secured lenders regarding potential additional financing to fund the operations at the Kannapolis Facility while the Company sought a potential buyer for that facility.  However, given the deteriorating financial performance, the significant costs of required FDA remediation work, and the uncertainty regarding whether a future sale would occur or would yield proceeds sufficient to repay the additional loans, the lenders were unwilling to advance additional funds to the Company.

11

30.    Accordingly, the Board decided that the best course for the Company to maximize value for its stakeholders was to cease operations at the Kannapolis Facility (the "North Carolina Closure" and together with the Daytona Closure, the "Facility Closures") and commence these chapter 11 cases.

31.    On September 6, 2018, the Company issued WARN Act notices to approximately 296 employees at its Kannapolis Facility.  As of the Petition Date, the Company has no ongoing manufacturing operations at its Daytona Facility and is presently conducting wind-down operations with approximately 13 employees in the Daytona facility and 31 employees at its Kannapolis Facility.  The Company has approximately two outside contractors as part of this team. The Company has engaged in discussions with its largest customer for a tolling manufacturing agreement for a limited period of time for business continuity reasons on a fee fronted basis in the Kannapolis facility but no agreement has been reached as of the Petition Date.

**C.    Pre-Petition Capital Structure of the Debtors**

***Corporate Structure***

32.    Non-debtor Product Quest Acquisition Corporation, a Delaware corporation, is the sole member and owner of one hundred percent of the equity interests in PQM.  PQM, a Florida limited liability company, is the sole owner of one hundred percent of the equity interests in each of Scherer Labs International, LLC, a Florida limited liability company, Product Quest Logistics, LLC, a Florida limited liability company, JBTRS, L.L.C., a Florida limited liability company, PQ Real Estate LLC, a Delaware limited liability company, and Ei LLC, a North Carolina limited liability company.

*Prepetition Secured Debt*

33.     PQ Finance Sub LLC, as borrower prior to the consummation of the Closing Date Merger,[5] PQM, as borrower after the consummation of the Closing Date Merger, certain lenders (the "Lenders"), Madison Capital Funding LLC, as administrative agent, a joint lead arranger and a joint book runner (the "Agent"), Carlyle GMS Finance, Inc., Carlyle GMS Finance SPV LLC and NF Investment Corp., as joint lead arrangers and joint book runners, are parties to that certain Credit Agreement dated September 9, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement").  Pursuant to the Credit Agreement, the Lenders initially provided a Revolving Loan with a commitment of $20,000,000 and a Term Loan (as each is defined in the Credit Agreement) in the amount of $120,000,000 to PQM.  The Credit Agreement was subsequently amended by that First Amendment to the Credit Agreement, dated as of September 20, 2017, whereby the Lenders agreed to make available a $25,000,000 super-priority revolving loan with a maturity date of March 31, 2019.  The Credit Agreement was further amended by that certain Second Amendment to Credit Agreement, dated as of March 29, 2018, that certain Third Amendment to Credit Agreement, dated as of May 4, 2018, and that certain Fourth Amendment to Credit Agreement, dated as of May 31, 2018.  PQM's obligations under the Credit Agreement are secured by a first priority security interest and liens upon substantially all of the assets of the Debtors.  As of the Petition Date, the Debtors' total obligations under the Credit Agreement are approximately $153,652,695.71.

---

[5] The "Closing Date Merger" is the merger on the closing date of PQ Finance Sub LLC with and into PQM pursuant to that certain certificate of merger dated as of September 9, 2015, resulting in PQM as the surviving entity and the current Borrower under the Credit Agreement.

## THE FIRST DAY MOTIONS[6]

34.    Contemporaneously with the filing of their bankruptcy petitions and certain other motions, the Debtors filed the motions and applications listed on <u>Exhibit A</u> (collectively, the "<u>First Day Motions</u>").  I submit this declaration in support of the First Day Motions.  I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe that the facts set forth therein are true and correct. Such representation is based upon information and belief, through my review of various materials and other information, and my experience and knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

35.    As a result of my first-hand experience, and through my review of various materials and other information, discussions with other of the Debtors' executives, and discussions with the Company's professionals, I have formed opinions as to (a) the necessity of obtaining the relief sought in the First Day Motions; (b) the importance of the relief sought in the First Day Motions for the Debtors to continue to operate effectively; and (c) the negative impact upon the Debtors of not obtaining the relief sought in the First Day Motions.

36.    As described more fully below, the relief sought in the First Day Motions will minimize the adverse effects of the chapter 11 cases on the Debtors and ensure that the Debtors' reorganization efforts proceed as efficiently as possible and result in maximum recovery for creditors, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate as debtors in possession.

---

[6] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant motion or application.

14

# I.    Procedural Motions

**A.    Debtors' Emergency Motion for an Order Directing Joint Administration of Chapter 11 Cases**

37.    The Debtors request the entry of an order directing that their bankruptcy cases be jointly administered for procedural purposes only under the caption of the case filed by Product Quest Manufacturing, LLC.

38.    The Debtors believe that it would be more efficient for these cases to be jointly administered.  The Debtors anticipate significant activity during these cases and believe that most hearings and contested matters will apply to both of the Debtors' cases equally. Consequently, joint administration of these cases will promote the economical and efficient administration of the Debtors' estates, unencumbered by the procedural problems otherwise attendant to the administration of separate, albeit related, cases.

