## IN THE UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
## WINSTON-SALEM DIVISION

|  |  |  |
|---|---|---|
| **In re:** | ) | |
| **Product Quest Manufacturing, LLC, *et al.*,** [1] | ) ) | **Case No. B-18-50946C-7W** |
| | ) | **(Jointly Administered)** |
| Debtors. | ) ) | |

### TRUSTEE'S MOTION FOR ORDER AUTHORIZING AND APPROVING THE PRIVATE SALE OF MINOXIDIL ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; APPROVING THE ASSET PURCHASE AGREEMENT; AND GRANTING RELATED RELIEF

C. Edwin Allman, III, Trustee in the Ei LLC bankruptcy case (No. B-18-50945C-7W), respectfully moves the Court for entry of an Order, pursuant to 11 U.S.C. § 363 and Bankruptcy Rules 2002 and 6004 (i) authorizing the private sale of abbreviated new drug application 078176 Theroxidil (Minoxidil 2%) ("ANDA 2%"); abbreviated new drug application 076239 Theroxidil (Minoxidil 5%) ("ANDA 5%"); all related documentation, samples and retains regarding ANDA 2% and ANDA 5%; bulk Women's Minoxidil 2% finished goods (the "Finished Goods"); packaging Dropper 20/410 and Packaging Inserts (PQM-WMIN2-10) (collectively, the "Minoxidil Assets") to Atlantic Coast Media Group LLC, t/a Atlantic Coast Brands ("Purchaser") pursuant to an Asset Purchase Agreement between the Trustee and Purchaser attached hereto as **Exhibit 1** (the "Asset Purchase Agreement")[2] and incorporated herein by reference; (ii) authorizing and approving the Asset Purchase Agreement; and, (iii) granting certain related relief. In support hereof, the Trustee respectfully represents as follows:

### Jurisdiction and Venue

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. Sections 157 and 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Statutory predicates for the relief requested herein are §§ 105(a) and 363 of the Bankruptcy Code, Bankruptcy Rules 2004 and 6004.

---

[1] The Debtors in these cases, along with the associated case number, are: (i) Ei LLC (18-50945); (ii) Product Quest Manufacturing, LLC (18-50946); (iii) Scherer Labs International, LLC (18-50948); (iv) Product Quest Logistics, LLC (18-50950); (v) JBTRS, L.L.C. (18-50951); and (vi) PQ Real Estate LLC (18-50952). The Debtors' service address is: 2865 N. Cannon Blvd., Kannapolis, North Carolina 28083.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Asset Purchase Agreement.

1

## Background

2.     On September 7, 2018 (the "Petition Date") each of the Debtors filed with the Court a Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code. The cases are being jointly administered pursuant to Bankruptcy Rule 1015(b). On October 31, 2018, the cases were converted to Chapter 7 cases and C. Edwin Allman, III, was appointed to serve as Trustee. Pursuant to Orders entered herein, the Trustee is authorized to continue to operate the Debtors' businesses in furtherance of a wind down of the Debtors' affairs and liquidation of the Debtors' assets. See: Order Pursuant to 11 U.S.C. Section 721 Authorizing Trustee to Continue to Operate the Debtors in Connection with an Orderly Wind Down and Liquidation of the Estate on an Interim Basis and Notice of Hearing dated November 13, 2018 [docket #294] and Order Authorizing Trustee to Operate Debtor on an Interim Basis and Notice of Hearing dated October 30, 2018 [docket #261].

3.     Information regarding the Debtors' businesses, capital structure and circumstances leading to the Chapter 11 filings is as set forth in the Declarations of Michael J. Musso in Support of First Day Motions and Applications [docket #13].

## Description of Property Being Sold

4.     The property proposed to be sold herein consists of the Minoxidil Assets.

## Debtors' Marketing Efforts

5.     During the Chapter 11 proceedings the Debtors, with appropriate court authorization, solicited offers for all of their assets and bid procedures were implemented. Although a number of offers were received in accordance with the bid procedures approved by the Court, none of the offers were acceptable to the Debtors or Debtors' secured lenders, Madison Capital Funding LLC, as agent for the secured lenders in all of the cases ("Lender"). During the Chapter 7 case, negotiations with Purchaser and five other interested and qualified bidders occurred relative to the purchase and sale of the Minoxidil Assets. Consequently, in order to achieve reasonable value for the Minoxidil Assets it was necessary to engage each of the prospective purchasers in a process which would culminate in the submission to Lender and Trustee of the highest and best offer such purchaser would be willing to make.

## Summary of Terms of Asset Purchase Agreement

6.     The above process was undertaken and culminated with an offer from Purchaser which the Trustee and Lender consider to be the best offer presented. The Asset Purchase Agreement was executed and, generally, it provides as follows:

2

| Seller: | C. Edwin Allman, III, Trustee for Ei LLC (Case No. 18-50945C-7W) |
|---|---|
| Purchaser: | Atlantic Coase Media Group, LLC, t/a Atlantic Coast Brands |
| Property Being Sold: | Abbreviated new drug application 078176 Theroxidil (Minoxidil 2%) ; abbreviated new drug application 076239 Theroxidil (Minoxidil 5%); all related documentation, samples and retains regarding ANDA 2% and ANDA 5%; bulk Women's Minoxidil 2% finished goods more fully described in Exhibit A to the Asset Purchase Agreement ; packaging Dropper 20/410 and Packaging Inserts (PQM-WMIN2-10)_more fully described in Exhibit A to the Asset Purchase Agreement. |
| Assumed Liabilities | Purchaser shall assume and hereafter pay, discharge or perform when due all those current and past due fees due from Seller to the FDA with regard to the Minoxidil Assets, together with any transfer fees resulting from the transaction contemplated herein. |
| Cash Purchase Price: | $1,245,000.00. |
| Other Consideration: | Purchaser will withdraw any claim asserted against any of the Debtors or their respective estates arising prior to the Closing Date (whether arising before or after the petition date) after the entry of the Sale Approval Order becoming a Final Order. |
| Closing: | As soon as practicable, but in any even within three (3) days of the date on which the Sale Approval Order becomes a Final Order unless otherwise agreed by Purchaser and Seller. |
| Deposit: | $249,000.00 |
| Relief from Bankruptcy Rule 6004(h) | The parties intend for the Sale Approval Order to provide for a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h). |
| Sale Free and Clear of Liens: | The sale will be free and clear of all liens with such liens attaching to the proceeds of sale to be held or distributed in accordance with existing cash collateral orders. |
| Stalking Horse Provisions: | In the event the Bankruptcy Court approves the sale of the Minoxidil Assets to a third party, under certain specified conditions Purchaser shall be entitled to reimbursement of actual, reasonable and out-of-pocket expenses not to exceed $100,000.00 ("Expense Reimbursement") and a break-up fee of $49,800.00 ("Break-up Fee") |

## Relief Requested

7.    By this Motion, the Trustee requests that the Court enter an Order authorizing and approving the sale of the Minoxidil Assets to Purchaser for the sum of $1,245,000.00 and approving and authorizing the Asset Purchase Agreement.

## Basis for Relief Requested

8.     Following negotiations and a period of competitive bidding, Lender and the Trustee believe that the best offer for Minoxidil Assets was the offer submitted by Purchaser as set forth in the Asset Purchase Agreement. Consequently, Lender and Trustee believe that the price received for the Minoxidil Assets is fair and reasonable and should be approved.

9.     The sale is proposed in good faith after a period of negotiation and competitive bidding among several interested and capable prospective purchasers. The Trustee submits that the sale transaction contemplated herein and in the Asset Purchase Agreement has been proposed in good faith. Neither Purchaser nor any of its affiliates are insiders of the Debtors and the Asset Purchase Agreement was the product of good faith arm's length negotiations between the Lender and the Trustee on one hand and the Purchaser on the other, with all parties represented by counsel. The Trustee believes and submits that the proposed sale is not the product of collusion or bad faith and the Trustee has seen no evidence that would suggest that the Asset Purchase Agreement is anything but the product of arm's length negotiations between the Purchaser, the Lender, the Trustee and their respective professionals.

## Sale Free and Clear of Liens

10.     Substantially all assets of the Debtors' bankruptcy estate are encumbered by liens in favor of Lender. Lender has been actively involved in the negotiations on this particular sale and has agreed to the terms thereof. Lender consents to the sale being free and clear of liens with such liens attaching to the proceeds of sale with the same priority and being administered in accordance with existing cash collateral orders of the Court.

## Higher Offer Acceptance and Procedure

11.     The Trustee is mindful that one or more entities may wish to submit an enhanced bid at or prior to the hearing on approval of the Motion. Consequently, the Trustee requests that the Court authorize and approve the highest and best offer submitted at the hearing provided (i) the successful purchaser acquire the Minoxidil Assets on terms specifically set forth in the Asset Purchase Agreement; and (ii) that such purchaser shall have submitted a deposit in the amount of 20% of the Total Enhanced Bid (as defined below) not later than forty-eight (48) hours prior to the scheduled hearing into the Trustee's law firm trust account and electronically file a Notice of Intent to Bid with the Clerk of the Court using the CM/EMC system not later than forty-eight (48) hours prior to the scheduled hearing. In the event a higher bid is submitted at or before the hearing the Trustee may request a brief adjournment of the hearing to allow all qualified purchasers a final opportunity to increase their bid in order to ensure that the highest and best value is received for the Minoxidil Assets. The Trustee recommends that a higher bid must include an amount equal to the Expense Reimbursement (which may be estimated), the Break-up Fee of

4

$49,800.00, and the Initial Overbid amount of $25,000 (the "Total Enhanced Bid").

## Waiver of Bankruptcy Rule 6004(h)

12.    The Minoxidil Assets are not appreciating in value and the Asset Purchase Agreement contemplates a closing soon after entry of an order approving the sale. Consequently, the Trustee requests that the Court waive the fourteen (14) day stay period provided in Bankruptcy Rule 6004(h) and that the approval order so provide.

WHEREFORE, the Trustee prays:

1.    That the Court approve the sale of the Minoxidil Assets to Atlantic Coast Media Group, LLC, t/a Atlantic Coast Brands for the sum of $1,245,000.00;

2.    That the sale be free and clear of liens;

3.    That the fourteen (14) day stay set forth in Bankruptcy Rule 6004(h) be waived by the Court such that the sale may be timely closed;

4.    That the Court approve the sale of the Minoxidil Assets to an alternative purchaser should one arise with a higher bid on the terms set forth herein and, in connection therewith, the Court approve the Expense Reimbursement and the Break-up Fee and authorize the payment of same to Atlantic Coast Media Group, LLC, t/a Atlantic Coast Brands from the sale proceeds;

5.    That the Asset Purchase Agreement be approved;

6.    That the Trustee be authorized to take such action as may be necessary and appropriate to close the sale; and,

7.    For such other and further relief as the Court may deem just and appropriate.

Respectfully submitted, this the 4th day of January, 2019.

/s/ C. Edwin Allman III
C. Edwin Allman, III, Trustee
North Carolina State Bar #8625

OF COUNSEL:
ALLMAN SPRY DAVIS LEGGETT & CRUMPLER, P.A.
380 Knollwood Street, Suite 700
Post Office Drawer 5129
Winston-Salem, NC 27113-5129
Telephone:   336-722-2300

THIS ASSET PURCHASE AGREEMENT (together with the exhibits and schedules hereto, this "Agreement"), is made as of this 4th day of January, 2019, by and between Atlantic Coast Media Group, LLC, t/a Atlantic Coast Brands (the "Purchaser"), and Ei LLC (the "Seller"), as a Debtor (defined below) acting by and through its Trustee.