**B.    Debtors' Emergency Motion for an Order Establishing Notice and Administrative Procedures**

39.    The Debtors request the entry of an order establishing appropriate notice procedures.  Currently, literally thousands of creditors and parties-in-interest may be technically entitled to receive notice in these cases.  To require the Debtors to provide notice of all pleadings and other papers filed in these cases to these parties in interest would be extremely burdensome and costly to the Debtors' estates as a result of the photocopying, postage, and other expenses associated with such large mailings.

**C.    Debtors' Emergency Motion for an Order to Extend Time to File Schedules and Statements of Financial Affairs**

40.    The Debtors request the entry of an order extending the time to file their schedules and statements of financial affairs (collectively, "Schedules") until October 7, 2018.

41.     To prepare the Schedules, the Debtors must gather information from books, records, and documents relating to a multitude of transactions.  Consequently, collection of the necessary information requires the expenditure of substantial time and effort on the part of the Debtors' limited and already over-burdened employees.  The efforts of the Debtors' employees during the initial stages of these cases are critical and need to be focused on attending to the Debtors' wind down and maximizing the value of the Debtors' estates.  The Debtors' employees will begin working diligently to assemble and collate the necessary information.  The Debtors anticipate that they will need a minimum of 30 additional days than that otherwise prescribed by the Bankruptcy Rules in order to prepare and file their Schedules in the appropriate format.

## II.     Operational Motions

**A.     Debtors' Emergency Motion to Authorize Payment of Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits, and Related Expenses, and Other Compensation to Employees (the "<u>Employee Obligations Motion</u>")**

42.     The  Debtors seek authority to pay certain wages, compensation, and benefits that become payable during the pendency of these chapter 11 cases and to continue at this time their practices, programs, and policies with respect to their current Employees and Independent Contractors, as such practices, programs, and policies were in effect as of the Petition Date.  The Debtors request that all applicable banks and other financial institutions be authorized and directed, when requested by the Debtors and in the Debtors' sole discretion, to receive, process, honor, and pay any and all checks drawn on the Debtors' accounts to pay the Employee and Contractor Obligations, whether those checks were presented prior to or after the Petition Date, and make other transfers necessary to implement these transactions provided that sufficient funds are available in the applicable accounts to make the payments and transfers.  The Debtors similarly request that they be authorized to pay any cost or penalty incurred by a person to which Employee and Contractor Obligations are owed in the event that a check issued by the Debtors

for payment of the Employee and Contractor Obligations is inadvertently not honored because of the filing of the Debtors' bankruptcy cases. Though the Debtors estimate any such costs or penalties to be *de minimis* in amount, if the Debtors are not authorized to pay such costs or penalties, then their Employees will suffer the exact type of harm that this Motion seeks to prevent, and the Debtors will suffer from loss of employee goodwill.

43.     As of the Petition Date, the Debtors employed approximately 44 people (the "Employees"). Of the Debtors' 44 Employees, approximately 19 are employed on a full-time salaried basis and approximately 25 are employed on a full-time hourly basis.

44.     The Debtors also engage two independent contractors (the "Independent Contractors"). The Independent Contractors serve, respectively, as the Debtors' Chief Financial Officer and the manager of the Debtors' Florida operations. The Debtors rely heavily on the Independent Contractors. Moreover, the Independent Contractors have worked with the Debtors over significant periods of time and have gained institutional knowledge and training.

45.     Prior to the petition date, the Debtors conducted operations at two facilities located in Daytona Beach, Florida and Kannapolis, North Carolina (the "Daytona Facility" and the "Kannapolis Facility", respectively). On July 30, 2018, the Debtors temporarily suspended operations at the Daytona Facility. On August 12, 2018, the Debtors permanently closed the Daytona Facility (the "Daytona Closure"). As a result of the Daytona Closure, the Debtors terminated and issued notices pursuant to the Workers Adjustment and Retraining Notification Act (the "WARN Act") to substantially all of their Daytona Facility employees (approximately 300 employees in total). During the period from the Daytona Closure to the Petition Date, the Debtors made certain payments under the WARN Act to the terminated employees. The Debtors

17

estimate that as of the Petition Date the Debtors owe approximately $1.2 million in payments under the WARN Act to its terminated employees at the Daytona Facility.

46.     Also prior to the petition date, on September 6, 2018, the Debtors ceased operations at the Kannapolis Facility (the "North Carolina Closure" and together with the Daytona Closure, the "Facility Closures").  As a result of the North Carolina Closure, the Debtors issued WARN Act notices to approximately 296 employees at the Kannapolis Facility. The Debtors did not make any payments under the WARN Act to the terminated employees at the Kannapolis Facility prior to the Petition Date.  The Debtors estimate that as of the Petition Date the Debtors owe approximately $2 million in payments under the WARN Act to the terminated employees at the Kannapolis Facility.

47.     Prior to the Petition Date, the payments the Debtors made to terminated employees under the WARN Act totaled approximately $724,422.  As of the Petition Date, the Debtors are no longer making payments under the WARN Act to terminated employees at either facility.

48.     As of the Petition Date, the Debtors are presently conducting wind-down operations with 31 Employees at the Kannapolis Facility and 13 Employees at the Daytona Facility.