## WITNESSETH

WHEREAS, the Debtors (defined below) filed voluntary petitions with the United States Bankruptcy Court for the Middle District of North Carolina (the "Bankruptcy Court") for relief under Chapter 11, title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"); and

WHEREAS, the debtors in these cases are: (i) Ei LLC (Case No. 18-50945); (ii) Product Quest Manufacturing, LLC (Case No. 18-50946); (iii) Scherer Labs International, LLC (Case No. 18-50948); (iv) Product Quest Logistics, LLC (Case No. 18-50950); (v) JBTRS, L.L.C. (Case No. 18-50951); and (vi) PQ Real Estate LLC (Case No. 18-50952) (collectively, the "Debtors"), which are jointly administered as Case No. 18-50946 (the "Bankruptcy Case"); and

WHEREAS, on October 10, 2018, the Debtors filed the Conditional Motion to Convert Case to Chapter 7 (Dkt. 186), and on October 11, 2018, the Bankruptcy Administrator filed the Motion to Convert Case to Chapter 7 or For Appointment of a Chapter 11 Trustee ("Motion to Convert") (Dkt. 192); and

WHEREAS, the Bankruptcy Court granted the Motion to Convert and C. Edwin Allman, III was appointed to serve as the Trustee; and

WHEREAS, Purchaser desires to purchase from Seller and Seller desires to sell to Purchaser certain assets as more fully described herein, free and clear of all Liens (the "Sale"), subject to final approval by the Bankruptcy Court.

NOW, THEREFORE, for and in consideration of the representations, warranties, covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.    **Certain Definitions.**

As used herein, the following terms shall have the following meanings:

"Alternative Transaction" means a transaction pursuant to which the Trustee enters into one or more agreements to sell, transfer or otherwise dispose of the Sale Assets to one or more Persons other than Purchaser to the extent (i) the aggregate cash consideration for the Sale Assets (defined below) exceeds the sum of the Sale Price plus the Bid Protections plus the Initial Overbid and (ii) such transaction is actually consummated.

"Bid Protections" means, collectively, the Expense Reimbursement and the Break-up Fee protections set forth in this Agreement.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are required or authorized by law to be closed in New York, New York.

"Closing Date" means such date as the Closing occurs hereunder.

"FDA" means the United States Food and Drug Administration.

"Final Order" means an order of the Bankruptcy Court or other court of competent jurisdiction: (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion or alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (c) as to which no stay is in effect; provided, however, that the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within ten (10) days of the entry of the order at issue.

"Initial Overbid" means Twenty-Five Thousand Dollars ($25,000).

"Lien" means any lien, security interest, pledge, hypothecation, encumbrance or other interest or claim (including, but not limited to, any and all "claims," as defined in Section 101(5) of the Bankruptcy Code, and any and all rights and claims under any bulk transfer statutes and similar laws) in or with respect to any of the Sale Assets (including, but not limited to, any options or rights to purchase such Sale Assets and any mechanics' or tax liens), whether arising by agreement, by statute or otherwise and whether arising prior to, on or after the commencement of the Bankruptcy Case.

"Person" means any individual, corporation, partnership, joint venture, trust, association, limited liability company, unincorporated organization, other entity, or governmental body or subdivision, agency, commission or authority thereof.

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials, including, without limitation, stability data or documentation and Good Manufacturing Practice (GMP) documentation.

"Sale Approval Order" means an order of the Bankruptcy Court (i) approving the sale of the Sale Assets pursuant to 11 U.S.C. § 363(f) in accordance with the terms of this Agreement, (ii) declaring that, upon payment of all amounts hereunder and consummation of the Closing in accordance with this Agreement, the sale of the Sale Assets shall be free and clear of any liens, claims, encumbrances and interests, with such liens, claims, encumbrances and interests attaching to the proceeds of such sale with the same validity and priority as such liens, claims, encumbrances and interests applied against the Sale Assets immediately prior to the consummation of the sale, (iii) authorizing the Trustee to take all necessary actions to proceed to Closing in accordance with the terms hereof, (iv) authorizing the Trustee to execute all necessary documents and instruments to consummate the sale of the Sale Assets in accordance with the

-2-

terms hereof and (v) otherwise approving the transactions completed by this Agreement and the definitive documentation related hereto.

"Trustee" means C. Edwin Allman, III or such other person as may be appointed as trustee for the Debtors.

## 2. Sale and Purchase of Assets.

**2.1    Sale Assets.**  Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, Seller shall sell, assign, convey, transfer and deliver to Purchaser, and Purchaser shall, by Purchaser's payment of the Sale Price, purchase and acquire from Seller, on behalf of the Seller's bankruptcy estate, all of Seller's right, title and interest in and to the following assets (collectively, the "Sale Assets"), "as is, where is," pursuant to Section 363 of the Bankruptcy Code:

(a)    Abbreviated New Drug Application 078176 Theroxidil (Minoxidil 2%).

(b)    Abbreviated New Drug Application 076239 Theroxidil (Minoxidil 5%).

(c)    Any identified reserve samples (i.e., "retains") relating to the foregoing.