49.     The Debtors seek authority to pay certain wages, compensation, and benefits more fully described below (the "Employee and Contractor Obligations") that become payable during the pendency of these chapter 11 cases and to continue at this time their practices, programs, and policies with respect to their current Employees and Independent Contractors, as such practices, programs, and policies were in effect as of the Petition Date.  By this Motion, the Debtors also seek authority to pay certain wages, compensation, and benefits to terminated

employees in the amounts more fully described below.  The Debtors believe that there are no terminated employees for whom these obligations would exceed $12,850.  Even though the Debtors have incurred certain Employee and Contractor Obligations prior to the Petition Date, certain of the Employee and Contractor Obligations will become due and payable in the ordinary course of the Debtors' businesses on and after the Petition Date.  The Debtors have provided the historical averages of the Employer and Contractor Obligations below; however, due to the closure of both of the Debtors' Facilities, these Obligations will be materially less going forward postpetition.  The Employee and Contractor Obligations include, without limitation: (i) wages, salary, and other compensation; (ii) payroll taxes; (iii) vacation and sick day programs; (iv) qualified 401(k) plan obligations; (v) health and welfare benefits; and (vi) expense reimbursements and other benefit programs.  The Employee and Contractor Obligations are more specifically described as follows:

- *Wages, salaries, and other compensation.*  These obligations consist of pre-relief wages, salaries, and commissions owed to the Employees and Independent Contractors (the "Payroll Obligations").  The Debtors pay their payroll bi-weekly. Prior to the Facility Closures, the average bi-weekly gross amount of the Payroll Obligations for employees was approximately $1,076,042 and the average bi-weekly gross amount of Payroll Obligations for Independent Contractors was $38,308.  This gross amount includes certain deductions described separately below, such as 401(k) contributions.  Historically, approximately 87% of the Payroll Obligations were deposited directly into the employees' bank accounts and the remaining 13% were paid by check.  As of the Petition Date, the bi-weekly gross amount of the Payroll Obligations for Employees is approximately $151,659.[7]  Because the Debtors' payroll is paid one week in arrears, as of the Petition Date, the Debtors estimate that they owe approximately $224,314 in Payroll Obligations to terminated employees and approximately $75,830 in Payroll Obligations to Employees and Independent Contractors

- *Payroll taxes.*  These obligations consist of federal, state, and local income taxes, social security, and Medicare taxes.  The payroll taxes include the amounts owed by Employees that the Debtors withhold from the gross amount of the Employees'

---

[7] The Debtors anticipate that this amount will decrease by $10,000 per week within several weeks after the Petition Date.

wages or salary as well as the amounts separately owed by the Debtors. Prior to the Facility Closures, the Debtors' average bi-weekly payroll tax liability for employees was approximately $232,578. This includes approximately $70,185 for the employer obligation and $162,393 for the employee component. The employee component is included in the gross amount of the Payroll Obligations discussed above. Because the Debtors' payroll is paid one week in arrears, as of the Petition Date, the Debtors estimate that they owe approximately $105,960 in payroll taxes on account of terminated employees and approximately $10,329 in payroll taxes on account of Employees. This amount is not included in the total Payroll Obligations described above.

- *Payments to the Board of Managers:* The Debtors pay certain amounts to members of the Board of Managers monthly for their service on the Board. Prior to the Petition Date, the average monthly amount of the payments to the Board of Managers was approximately $13,000. As of the Petition date, the Debtors are current on payments to the Board of Managers.

- *Unemployment taxes.* The Debtors also pay certain state and federal unemployment taxes. Prior to the Facility Closures, the Debtors' average bi-weekly unemployment tax liability was $2,621. The Debtors' federal unemployment taxes are paid on a bi-weekly basis; the Debtors' state unemployment taxes are paid on a monthly basis. As of the Petition Date, the Debtors owe approximately $1,311 in unemployment taxes. This amount is not included in the total Payroll Obligations described above.

- *Vacation, sick, and holiday programs.* These obligations consist of time off for vacation, illness and company holidays. The Debtors recognize 10 holidays per year. Full time Employees receive paid time off based upon the years of services as follows: (i) after one year of employment, the Employee receives 120 hours of paid time off per year; (ii) after five years of employment, the Employee receives 160 hours of paid time off per year; and (iii) after ten years of employment, the Employee receives 200 hours of paid time off per year.

Allotted vacation is granted monthly and credited on the first of every month. Under the Debtors' Paid Time Off Policy, Employees are permitted to carry over no more than 40 hours of unused paid time off remaining on that anniversary date, such carried over hours must be used prior to newly granted paid time off and should be used within the first three months of the new calendar year. Any unused carried over paid time off that is not used prior to April 1 of the following year is forfeited. However, prior to the Petition Date, the Debtors waived the carry-over limitations for all eligible Employees. At the time of separation, Employees are paid for no more than 40 hours of earned and unused paid time off hours. However, Employees who leave voluntarily or are terminated for cause are not paid for any unused paid time off. The Debtors desire to continue to honor their obligations for paid time off and holidays on a going forward basis. As of the Petition Date, the Debtors estimate that they owe approximately $35,111 in total unused paid time off pay that will be due to Employees at the time of

separation (but only if separation is part of a job elimination, with such paid time off hours to be limited to no more than 40 hours granted and unused). This amount is not included in the total Payroll Obligations described above.