(d)    The Seller's Records consisting of stability data, Good Manufacturing Practice (GMP) documentation, internal audit reports, master production records, batch records, stability protocols and reports, deviation investigations, process validations, method validations, change controls, standard operating procedures, correspondence with any federal, state, local or foreign governmental authority and any documentation subject to inspection by the FDA or other governmental authority, in each case, (x) solely to the extent relating to the methods to be used in, and the controls to be used for, the manufacture, processing, packing, or holding of the items described in Sections 2.1(a) and 2.1(b) above as required under the Federal Food, Drug and Cosmetic Act as to the identity, strength, quality and purity characteristics to such items and (y) solely to the extent such Records remain subject to the provisions of Section 9.3.

(e)    Bulk Women's Minoxidil 2% Finished Goods (PQM-WMXD2-BK) described in Exhibit A attached hereto.

(f)    Packaging Dropper 20/410 White 1ml Medicine Dropped w/CRC Closure White (P799811) and Packaging Inserts (PQM-WMIN2-10) described in Exhibit A attached hereto.

**2.2    [Reserved].**

**2.3    Excluded Assets.**  Notwithstanding anything herein to the contrary, the Sale Assets shall not include the following assets (the "Excluded Assets"):

(a)    Cash now or subsequently held in bank accounts or otherwise by the Debtors or by the Trustee on behalf of the Debtors.

(b)     Accounts receivable, deposits, or other debts or obligations owed to the Debtors by or from any party, including any right of setoff, recoupment or reconciliation.

(c)     Computer servers and storage devices.

(d)     Any customer owned equipment or intellectual property either on loan or licensed to the Debtors, and other tangible or intangible assets which are the property of a party other than the Debtors.

(e)     Any rights of the Seller under this Agreement (including the right to receive any Sale Price hereunder).

(f)     Insurance policies, any claims thereunder (whether asserted prior to or after the date of the Closing) and the proceeds thereof.

(g)     Any claims or causes of action which may be asserted by or on behalf of the Debtors against any party, including but not limited to claims or causes of action under Code §§ 544, 547, 548, 549, 550 and 553.

(h)     Any other assets that are expressly excluded by the Trustee from the Sale.

**2.4     Assumption of FDA Fees.**  In addition to the Sale Price as defined below, Purchaser agrees to pay those current and past due fees due from Seller to the FDA with regard to the Sale Assets, together with any transfer fees resulting from the transaction contemplated herein. For the avoidance of doubt, neither Seller nor the Seller's estate shall have any obligation to pay, perform or discharge any of Seller's liabilities or obligations in respect of the Sale Assets (whether incurred before or after the Closing), including, any past due fees payable to the FDA or any other governmental authority or any fees payable in connection with the transfer of the Sale Assets or the recertification required to manufacture and sell the Sale Assets at the Purchaser's own facilities.

**2.5     Sale Free and Clear of Liens.**  Subject to consummation of the Sale and payment in full of the Sale Price (defined below) and the FDA fees assumed by Purchaser pursuant to Section 2.4, the Sale Assets shall be sold, transferred and conveyed free and clear of all Liens to the fullest extent permitted under Section 363 of the Bankruptcy Code, with all Liens transferred to proceeds of Sale with the same validity and priority as such Liens applied against the Sale Assets immediately prior to the consummation of the sale, pursuant to the Sale Approval Order.

**2.6     Sale Price.**  In consideration for the Sale Assets, subject to the other terms and conditions of this Agreement and the entry and effectiveness of the Sale Approval Order, Purchaser shall pay to Seller an amount in cash equal to the sum of $1,245,000.00 (the "Sale Price"). The Sale Price shall be paid in cash and in full on the Closing Date by wire transfer of immediately available U.S. funds to an account designated by Seller (subject to application of the Deposit Amount in accordance with Section 2.7 below). In addition to the foregoing, Purchaser hereby agrees that Purchaser will withdraw any claim asserted against any of the Debtors or their respective estates arising prior to the Closing

Date (whether arising before or after the petition date) after entry of the Sale Approval Order becoming a Final Order.

**2.7     Deposit.**    Upon execution and delivery of this Agreement to Seller, Purchaser shall deposit an amount equal to $249,000.00 (the "Deposit Amount") in the form of a wire transfer or cashier's check to be held in a non-interest-bearing segregated account designated by the Trustee and pending completion of the Closing (but subject to the provisions set forth below).

      (a)     If this Agreement is terminated pursuant to Sections 8.1(a), 8.1(b), 8.1(c), 8.1(f) or 8.1(g), the Deposit Amount submitted by the Purchaser shall be refunded to the Purchaser.

      (b)     If the Sale to the Purchaser occurs in a manner approved by the Bankruptcy Court, then the Deposit Amount shall be applied at Closing as a credit toward the Sale Price.

      (c)     If (x) the Sale Approval Order is entered by the Bankruptcy Court by the date that is 45 days from the date of this Agreement and (y) the Sale to the Purchaser does not occur, then the Deposit Amount shall be (i) retained by the Seller's estate as liquidated damages, if the Sale to the Purchaser shall fail to close by reason of a breach or default of the Purchaser and the Agreement is terminated pursuant to Section 8.1(d), or (ii) returned to the Purchaser, in the event that the Sale to the Purchaser shall fail to close by reason of a breach or default of the Seller and the Agreement is terminated pursuant to Section 8.1(e).

**2.8     Closing.**    The closing of the sale of the Sale Assets (the "Closing") must occur as soon as practicable but in any event within three (3) days of the date on which the Sale Approval Order becomes a Final Order (or such other date as the Trustee and the agent for its secured lenders may agree). The Closing will take place at a location to be mutually agreed upon by Purchaser and Seller. The transfer of the Sale Assets shall be effective for all purposes as of 12:01 a.m. eastern time on the day following the Closing Date.