- *401(k) plan obligations*. The Debtors maintain a 401(k) plan, under which Employees may defer a portion of their salary. After completing six months of employment, full time Employees can contribute up to 100% of their annual pay (up to the annual maximum deferral amount). Under the plan, the Debtors match dollar to dollar on the first 3% of each participating Employee's contributions and 50 cents on the dollar for the next 2% of each participating Employee's contributions. All collected funds are remitted bi-weekly. Because the Debtors' payroll is paid one week in arrears, as of the Petition Date, the Debtors estimate that they owe approximately $3,678 in 401k contributions on account of terminated employees and $1,513 in 401k contributions on account of Employees, which are not included in the estimated total Payroll Obligations described above.

- *Expense Reimbursements and Other Benefits*. The Debtors customarily offer various other employee benefit policies and programs. The Debtors also reimburse eligible Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors. These reimbursement obligations include such things as travel and client entertainment expenses. The amount of these reimbursement obligations has historically been approximately $42,749 per month. As of the Petition Date, the Debtors estimate that they owe approximately $40,000 in other expense reimbursements.

- *Health and welfare benefits.* The Debtors provide several health and welfare benefit plans for the Employees, including insurance plans relating to medical, health, prescription, dental, disability, and life insurance.

  o *Health Care Plan.* The Debtors maintain and provide two health care plans for their Employees. Full time Employees (working at least 30 hours a week) may enroll in the plans after thirty days of employment. The plan premiums are paid by the Debtors and the Employees and are managed by Aetna. The first plan's annual deductibles for in-network providers are $1,000 for individuals and $4,500 for families, and $5,000 for individuals and $15,000 for families for out-of-network providers. The second plan's annual deductibles for in-network providers are $5,000 for individuals and $15,000 for families, and $10,000 for individuals and $30,000 for families for out-of-network providers. Prescription drugs are covered by the plans. Prior to the Facility Closures, the Debtors' average monthly claims, premiums, and administration fees were approximately $208,581 in connection with the health plans (this includes reinsurance, COBRA fees, network fees, etc.). This amount is not included in the estimated Payroll Obligations described above. As of the Petition Date, the Debtors estimate that they owe approximately $18,264 on account of terminated employees' health programs and approximately $2,149 on account of the Employees' health

programs.  By way of background, the total net program expense to the Debtors was $1,578,678 in 2017.

- The costs include health insurance for current and former employees.  There are 5 former employees covered under COBRA.

o *Dental Plan.*  The Debtors maintain and provide one dental coverage plan for their Employees.  Full time Employees (working at least 30 hours a week) may enroll in the plan after thirty days of continuous service.  The plan premiums are paid by the Debtors and the Employees and are managed by Aetna.  The plan's annual deductibles for in and out-of-network providers are $50 for individuals and $150 for families.  Diagnostic and preventative care are covered 100% by the plans.  The Debtors' average monthly claims, premiums and administration fees have historically been approximately $13,062 in connection with the dental plan (this includes reinsurance, network fees, etc.).  As of the Petition Date, the Debtors estimate that they owe approximately $1,663 on account of the dental plan for terminated employees and approximately $192 on account of the dental plan for Employees.  This amount is not included in the estimated Payroll Obligations described above.  By way of background, the total net program expense to the Debtors was $73,314 in 2017.

o *Basic Life Insurance*.  The Debtors provide life insurance at no cost to Employees to their full time (working at least 30 hours a week) Employees after 30 days of employment.  Prior to the Facility Closures, the Debtors' annual premium was approximately $30,386.  As of the Petition Date, the Debtors hold approximately $656 in premiums collected from terminated employees but not yet remitted to the carrier and approximately $81 premiums collected from Employees but not yet remitted to the carrier.  This amount is not included in the estimated Payroll Obligations described above.

o *Accidental Death and Dismemberment Insurance*.  The Debtors provide Accidental Death and Dismemberment Insurance to their full time (working at least 30 hours a week) Employees after 30 days of employment.  Prior to the Facility Closures, the annual cost to the Debtors was approximately $2,979.  As of the Petition Date, the Debtors hold approximately $38 in premiums collected from terminated employees but not yet remitted to the carrier and approximately $5 in premiums collected from Employees but not yet remitted to the carrier.  This amount is not included in the estimated Payroll Obligations described above.

o *Short Term Disability*.  After 30 days employment, the Debtors provide short-term disability coverage for full time Employees who are disabled.  Coverage covers 60% of the Employee's weekly pre-disability earnings,

up to a $200 weekly maximum.  This runs from 14 days after the date of disability and continues through the earlier of recovery or 180 days. Prior to the Facility Closures, the annual cost to the Debtors was approximately $117,940 annually.  As of the Petition Date, the Debtors owe approximately $1,636 on account of short-term disability coverage. This amount is not included in the estimated Payroll Obligations described above.

o   *Long Term Disability*.  After 30 days employment, the Debtors provide short-term disability coverage for full time Employees who are disabled. Coverage covers 60% of the Employee's monthly pre-disability earnings, up to a $1,500 monthly maximum.  Prior to the Facility Closures, the annual cost to the Debtors was approximately $27,608 annually.  As of the Petition Date, the Debtors owe approximately $568 on account of short-term disability coverage.  This amount is not included in the estimated Payroll Obligations described above.