**2.9     [Reserved].**

**2.10     Deliveries by Seller.**    At the Closing, Seller shall deliver or cause to be delivered to Purchaser the following (each in form and substance reasonably satisfactory to Purchaser):

      (a)     Duly executed bill of sale and (if applicable) a non-warranty deed transferring to Purchaser all right, title and interest in and to the Sale Assets free and clear of all Liens, without exception or condition except as provided herein, the form(s) of which are attached hereto as Exhibit B.

      (b)     A copy of the Sale Approval Order.

(c)     A letter to the FDA sufficient to notify the FDA of the transfer of the Sale Assets in conformity with 21 CFR 314.72, the form of which is attached hereto as Exhibit C.

(d)     Such other instruments or documents as Purchaser may reasonably request to fully effect the transfer of the Sale Assets and to confer upon Purchaser the benefits contemplated by this Agreement.

**2.11    Deliveries by Purchaser.**  At the Closing, Purchaser shall deliver, or cause to be delivered, the following:

(a)     The Sale Price less the Deposit Amount, as described in Section 2.6.

(b)     Such other instruments or documents as Seller may reasonably request to fully effect the transfer of the Sale Assets and to otherwise consummate the transactions contemplated by this Agreement.

**2.12    Transfer of Sale Assets.**  On or before the earlier of the date that is 5 days after entry of the Sale Approval Order and the Closing Date, Purchaser and Seller shall agree on the time and method in which Purchaser shall obtain possession of the Sale Assets. Upon consummation of the Closing, Seller shall make the Sale Assets available to Purchaser and Purchaser shall take possession of such Sale Assets in accordance such agreement.

3.    **Representations and Warranties of Purchaser.**

Purchaser hereby represents and warrants to Seller that the statements contained in this Article 3 are correct and complete as of the date hereof and as of the Closing Date:

(a)     Purchaser has cash available or has existing borrowing facilities or unconditional, binding funding commitments that are sufficient to enable it to timely consummate a Sale hereunder, without incurrence of any obligation, commitment, restriction or liability of any kind which would impair or adversely affect the transactions contemplated by this Agreement.

(b)     Purchaser has not taken any action that would cause Seller to have any obligation or liability to any Person for finders' fees, brokerage fees and commissions or like payments in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

(c)     Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges the condition of the Sale Assets and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in Section 4 hereof, and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Sale Assets are being transferred on a "WHERE IS" and, as to condition, "AS IS" basis and "WITH ALL FAULTS." Without in any way

-6-

limiting the foregoing, Seller hereby disclaims any warranty (express or implied) or merchantability or fitness for any particular purpose as to any portion of the Sale Assets.

4.    **Representations and Warranties of Seller.**

Seller hereby represents and warrants to Purchaser that the statements contained in this Article 4 are correct and complete as of the date hereof and as of the Closing Date:

(a)    At the Closing Seller shall have and convey to Purchaser, good, valid and marketable title to the Sale Assets, free and clear of all Liens.

(b)    Seller has not taken any action that would cause Purchaser to have any obligation or liability to any Person for finders' fees, brokerage fees and commissions or like payments in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

(c)    Except as expressly set forth herein, Seller makes no representation or warranty, express or implied, at law or in equity, with respect to Seller and the Sale Assets or any other information provided to Purchaser, its agents or representatives in connection with or in expectation of the transactions contemplated by this Agreement.  Seller does not make any representations or warranties regarding information, documents, projections, forecasts or other material made available to Purchaser, its agents or representatives in connection with or in expectation of the transactions contemplated in this Agreement except to the extent such information is expressly and specifically included in a representation or warranty contained in this Article.

5.    **Bankruptcy Court Approval.**

5.1    Seller and Purchaser acknowledge and agree that the Bankruptcy Court's entry of the Sale Approval Order is required in order for Seller and Purchaser to consummate the transactions contemplated hereby and that the requirement that the Sale Approval Order be entered is a condition that cannot be waived by any party hereto. The parties agree that the Bankruptcy Court shall have exclusive jurisdiction to hear, determine and enter final orders with respect to any dispute arising out of this Agreement.

5.2    Seller shall seek: (i) the Bankruptcy Court's approval of this Agreement (including the Bid Protections) and Seller's performance under this Agreement generally; and (ii) the entry of the Sale Approval Order.  Seller shall use commercially reasonable efforts to obtain a waiver of the fourteen (14) day period imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure by the Bankruptcy Court in the Sale Approval Order.  Purchaser shall take such actions as are reasonably requested by Seller to assist Seller in obtaining a finding by the Bankruptcy Court that Purchaser is deemed to have purchased the Sale Assets in good faith pursuant to section 363(m) of the Bankruptcy Code.

**5.3**     If the Sale Approval Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Approval Order or other such order), subject to rights otherwise arising from this Agreement, Seller and Purchaser shall use their commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

**5.4**     Notwithstanding anything contained herein to the contrary, but subject to Section 8.2, from the date of this Agreement (and any prior time) and until the entry of the Sale Approval Order, Seller is permitted to cause their respective representatives to initiate contact with, solicit, or encourage submission of any inquiries, proposals, or offers by any Person in connection with any sale or other disposition of the Sale Assets. The Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Sale Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Sale Assets to prospective buyers.

**6.     Conditions Precedent to Obligations of Purchaser.**

The obligation of Purchaser to consummate the transactions contemplated herein is subject to the satisfaction, at or before the Closing, of each of the following conditions:

**6.1**     The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on the Closing Date. Seller shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date.

**6.2**     The Bankruptcy Court shall have entered the Sale Approval Order in form reasonably satisfactory to Purchaser containing findings that (i) Purchaser is a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arms' length purchaser; (ii) the Sale Price is fair and reasonable; (iii) this Agreement was negotiated at arms' length; and (iv) the sale of the Sale Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code, and which Sale Approval Order is a Final Order.