**The following are "pass-through" programs for which the Debtors make no contributions or payments.  The Debtors withhold the necessary amounts from the Employee's paycheck and remit the amounts to the benefit provider.  Accordingly, the Debtors ask for authority to remit amounts collected from the Employees before the Petition Date but not yet remitted to the carrier.**

o   *Vision Plan.*  The Debtors permit Employees to enroll in a vision plan managed by Aetna.  The Debtors collect funds from the enrolled Employees and remit the funds to the insurance company, but do not provide any reimbursement for this program.  There is no material cost to the Debtors for this program.  As of the Petition Date, the Debtors hold approximately $89 in premiums collected from Employees but not yet remitted to the carrier.  This amount is not included in the estimated Payroll Obligations described above.

o   *Supplemental Life and AD&D Insurance*.  The Debtors provide Employees with the option of increasing their life and accidental death and dismemberment coverage by purchasing supplemental insurance. Employees may also purchase coverage for their spouses and unmarried, dependent children.  The Debtors collect funds from Employees and remit the funds to the insurance company, but do not provide any reimbursement for this program.  There is no material cost to the Debtors for this program.  As of the Petition Date, the Debtors hold approximately $85 in premiums collected from Employees but not yet remitted to the carrier. This amount is not included in the estimated Payroll Obligations described above.

o   *Supplemental Short-Term and Long-Term Disability*.  The Debtors provide Employees the option to purchase short- and long-term

23

supplemental disability coverage of up to a max of $1,000 per week at a rate of $0.58 per $10 of covered monthly benefit for short-term disability and up to $10,000 at a rate of $0.60 per $100 of covered monthly payroll for long-term disability. The Debtors collect premiums from Employees and remit same to the insurance company, but do not subsidize this program. There is no material cost to the Debtors for this program. As of the Petition Date, the Debtors hold approximately $81 in premiums collected from Employees but not yet remitted to the carrier. This amount is not included in the estimated Payroll Obligations described above.

o *Critical Illness, Accident, Hospital Indemnity*. The Debtors provide Employees the option to purchase critical illness insurance, accident insurance and hospital indemnity. The Debtors collect premiums from Employees and remit same to the insurance company, but do not subsidize this program. There is no material cost to the Debtors for this program. As of the Petition Date, the Debtors hold approximately $93 in premiums collected from Employees but not yet remitted to the carrier. This amount is not included in the estimated Payroll Obligations described above.

o *Flexible Spending*. The Debtors provide Employees the option to participate in health care and dependent care savings accounts (the "Savings Accounts"). If an Employee elects to participate, a designated amount of the funds the Employee has preselected will be deducted from the Employee's pay on a pre-tax basis and credited to one or both of the Savings Accounts. The Employees may then use the funds to pay for eligible health care or dependent care expenses. The Debtors collect the funds for the Savings Accounts from Employees and remit the same to the carrier for the Savings Accounts, but do not subsidize this program. There is no material cost to the Debtors for this program. As of the Petition Date, the Debtors hold approximately $51 in Savings Account funds collected from Employees but not yet remitted to the carrier. This amount is not included in the estimated Payroll Obligations described above.

**B. Debtors' Emergency Motion for Authority to Continue Pre-Existing Insurance Programs, to Maintain Insurance Premium Financing Programs, and to Pay Pre-Petition Premiums and Related Obligations (the "Insurance Motion")**

50. The Debtors seek an order (a) authorizing them to maintain their insurance programs, insurance policies, insurance premium financing programs, workers' compensation program, and any related agreements, as such practices, programs, and policies were in effect as

24

of the Petition Date and to pay, in their sole discretion, pre-petition amounts, if any, accrued in connection therewith, and (b) authorizing the Debtors' banks and other financial institutions to receive, process, and pay any and all checks and other transfers related to such claims.

51.    In connection with the operation of their businesses, the Debtors maintain various insurance policies and programs through several different insurance carriers (the "Insurance Carriers").  All of the Debtors' insurance policies are listed on Exhibit A to the Insurance Motion, together with a list of the Insurance Carriers, policy terms, and the premiums due thereunder.

52.    The Debtors' insurance policies and programs include liability and property insurance policies, which provide the Debtors with insurance coverage relating to, among other things, general liability, general property, automobile liability, workers' compensation, crime, fiduciary liability and directors' and officers' liability.

53.    The Debtors are required to pay premiums based upon a fixed rate established by each Insurance Carrier.  The premiums for most of these policies are determined annually and are either directly billed to the Debtors or to the Debtors' insurance broker.

54.    Prior to the Petition Date, the Debtors paid a premium for tail coverage on their directors' and officers' liability policy.  As of the Petition Date, the tail policy is not yet in place.

55.    As of the Petition Date, the Debtors believe that they are either current on their insurance premiums with respect to the pre-petition period or they have paid all of the 2018 annual premiums payable under certain of their insurance policies.  However, to the extent there is an outstanding insurance policy premium payable by the Debtors that relate (in whole or in part) to the pre-petition period, the Debtors seek authority to pay these pre-petition premiums in

the ordinary course as such payments are necessary to keep its insurance policies and programs in force.

56.    The Debtors spend approximately $925,000 annually on insurance premiums. The Debtors are currently parties to two insurance premium financing agreements (the "Premium Financing Programs") whereby certain of the Debtors' insurance policies and programs are financed by AFCO Credit Corporation ("AFCO") and IPFS Corporation ("IPFS").   Exhibit A indicates which of the insurance policies and programs are included in the premium financing agreements.