**6.3**     Purchaser shall have received all documents and other items to be delivered by Seller under Section 2.10.

**7.     Conditions Precedent to the Obligations of Seller.**

The obligation of Seller to consummate the transactions contemplated herein is subject to the satisfaction, at or before the Closing, of each of the following conditions:

-8-

**7.1**    The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on the Closing Date.  Purchaser shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Purchaser on or before the Closing Date.

**7.2**    The Bankruptcy Court shall have entered the Sale Approval Order containing findings that (i) Purchaser is a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arms' length purchaser; (ii) the Sale Price is fair and reasonable; (iii) this Agreement was negotiated at arms' length; and (iv) the sale of the Sale Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code, and which Sale Approval Order is a Final Order.

**7.3**    Seller shall have received or concurrently receive the Sale Price and other items to be delivered by Purchaser under Section 2.11.

**8.**    <u>**Termination of Agreement; Bid Protections.**</u>

**8.1**    This Agreement may be terminated only as follows:

(a)    By mutual written agreement of both Seller and Purchaser at any time.

(b)    By Seller or Purchaser, if the Bankruptcy Court does not enter the Sale Approval Order by that date that is forty five (45) days from the date of this Agreement.

(c)    By Seller or Purchaser, if the Closing shall not have occurred on or prior to ten (10) days after the entry of the Sale Approval Order becoming a Final Order, for any reason other than such party's breach of this Agreement.

(d)    By the Seller, if Purchaser shall have breached or failed to perform in any material respect any of its respective representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform cannot be or has not been cured prior to the date that is ten (10) days from the date that Purchaser is notified by the Seller of such breach or failure to perform; provided, however, that the Seller shall not have a right to terminate this Agreement under this Section if the Seller is then in material breach of this Agreement.

(e)    By Purchaser, if the Seller shall have breached or failed to perform in any material respect any of its respective representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform cannot be or has not been cured prior to the date that is ten (10) days from the date that the Seller is notified by Purchaser of such breach or failure to perform; provided, however, that Purchaser shall not have a right to terminate this

-9-

Agreement under this Section if Purchaser is then in material breach of this Agreement.

    (f)    Automatically and without any action or notice by Seller or Purchaser, immediately upon entry of a Final Order by the Bankruptcy Court approving an Alternative Transaction unless Purchaser is designated a "back-up bidder" under such Final Order.

    (g)    Automatically and without any action or notice by Seller or Purchaser, immediately upon the consummation of an Alternative Transaction.

    **8.2**    To the extent that this Agreement is terminated pursuant to Section 8.1(g), then in consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification, diligence, and quantification of the Sale Assets of Seller, Seller shall pay to Purchaser (x) an amount necessary to reimburse Purchaser for its actual, reasonable and out-of-pocket expenses in the diligence, negotiation and preparation of documents related to the transactions contemplated by this Agreement, not to exceed $100,000 in the aggregate (the "Expense Reimbursement") and (y) a break-up fee in an amount equal to 4% of the Sale Price (the "Break-up Fee"). The Expense Reimbursement and Break-up Fee shall not be applicable for any other termination of this Agreement.

**9.**    <u>**Miscellaneous Provisions.**</u>

    **9.1**    <u>**Transaction Expenses.**</u>  Except as expressly provided for herein (including Section 8.2), each party shall pay all fees, costs and expenses incurred by it with respect to this Agreement, whether or not the transactions contemplated hereby are consummated.

    **9.2**    <u>**Further Assurances.**</u>  Purchaser and Seller shall, from time to time after the Closing, without further consideration, execute and deliver such instruments and take such further actions as may be reasonably necessary or desirable to carry out the provisions hereof and the transactions contemplated hereby.

    **9.3**    <u>**Availability of Records.**</u>  From and after the Closing, Purchaser shall promptly provide to Seller (after reasonable notice and during normal business hours and without charge to the Debtors or the Trustee) access to all Records included in the Sale Assets for periods prior to the Closing, and shall preserve such Records and provide such access until the latest of (i) 45 days after the Closing Date, (ii) the required period for retention pursuant to any governmental authority or applicable law, (iii) the conclusion of all bankruptcy proceedings relating to the Bankruptcy Case and (iv) the resolution of any claims under insurance policies. Such access shall include access to any information in electronic form to the extent reasonably available. Purchaser acknowledges that Debtors and the Trustee have the right to retain originals or copies of all of Records included in the Sale Assets for periods prior to the Closing. Prior to destroying any Records included in the Sale Assets for periods prior to the Closing, Purchaser shall notify the Trustee

thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Purchaser shall permit Debtors and the Trustee to retain such Records, at the Debtors' cost and expense.

**9.4    Notifications.** From the date of this Agreement until the earlier of the Closing or the termination of this Agreement, Seller shall give Purchaser prompt written notice of the occurrence of any of the following events:

(a)    Any loss, taking, condemnation, damage or destruction of or to any of the Sale Assets.

(b)    The commencement of any proceeding or litigation at law or in equity or any other commission, agency or administrative or regulatory body or authority against Seller which would prohibit the Sale of the Sale Assets pursuant to an order of the Bankruptcy Court.

(c)    Any other materially adverse developments with respect to the Sale Assets.

(d)    Any event, occurrence or fact that causes any of the representations or warranties to be untrue at any time in any material respect; provided, that no disclosure by Seller pursuant to this section shall be deemed to amend or supplement any provision of this Agreement or to prevent or cure any misrepresentation, breach of warranty or breach of covenant.

**9.5    Survival.** The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and neither of the parties nor any of its respective officers, directors, representatives, employees, advisors or agents shall have any liability to the other after the Closing for any breach thereof. The parties hereto agree that only the covenants contained in this Agreement that are expressly required to be performed at or after the Closing Date shall survive the Closing hereunder, and each of the parties hereto shall be liable to the other after the Closing Date for any breach thereof.