57.    Pursuant to the terms of the premium financing agreement with AFCO, the Debtors make a down payment contemporaneously with the execution of the Premium Financing Agreement and then makes eleven monthly installments to AFCO toward the balance of the financing over the term of the premium financing agreement.  The Debtors paid the down payment and prior to the Petition Date have paid all but three of the installment payments under the premium financing agreement with AFCO.

58.    Pursuant to the terms of the premium financing agreement with IPFS, the Debtors make a down payment contemporaneously with the execution of the Premium Financing Agreement and then make eleven monthly installments to IPFS toward the balance of the financing over the term of the premium financing agreement.

**C.    Debtors' Emergency Motion for Authority to (A) Maintain Existing Bank Accounts and Continue Use of Existing Cash Management System, (B) Continue Use of Existing Business Forms, and (C) Continue Existing Investment Practices (the "Cash Management Motion")**

59.    The Debtors respectfully request an order: (a) authorizing them to continue to maintain their existing bank accounts and to continue use of their existing cash management system; and (b) authorizing them to continue to utilize their existing business forms, including

checks.  Finally, the Debtors seek a waiver of the deposit guidelines set forth in section 345(b) to the extent necessary to allow the Debtors to maintain their bank accounts.

60.    As described in greater detail above, the Debtors' operations are divided into two geographic and corporate segments: (i) the manufacturing facility and related assets in Florida (the "Florida Segment") and (ii) the manufacturing facility and related assets in North Carolina (the "North Carolina Segment").  The Florida Segment and the North Carolina Segment provide manufacturing services to a handful of "cross-over" clients.  The Segments also share coverage under a number of Debtor insurance policies and prior to the Petition Date, certain Debtor employees worked for both the Florida and North Carolina Segments.  The Debtors use a consolidated cash management system, which is described on Exhibit A-1 to the Cash Management Motion.  Importantly, each and every deposit, payment and other transfer made pursuant to the Debtors' cash management practices is documented and accounted for on a per Segment basis.  The existing cash management practices are integral to the stability and efficiency of the Debtors' operations, as they ensure Debtor receivables are easily collected and the Debtors' operating expenses are timely satisfied in a way that minimizes the Debtors' administrative costs.  The loss or even interruption of the cash management practices would be detrimental to the Debtors.

61.    As described more fully below, prior to the commencement of these chapter 11 cases, the Debtors maintained seven bank accounts at one bank, a schedule of which is attached as Exhibit A-2 to the Cash Management Motion.  The Debtors' primary cash management bank is Bank of America, N.A. ("BoA").  The Debtors maintain all of their accounts with BoA through which substantially all of their collections are deposited and disbursements are made. The Debtors' cash management system operates as follows:

(a) The Debtors collect receipts primarily through (1) wires and ACH's deposited into a BoA operating master account (the "Operating Master Account"); (2) checks received at their facility in Florida; and (3) checks received at their facility in North Carolina.  The Debtors' incoming receipts are all deposited into the Operating Master Account. The Operating Master Account is subject to a deposit account control agreement, dated as of November 6, 2015, among Product Quest Manufacturing, LLC, and Madison Capital Funding LLC, as administrative agent on behalf of itself and certain lenders and Bank of America, N.A.  (the "Operating Account Control Agreement").  The Operating Account Control Agreement permits the Company to freely access the funds in this account until the Agent notifies BoA otherwise.

(b) The Operating Master Account funds three disbursement accounts: a payroll account shared by the Debtors (the "Payroll Account") and two general disbursements accounts – one for PQM (the "PQM Disbursement Account") and one for EI (the "EI Disbursement Account", together with the PQM Disbursement Account, the "Disbursement Accounts").  As needed, Bank of America transfers funds from the Operating Master Account to the Payroll Account and the Disbursements Accounts to cover expected presentments.  At all times, the Payroll Account and the Disbursement Account maintain a zero balance.

(c) In addition to the three accounts described above, the Debtors maintain three inactive accounts with BoA.  Two of the accounts have not been used by the Debtors in the past twelve months and one account, the Debtors' petty cash account (Acct. No. 487001618920), has not been used in the past two months and holds a small balance.

62.    Authorizing the Debtors to continue to use their existing bank accounts is essential to a smooth and orderly transition of the Debtors into chapter 11.  Moreover, having to open new accounts as of the Petition Date would unnecessarily distract the Debtors' key accounting and financial personnel.

63.    By permitting existing accounts to remain open, preserving continuity, and avoiding the operational and administrative paralysis that closing the accounts and opening new ones would necessarily entail, all parties-in-interest will be best served, and the Debtors' estates will benefit considerably.

64.     Finally, by virtue of the nature and scope of the Debtors' businesses, the number of accounts, and the number of employees, suppliers of goods and services, and others with whom the Debtors transact business, it is imperative that the Debtors be permitted to continue to use their existing business forms, including checks.  A substantial amount of time and expense would be required to print new business forms and stationery and would also likely result in a substantial risk of disruption to the Debtors.

65.     Because of the severe disruption to the Debtors' cash management system that would result if the Debtors were forced to open new accounts, the Debtors believe it is extremely important that this Court grant their request for maintaining their existing bank accounts and business forms.  The Debtors also ask for authorization to open, when necessary, additional FDIC-insured bank accounts that will be subject to the requirements of this Order.