**9.6    Jurisdiction.** The parties agree that the Bankruptcy Court shall retain the exclusive and sole jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the implementation or the breach hereof. The parties consent to the core jurisdiction of the Bankruptcy Court, to the constitutional authority of the Bankruptcy Court to enter a final judgment, and agree to have waived any right to a jury trial in connection with any disputes related to or arising out of this Agreement.

**9.7    Notices.** All notices, consents or other communications required or permitted hereunder shall be given in writing and hand delivered or addressed and sent by Federal Express or other recognized overnight courier, or by certified or registered mail, postage prepaid, and return receipt requested, as follows or to such other address as may hereafter be designated by any party by the giving of notices in accordance with this Section 9.7:

-11-

(a)    If to Seller:    C. Edwin Allman, III, Trustee, PO Box 5129, Winston-Salem, NC 27113 email: ceallman@allmanspry.com

(b)    With a copy to:    Dimitri G. Karcazes, counsel for Madison Capital Funding LLC, as Agent for the Lenders to the Seller, 55 East Monroe Street, Suite 3300, Chicago, IL 60603 email: dimitri.karcazes@goldbergkohn.com

(c)    If to Purchaser:  Andrew J. Surwilo, Managing Member, Atlantic Coast Media Group, LLC , 100 Town Square Place, 6th Floor, Jersey City, NJ 07310 email: drew@atlanticcoastbrands.com.

(d)    With a copy to: Roy M. Terry, counsel for Atlantic Coast Media Group, LLC, 1111 East Main Street, Suite 2400 Richmond,   VA 23219 email: rterry@sandsanderson.com.

(e)    All notices, consents or other communications shall be deemed given when actually delivered (in the case of hand delivery by Federal Express or other recognized overnight courier) or five days after mailing in accordance with this Section 9.7.

**9.8    Governing Law.**  To the extent not governed by the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina, without giving effect to rules governing the conflict of laws.

**9.9    Waiver.**  The waiver by a party of a breach of any covenant, agreement or undertaking contained herein shall be made only by a written waiver in each case.  No waiver of any breach of any covenant, agreement or undertaking contained herein shall operate as a waiver of any prior or subsequent breach of the same covenant, agreement or undertaking or as a waiver of any breach of any other covenant, agreement or undertaking.

**9.10    Severability.**  If any provision of this Agreement shall be held invalid, illegal or unenforceable, in whole or in part, the validity, legality, and enforceability of the remaining part of such provision, and the validity, legality and enforceability of all other provisions hereof or thereof, shall not be affected thereby.

**9.11    Counterparts.**  This Agreement may be executed in one or more counterparts (whether manually signed or by facsimile or other electronic means), each such counterpart shall be deemed an original, and all such counterparts shall constitute one and the same agreement.

**9.12    Captions: References.**  The headings, titles or captions of the Articles and Sections of this Agreement are inserted only to facilitate reference, and they shall not define, limit, extend or describe the scope or intent of this Agreement or any provision hereof, and they shall not constitute a part hereof or affect the meaning or interpretation of this Agreement or any part hereof.

**9.13    Amendments.**  This Agreement may not be amended, changed, modified, altered or terminated unless the parties hereto mutually agree in writing to such amendment, change, modification, alteration or termination.

**9.14    Remedies Cumulative; Specific Performance.**  Except as otherwise expressly provided in this Agreement, no remedy herein conferred is exclusive of any other available remedy and each and every such remedy shall be cumulative and shall be in addition to every other remedy given by agreement or now or hereafter existing at law or in equity or by statute.  Except as otherwise expressly provided in this Agreement, in addition to any and all other remedies that may be available at law, in the event of any breach of this Agreement each party shall be entitled to seek specific performance of the agreements and obligations hereunder and to such other injunctive or equitable relief as may be granted by a court of competent jurisdiction.

**9.15    Binding Nature; Assignment.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interest or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other party; provided, however, that the Seller's rights under this Agreement, including, without limitation, the Seller's rights to enforce this Agreement, have been assigned for collateral security purposes to the Seller's secured lenders (and the agent therefor) and Purchaser acknowledges such assignment and the rights of the Seller's secured lenders (and the agent therefor) to enforce the rights of Seller under this Agreement as well as the right of Seller to designate the secured lenders to directly receive any amounts owed to Seller under this Agreement.  Nothing contained herein, express or implied, is intended to confer on any Person other than the parties hereto or their successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

**9.16    No Third-Party Beneficiaries.**  This Agreement is a contract solely between Purchaser and Seller.  No third party beneficiaries, (including, without limitation, employees and customers of Seller) are intended hereunder and none shall be inferred herein; and no party other than Purchaser or Seller may assert any right, make any claim or otherwise attempt to enforce any provision of or under this Agreement; provided, however, that the Seller's secured lenders (and the agent therefor) are express third party beneficiaries for purposes of Section 2.8, Section 9.15, this Section 9.16 and Section 9.17 and Purchaser acknowledges the rights of Seller's secured lenders (and the agent therefor) as a result thereof.

**9.17    Release and Waiver.**  Effective upon the Closing, except as set forth in this Agreement, the Purchaser hereby irrevocably waives, releases, and discharges Seller, solely in Seller's capacity as the owner of the Sale Assets, each of Seller's Affiliates (in each such Person's capacity as an Affiliate of such Seller), and Seller's secured lenders (and the agent therefor) (in such Person's capacity as a lender (or agent for such lender) of Seller) from any and all liabilities or debts to its business and the Purchaser of any nature or kind whatsoever (including in respect of rights of contribution or indemnification).