66.     The Debtors also seek a waiver of the deposit guidelines set forth in section 345(b) to the extent necessary to allow the Debtors to maintain their bank accounts.

67.     Debtors submit that their practices generally conform with the intent of section 345(b) to protect and maximize the value of their estates.  The Debtors believe that their existing investment procedures are designed to protect the principal invested while maximizing liquidity and, therefore, believe that sufficient cause exists to waive the investment requirements of section 345(b) to allow the Debtors to continue their existing investment procedures.

68.     Moreover, the Debtors believe that the bank the Debtors use is well-established and invests the Debtors' funds in accordance with their standard investment guidelines. Requiring the Debtors to open multiple accounts at different banks so that the deposits in each such bank would be insured by FDIC would be unnecessarily burdensome and would lead to the same delays and disruption to the Debtors' businesses that this Motion seeks to avoid.

69.     The Debtors submit that given the totality of the circumstances, their request is reasonable and cause exists for the Court to waive the requirements of section 345(b).

**D.     Debtors' Emergency Motion for an Order Authorizing the Debtors to Pay Pre-Petition Trust Fund and Other Taxes and Related Obligations (the "<u>Tax Motion</u>")**

70.     The Debtors seek authority to pay, in their sole discretion, undisputed pre-petition sales and other similar "trust fund" taxes and obligations ("<u>Sales Taxes</u>") owed to the state taxing authorities listed on the <u>Exhibit A</u> attached to the Tax Motion (collectively, the "<u>Taxing Authorities</u>") in the ordinary course of business.

71.     In connection with the normal operation of their businesses, the Debtors purchase supplies, not for manufacturing use, from third party vendors for which the vendors occasionally do not collect the proper sales tax percentage.  As a result, the Debtors are liable to the Taxing Authorities for all uncollected Sales Taxes.  The Debtors pay approximately $4,800 per month to the Taxing Authorities on account of these Sales Taxes.  The Debtors estimate that, as of the Petition Date, they hold approximately $4,800 in unremitted Sales Taxes.

**E.     Debtors' Emergency Motion For Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service on Account of Prepetition Invoices, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment (the "<u>Utilities Motion</u>")**

72.     The Debtors respectfully request the entry of an interim and final order (the "<u>Interim Order</u>" and the "<u>Final Order</u>", respectively), pursuant to section 366: (a) prohibiting the Utility Companies from altering, refusing, or discontinuing service on account of prepetition invoices, (b) deeming utilities adequately assured of future performance, and (c) establishing the Determination Procedures for determining adequate assurance of payment.

73.     Also, the Debtors request that the Court schedule a final hearing on this Motion (the "<u>Final Hearing</u>") at its convenience on a date in advance of the expiration of thirty (30) days

following the Petition Date in order to, as discussed below: (a) address any outstanding objections to the Motion and (b) resolve any disputes regarding adequate assurance of payment prior to the expiration of the thirty (30) day period set forth in section 366(c)(2) of the Bankruptcy Code.

74.    Utility services are essential to the Debtors' ability to sustain their operations while these chapter 11 cases are pending.  In the normal conduct of their businesses, the Debtors have relationships with approximately fifteen utility companies (collectively, the "Utility Companies") for the provision of telephone, internet, electric, gas, water, sewer and waste management (the "Utility Services").  A list identifying the Utility Companies and their notice addresses is attached as Exhibit A to the Utilities Motion (the "Utilities Service List").[8]

75.    As described in greater detail above, as a result of the investigation by the United States Food and Drug Administration (the "FDA") of the Debtors' Florida manufacturing facility, on or about July 31, 2018 (the "Florida Shutdown Date"), the Debtors ceased operations at the Florida facility for the foreseeable future.  Subsequently, on or about September 6, 2018 (the "North Carolina Shutdown Date"), the Debtors' ceased operations at the North Carolina manufacturing facility for the foreseeable future.  Following the Florida Shutdown Date, the Debtors have used significantly less utility services in their Florida facility, and anticipate that,

---

[8] The listing of any entity on Exhibit A is not an admission that such entity is a utility within the meaning of section 366.  The Debtors reserve all rights to further address the characterization of any particular entities listed on Exhibit A as a utility company subject to section 366(a).  The Debtors further reserve the right to terminate the services of any Utility Company at any time and to seek an immediate refund of any utility deposit without effect to any right of setoff or claim asserted by such Utility Company against the Debtors.  This Motion does not seek assumption or rejection of any executory contract under section 365 of the Bankruptcy Code, and the Debtors reserve the right to claim that any contract with the Utility Companies is or is not an executory contract, as the facts may dictate.  The relief requested herein is with respect to all Utility Companies and is not limited only to those listed on Exhibit A.

following the North Carolina Shutdown Date, the Debtors will use significantly less utility services in their North Carolina facility going forward.

76.    At all relevant times, the Debtors have attempted to remain current with regard to their utility bills.  Furthermore, to the best of the Debtors' knowledge, the Debtors are current on all amounts owing to the Utility Companies, other than payment interruptions that may be caused by the commencement of these chapter 11 cases.

77.    Continued and uninterrupted Utility Service is vital to the Debtors' ability to sustain their operations during these chapter 11 cases.  Because of the nature of the Debtors' operations, termination or interruption of the Debtors' utility service would dramatically impair the Debtors' ability to conduct business and cause considerable inconvenience to the Debtors' customers and employees.