[signatures on following page]

**IN WITNESS WHEREOF**, the parties have caused their duly authorized officers to execute this Agreement as of the day and year first above written.

**ATLANTIC COAST MEDIA GROUP, LLC**
Purchaser

By: Andrew J. Surwilo, Managing Member

**EI LLC**
For itself acting as "Seller"

By: _____
    C. Edwin Allman, III, Trustee

Signature Page to Asset Purchase Agreement

Exhibit A

| Minoxidil | (excludes all reject status) | | | | |
|---|---|---|---|---|---|
| | | | | | |
| Type | Sub Type | Item | Desc | Qty | U/M |
| Finished Goods | Finished Goods | PQM-WMXD2-BK | BULK WOMEN'S MINOXIDIL 2% (30 DAY) | 33,264 | EA |
| Packaging | Dropper | P79981 | 20/410 White 1ml Medicine Dropper w/CRC Closure White | 34,000 | EA |
| Packaging | Inserts | PQM-WMIN2-10 | WOMEN'S MINOXIDIL 2% GENERIC INSERTS | 31,826 | EA |

**Exhibit B**

## BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

This Bill of Sale and Assignment and Assumption Agreement (this "Agreement") is made and entered into effective as of _____, 2019 by and between Atlantic Coast Media Group, LLC, t/a Atlantic Coast Brands ("Purchaser") and Ei LLC ("Seller"). Seller and Purchaser may each be referred to herein as a "Party" and collectively as the "Parties."

### RECITALS

WHEREAS, Seller and Purchaser have entered into that certain Asset Purchase Agreement, dated as of _____, 2019 (as the same may be amended, restated, supplemented or modified from time to time, the "Asset Purchase Agreement"); and

WHEREAS, pursuant to the Asset Purchase Agreement, Seller has agreed to sell the Sale Assets, and Purchaser has agreed to purchase the Sale Assets and assume the FDA Fees.

WHEREAS, Purchaser has agreed to accept assignment of the Sale Assets and assume the FDA Fees, all on the terms and conditions set forth in the Asset Purchase Agreement.

### AGREEMENT

NOW, THEREFORE, for consideration of the mutual agreements and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. **Definitions.** Unless otherwise specifically provided herein, capitalized terms used in this Agreement and not otherwise defined herein shall have the respective meanings ascribed thereto in the Asset Purchase Agreement.

2. **Conveyance and Acceptance.** In accordance with the provisions of the Asset Purchase Agreement, Seller hereby sells, transfers, conveys, assigns and delivers to Purchaser all of Seller's right, title and interest in and to the Sale Assets, and Purchaser hereby purchases and accepts the Sale Assets, in each case, free and clear of all Liens.

3. **Assumption of FDA Fees.** Purchaser hereby assumes, and will hereafter pay, discharge or perform when due all those current and past due fees due from Seller to the FDA with regard to the Sale Assets, together with any transfer fees resulting from the transaction contemplated herein.

4. **Asset Purchase Agreement Controls.** Notwithstanding any other provision of this Agreement to the contrary, nothing contained herein shall in any way supersede, modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions, including warranties, covenants, agreements, conditions, representations or, in general any of the rights and remedies, or any of the obligations of Purchaser or Seller set forth in the Asset Purchase Agreement. This Agreement is subject to and governed entirely in accordance with the terms and conditions of the Asset Purchase Agreement. Nothing contained herein is intended to modify or supersede any of the provisions of the Asset Purchase Agreement.

5. **Miscellaneous.**

    a) This Agreement may be amended, modified, superseded or canceled, and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the parties or, in the case of a waiver, by or on behalf of the party waiving compliance. No course of dealing between the parties shall be effective to amend of waive any provision of this Agreement.

1

b) This Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and permitted assigns.

c) In the event that any provision contained in this Agreement shall for any reason be held to be illegal, invalid or unenforceable in any jurisdiction, such provision shall be ineffective as to such jurisdiction to the extent of such invalidity, illegality or unenforceability without invalidating or affecting the remaining provisions hereof or affecting the validity, legality or enforceability of such provision in any other jurisdiction. Upon such a determination, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

d) This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when each party hereto shall have received counterparts hereof signed by each of the other parties hereto. If any signature is delivered by facsimile transmission or by PDF or similar electronic means, such signature shall create a valid and binding obligations of the party executing (or on whose behalf the signature is executed) with the same force and effect as if such facsimile or PDF electronic signature were an original thereof.

**IN WITNESS WHEREOF**, the Parties hereto have each caused this Agreement to be duly executed as of the Closing Date.

_____

Purchaser

By: _____

Name: _____

Title: _____

**EI LLC**
For itself acting as "Seller"

By: _____
    C. Edwin Allman, III, Trustee

2

**Exhibit C**

Form of Seller Change in Ownership Letter

[Seller's Letterhead]

[Date], 2019

[Address of FDA Contact]

Re: ANDA 078176 Theroxidil (Minoxidil 2%) and ANDA 076239 Theroxidil (Minoxidil 5%)

[Product Name]

Transfer of ANDA Ownership

Dear Sir/Madame:

With this letter, we wish to notify the Food and Drug Administration ("FDA") consistent with 21 C.F.R. § 314.72(a)(1) that, effective        , 2019, Ei LLC has transferred all rights to the above-referenced Abbreviated New Drug Application(s) ("ANDA") to Atlantic Coast Media Group, LLC, t/a Atlantic Coast Brands (the "Purchaser").

Written acknowledgement of the change in ANDA ownership would be appreciated. Please contact [Seller contact's name, phone number and email address] or [Purchaser contact's name, phone number and email address] if you have any comments or questions regarding this letter.

This submission is being provided in electronic format. For technical issues unrelated to the content of this submission, please contact [name] at [phone number].

Sincerely,


[Seller]