**F.    Debtors' Emergency Motion for Entry of an Interim and Final Order (A) Authorizing the Debtors to use Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (B) Granting Adequate Protection to Pursuant to Sections 361 and 363 of the Bankruptcy Code, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing Pursuant to Rule 4001(c) of the Federal Rules of Bankruptcy Procedures (the "<u>Cash Collateral Motion</u>")**

78.    The Debtors, after conducting an interim hearing (the "<u>Interim Hearing</u>") on the Motion, seek the entry pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Rule 4001(b), of an order (a) authorizing the Debtors to use cash collateral, (b) granting adequate protection, and (c) scheduling a final hearing (the "<u>Final Hearing</u>").

79.    On September 9, 2015, PQ Finance Sub LLC, as borrower prior to the consummation of the Closing Date Merger[9] ("<u>Initial Borrower</u>"), Product Quest Manufacturing, LLC, as borrower after the consummation of the Closing Date Merger ("<u>Current Borrower</u>"),

---

[9] The "Closing Date Merger" is the merger on the closing date of PQ Finance Sub LLC with and into Product Quest Manufacturing, LLC pursuant to that certain certificate of merger dated as of September 9, 2015, resulting in Product Quest Manufacturing, LLC as the surviving entity and the Current Borrower under the Credit Agreement.

certain lenders (the "Lenders"), Madison Capital Funding LLC, as administrative agent, a joint lead arranger and a joint book runner (the "Agent"), Carlyle GMS Finance, Inc., Carlyle GMS Finance SPV LLC and NF Investment Corp., as joint lead arrangers and joint book runners entered into that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), pursuant to which, the Lenders agreed to make (a) available a $20,000,000 revolving credit facility (the "Revolving Loan"), and (b) a $120,000,000 term loan (the "Term Loan"). Both the Revolving Loan and the Term Loan mature on September 9, 2020. The Credit Agreement was subsequently amended by that First Amendment to the Credit Agreement, dated as of September 20, 2017, whereby the Lenders agreed to make available a $25,000,000 super-priority revolving loan with a maturity date of March 31, 2019 (the "Super-Priority Revolving Loan", together with the Revolving Loan and the Term Loan, the "Loans"). The Credit Agreement was further amended by that certain Second Amendment to Credit Agreement, dated as of March 29, 2018, that certain Third Amendment to Credit Agreement, dated as of May 4, 2018 and that certain Fourth Amendment to Credit Agreement, dated as of May 31, 2018.

80.     In the aggregate, the Loan Documents provide that the Prepetition Debt is secured by security interests and liens upon substantially all of the assets of the Debtors (the "Prepetition Liens"). The assets of the Debtors that are subject to the liens, security interests, and mortgages of the Agent and the Lenders are hereinafter collectively referred to as the "Prepetition Collateral."

81.     Substantially all of the cash held by or otherwise generated by the Debtors' management of their properties as of the Petition Date constitutes "cash collateral," as such term

is defined in section 363(a) of the Bankruptcy Code, and is subject to the interest of the Lenders (the "Cash Collateral").

82.     Without the use of the Cash Collateral, the Debtors do not have sufficient access to working capital to manage their properties in the ordinary course for a period of time sufficient to facilitate the wind down of their estates. The Debtors' ability to administer these bankruptcy cases is dependent on their ability to use the Cash Collateral.

83.     The inability of the Debtors to access the Cash Collateral and to make payments on certain obligations on a timely basis may result in, *inter alia*, the Debtors' inability to continue to  maximize the value of their assets.  Without access to the Cash Collateral, the impact on the Debtors' estates would be catastrophic and would result in material harm to all of the Debtors' creditors and other constituents.

[*signature on following page*]

Executed on September 7, 2018, at Kannapolis, North Carolina

Michael J. Musso
CEO of Product Quest Manufacturing, LLC

**<u>EXHIBIT A</u>**

**<u>INDEX OF FIRST DAY MOTIONS</u>**

| Pleadings |
|---|
| Debtors' Emergency Motion for an Order Directing Joint Administration of Chapter 11 Cases |
| Debtors' Emergency Motion for an Order Establishing Notice and Administrative Procedures |
| Debtors' Emergency Motion for an Order to Extend Time to File Schedules and Statements of Financial Affairs |
| Debtors' Emergency Motion to Authorize Payment of Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits, and Related Expenses, and Other Compensation to Employees |
| Debtors' Emergency Motion for Authority to Continue Pre-Existing Insurance Programs, to Maintain Insurance Premium Financing Programs, and to Pay Pre-Petition Premiums and Related Obligations |
| Debtors' Emergency Motion for Authority to (A) Maintain Existing Bank Accounts and Continue Use of Existing Cash Management System, (B) Continue Use of Existing Business Forms, and (C) Continue Existing Investment Practices |
| Debtors' Emergency Motion for an Order Authorizing the Debtors to Pay Pre-Petition Trust Fund and Other Taxes and Related Obligations |
| Debtors' Emergency Motion For Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service on Account of Prepetition Invoices, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment |
| Debtors' Emergency Motion for Entry of an Interim and Final Order (A) Authorizing the Debtors to use Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (B) Granting Adequate Protection to Pursuant to Sections 361 and 363 of the Bankruptcy Code, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing Pursuant to Rule 4001(c) of the Federal Rules of Bankruptcy Procedures |