

**SO ORDERED.**

**SIGNED this 30th day of January, 2019.**

*Lena Mansori James*
LENA MANSORI JAMES
UNITED STATES BANKRUPTCY JUDGE

---

**IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION**

| | | |
|---|---|---|
| In re: | ) | **Chapter 7** |
| | ) | |
| **Product Quest Manufacturing, LLC,** *et al.,*[1] | ) | **Case No. 18- 50946** |
| | ) | **(Jointly Administered)** |
| Debtors. | ) | |

---

**ORDER APPROVING SALE OF
MINOXIDIL ASSETS, FREE AND CLEAR OF LIENS,
CLAIMS AND ENCUMBRANCES TO PURE SOURCE, LLC;
APPROVING THE ASSET PURCHASE AGREEMENT;
AND GRANTING RELATED RELIEF**

THIS MATTER came on for hearing on January 23, 2019, upon Order and Notice of Expedited Hearing [*Docket #360*], before the Honorable Lena M. James, Bankruptcy Judge for the Middle District of North Carolina, upon Trustee's Motion for Order Authorizing and Approving the Private Sale of Minoxidil Assets Free and Clear of Liens, Claims and Encumbrances; Approving the Asset Purchase Agreement; and Granting Related Relief (the "Minoxidil Sale Motion") [*docket #354*].

---

[1]    The Debtors in these cases, along with the associated case number, are: (i) Ei LLC (18-50945); (ii) Product Quest Manufacturing, LLC (18-50946); (iii) Scherer Labs International, LLC (18-50948); (iv) Product Quest Logistics, LLC (18-50950); (v) JBTRS, L.L.C. (18-50951); and (vi) PQ Real Estate LLC (18-50952).  The Debtors' service address is: 2865 N. Cannon Blvd., Kannapolis, North Carolina 28083.

By the Minoxidil Sale Motion the Trustee in the Ei LLC Case (Case No. 18-50945) ("Seller" or "Trustee") sought approval and authority to sell the Minoxidil Assets owned by Ei LLC ("Debtor") (as defined in the Minoxidil Sale Motion and the accompanying Asset Purchase Agreement), to Atlantic Coast Media Group, LLC, t/a Atlantic Coast Brands ("Atlantic Coast Brands"), free and clear of liens, for the sum $1,245,000.00.

IT APPEARS TO THE COURT that the proposed sale of the Minoxidil Assets to Atlantic Coast Brands was the result of a bidding process implemented by Madison Capital Funding, LLC, as agent for the secured lenders in all of the cases ("Lender") and the Trustee pursuant to which prospective purchasers were invited to submit their best and highest bid no later than December 14, 2018.  Upon reviewing bids received by that date Lender and the Trustee determined that the highest and best bid for the Minoxidil Assets was submitted by Atlantic Coast Brands and thereafter an Asset Purchase Agreement was negotiated and executed by the parties (the "ACB Asset Purchase Agreement") and the Minoxidil Sale Motion was filed with the ACB Asset Purchase Agreement as an Exhibit.  Because of the interest in the Minoxidil Assets, the ACB Asset Purchase Agreement and the Minoxidil Sale Motion made provisions for the possibility that a higher bidder would emerge at the hearing and provisions relating to a four percent (4%) breakup fee, an expense reimbursement, a deposit, an incremental price increase and additional incremental bidding were included in the Minoxidil Sale Motion and the ACB Asset Purchase Agreement.  This information was also included in the Order and Notice of Expedited Hearing.

IT FURTHER APPEARS TO THE COURT that on January 17, 2019, Notice of Intent to Extend Enhanced Bid was filed by Pure Source LLC ("Pure Source") [*docket #404*].  Attached to the Notice was a Term Sheet wherein Pure Source indicated an intent to bid $1,400,000.00 for the Minoxidil Assets on terms consistent with the ACB Asset Purchase Agreement attached to the Minoxidil Sale Motion.

IT FURTHER APPEARS TO THE COURT that on January 22, 2019, Pure Source filed an Objection to the Minoxidil Sale Motion [*docket #*406] and, in its Objection, Pure Source suggested, among other things, that the bid protection afforded Atlantic Coast Brands was excessive.

IT FURTHER APPEARS TO THE COURT  that this Court has jurisdiction (i) to consider the Minoxidil Sale Motion and (ii) over the property of the Debtor, including the Minoxidil Assets to be sold, transferred, and conveyed pursuant to the Agreement, under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of this case and the Minoxidil Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

IT FURTHER APPEARS TO THE COURT that the legal predicates for the relief sought in the Minoxidil Sale Motion are Bankruptcy Code sections 105(a), 363(b), 363(f), 363(m),

ASDLC|385517

541(a), 1107, and 1108 and Bankruptcy Rules 2002, 6004 and 9006 Bankruptcy Rules 2002, 6004 and 9006.

THAT IT FURTHER APPEARS TO THE COURT that as evidenced by the affidavit of service filed with the Court and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate, and sufficient notice of the Minoxidil Sale Motion, the Sale Hearing, the Asset Purchase Agreement has been provided in accordance with Bankruptcy Code sections 102(1) and 363 and Bankruptcy Rules 2002, 6004, and 9006 to each party entitled to such notice, (ii) such notice was good, sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Minoxidil Sale Motion, the Sale Hearing, the Asset Purchase Agreement is or shall be required.

THAT IT FURTHER APPEARS TO THE COURT that the consideration provided by Pure Source under the Asset Purchase Agreement constitutes the highest or otherwise best offer for the Minoxidil Assets and provides fair consideration to Seller in exchange for the Minoxidil Assets. The transaction contemplated by the Asset Purchase Agreement represents the best opportunity to maximize and realize the value of the Minoxidil Assets for the estate. Consummation of the Sale Transaction at this time is in the best interests of Seller, the Trustee, the  Debtor's estate, its creditors, and all other parties in interest.

THAT IT FURTHER APPEARS TO THE COURT that the sale of the Minoxidil Assets must be approved and consummated promptly in order to preserve the value of the Minoxidil Assets. To maximize the value of the Minoxidil Assets, it is essential that the Sale Transaction occur within the timeframe set forth in the Asset Purchase Agreement.

THAT IT FURTHER APPEARS TO THE COURT that Pure Source is not and shall not be deemed a successor to the Seller or the Debtor as a result of the consummation of the Sale.

IT FURTHER APPEARS TO THE COURT that at the hearing Pure Source and Atlantic Coast Brands both appeared through their respective counsel.  Also appearing were the Trustee, Lender's counsel, and the Assistant Bankruptcy Administrator.

IT FURTHER APPEARS TO THE COURT from presentations  from  the  various counsel, that an agreement satisfactory to all parties was reached pursuant to which Pure Source will acquire the Minoxidil Assets for $1.4 million under substantially the same terms as established in the ACB Asset Purchase Agreement other than the terms relating to the bid protections afforded to Atlantic Coast Brands in the form attached hereto (the "Pure Source Asset Purchase Agreement").  As a result of the parties' agreement the Pure Source objection was withdrawn.  Pursuant to the parties' agreement, from the sale proceeds Atlantic Coast Brands will be paid the sum of $130,000.00 representing an agreed break-up fee of $49,800.00 and an expense reimbursement of $80,200.00, in full satisfaction of the Bid Protections in favor of

3

Atlantic Coast Brands under the ACB Asset Purchase Agreement. The Court notes that Lender is substantially under collateralized in this case and since it will be the recipient of the sale proceeds and since it has consented to the agreement reached by the parties, the Court will not take issue with either the agreed upon breakup fee or the agreed upon expense reimbursement. However, the Court points out that its allowance of such in this case should not be considered of any precedential value in future cases. The Court acknowledges that the Bankruptcy Administrator likewise expressed concern over the amount of the breakup fee and expense reimbursement; however, in view of the unique circumstances of this case, the Bankruptcy Administrator did not object to the agreement reached by the parties.

Based on representations of the Trustee and other counsel, the Court finds that Pure Source is a good faith purchaser of the Minoxidil Assets and is entitled to all of the protection afforded by Section 363(m) of the Bankruptcy Code. The Court further finds that the sale of the Minoxidil Assets was conducted in a "non-collusive" manner within the meaning of Section 363(n) of the Bankruptcy Code.

Further, the Court finds that the Minoxidil Assets were competitively marketed and that the sale price to be paid by Pure Source is fair and reasonable.

Further, the Court finds that counsel for Lender represented to the Court Lender's consent to the sale of the Minoxidil Assets in accordance with the terms of the Pure Source Asset Purchase Agreement and this Sale Order free and clear of liens with the liens attaching to the proceeds of sale with the same validity and priority as such liens applied against the Minoxidil Assets immediately prior to the consummation of the sale, thus satisfying the statutory predicate set forth in Section 363(f)(2) of the Bankruptcy Code.

Finally, the Court finds that the parties intend to close on the sale of the Minoxidil Assets pursuant to the Pure Source Asset Purchase Agreement soon after entry of this Sale Order and the Court will therefore waive the fourteen (14) day stay period imposed by Bankruptcy Rule 6004(h).

NOW, THEREFORE, based on the foregoing and for other good and sufficient cause shown, it is hereby

ORDERED, ADJUDGED and DECREED as follows:

1.      The sale of the Minoxidil Assets to Pure Source, LLC, for the sum of $1.4 million pursuant to the terms of the Pure Source Asset Purchase Agreement is approved;

2.      The sale shall be free and clear of liens with such liens attaching to the proceeds of sale and that this Order: (a) shall be effective as a determination that, as of the Closing Date, (i) no Liens will be capable of being asserted against Pure Source  (ii) the Minoxidil Assets shall

4

ASDLC|385517

have been transferred to Pure Source free and clear of all Liens, and (iii) the conveyances described herein have been effected; and (b) is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Assets Purchase Agreement;

3.      Pure Source, LLC, is a good faith purchaser and is entitled to all the benefits afforded by Section 363(m) of the Bankruptcy Code and that as of the closing date, all of Seller's legal, equitable, and beneficial right, title, interest in, and possession of the Minoxidil Assets shall be immediately vested in Pure Source pursuant to Bankruptcy Code sections 105(a), 363(b), and 363(f). Such transfer shall constitute a legal, valid, binding, and effective transfer of the Minoxidil Assets and shall vest Pure Source with good and marketable title to the Minoxidil Assets. All persons or entities, presently, or on or after the Closing Date, in possession of some or all of the Minoxidil Assets are directed to surrender possession of the Minoxidil Assets directly to Pure Source or its designees on the Closing Date or at such time thereafter as Pure Source may request.

4.      Pure Source is not and shall not be deemed a successor to the Debtor, Trustee or Seller as a result of the consummation of the Sale Transaction, except with respect to the business conducted by the Debtor or its assets. By virtue of the transaction contemplated by the Asset Purchase agreement, Pure Source shall not be deemed to: (i) have, de facto or otherwise, merged with or into Seller or the Debtor; or (ii) be a mere continuation or substantial continuation of Seller or the Debtor or the enterprise or operations of Seller or the Debtor.

5.      A breakup fee of $49,800.00 and an expense reimbursement amount of $80,200.00 is approved and shall be paid to Atlantic Coast Brands by the Trustee from the sale proceeds in full satisfaction of the "Bid Protections" (as defined in the ACB Asset Purchase Agreement) in favor of Atlantic Coast Brands under the ACB Asset Purchase Agreement;

6.      The Pure Source Asset Purchase Agreement is approved and the Trustee is authorized to take such reasonable action a may be necessary to consummate the sale pursuant to the terms of the Pure Source Asset Purchase Agreement; and,

7.      The sale proceeds shall be administered by the Trustee in a manner consistent with the Final Cash Collateral Order entered in this case on November 19, 2018 [*docket #310*].

ASDLC\385517

5

8.      This Court shall retain exclusive jurisdiction to, among other things, interpret, enforce, and implement the terms and provisions of this Order and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Asset Purchase Agreement.

- END OF DOCUMENT -

ASDLC|385517

THIS ASSET PURCHASE AGREEMENT (together with the exhibits and schedules hereto, this "Agreement"), is made as of this 16th day of January, 2019, by and between Pure Source, LLC (the "Purchaser"), and Ei LLC (the "Seller"), as a Debtor (defined below) acting by and through its Trustee.

## WITNESSETH

WHEREAS, the Debtors (defined below) filed voluntary petitions with the United States Bankruptcy Court for the Middle District of North Carolina (the "Bankruptcy Court") for relief under Chapter 11, title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"); and

WHEREAS, the debtors in these cases are: (i) Ei LLC (Case No. 18-50945); (ii) Product Quest Manufacturing, LLC (Case No. 18-50946); (iii) Scherer Labs International, LLC (Case No. 18-50948); (iv) Product Quest Logistics, LLC (Case No. 18-50950); (v) JBTRS, L.L.C. (Case No. 18-50951); and (vi) PQ Real Estate LLC (Case No. 18-50952) (collectively, the "Debtors"), which are jointly administered as Case No. 18-50946 (the "Bankruptcy Case"); and

WHEREAS, on October 10, 2018, the Debtors filed the Conditional Motion to Convert Case to Chapter 7 (Dkt. 186), and on October 11, 2018, the Bankruptcy Administrator filed the Motion to Convert Case to Chapter 7 or For Appointment of a Chapter 11 Trustee ("Motion to Convert") (Dkt. 192); and

WHEREAS, the Bankruptcy Court granted the Motion to Convert and C. Edwin Allman, III was appointed to serve as the Trustee; and

WHEREAS, Purchaser desires to purchase from Seller and Seller desires to sell to Purchaser certain assets as more fully described herein, free and clear of all Liens (the "Sale"), subject to final approval by the Bankruptcy Court.

NOW, THEREFORE, for and in consideration of the representations, warranties, covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1. **Certain Definitions.**

As used herein, the following terms shall have the following meanings:

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are required or authorized by law to be closed in New York, New York.

"Closing Date" means such date as the Closing occurs hereunder.

4870693-2

**ATTACHMENT**

"FDA" means the United States Food and Drug Administration.

"Final Order" means an order of the Bankruptcy Court or other court of competent jurisdiction: (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion or alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (c) as to which no stay is in effect; provided, however, that the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within ten (10) days of the entry of the order at issue.

"Lien" means any lien, security interest, pledge, hypothecation, encumbrance or other interest or claim (including, but not limited to, any and all "claims," as defined in Section 101(5) of the Bankruptcy Code, and any and all rights and claims under any bulk transfer statutes and similar laws) in or with respect to any of the Sale Assets (including, but not limited to, any options or rights to purchase such Sale Assets and any mechanics' or tax liens), whether arising by agreement, by statute or otherwise and whether arising prior to, on or after the commencement of the Bankruptcy Case.

"Person" means any individual, corporation, partnership, joint venture, trust, association, limited liability company, unincorporated organization, other entity, or governmental body or subdivision, agency, commission or authority thereof.

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials, including, without limitation, stability data or documentation and Good Manufacturing Practice (GMP) documentation.

"Sale Approval Order" means an order of the Bankruptcy Court (i) approving the sale of the Sale Assets pursuant to 11 U.S.C. § 363(f) in accordance with the terms of this Agreement, (ii) declaring that, upon payment of all amounts hereunder and consummation of the Closing in accordance with this Agreement, the sale of the Sale Assets shall be free and clear of any liens, claims, encumbrances and interests, with such liens, claims, encumbrances and interests attaching to the proceeds of such sale with the same validity and priority as such liens, claims, encumbrances and interests applied against the Sale Assets immediately prior to the consummation of the sale, (iii) authorizing the Trustee to take all necessary actions to proceed to Closing in accordance with the terms hereof, (iv) authorizing the Trustee to execute all necessary documents and instruments to consummate the sale of the Sale Assets in accordance with the terms hereof and (v) otherwise approving the transactions completed by this Agreement and the definitive documentation related hereto.

"Trustee" means C. Edwin Allman, III or such other person as may be appointed as trustee for the Debtors.

-2-

**ATTACHMENT**

2.    **Sale and Purchase of Assets.**

    **2.1**   **Sale Assets.**  Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, Seller shall sell, assign, convey, transfer and deliver to Purchaser, and Purchaser shall, by Purchaser's payment of the Sale Price, purchase and acquire from Seller, on behalf of the Seller's bankruptcy estate, all of Seller's right, title and interest in and to the following assets (collectively, the "Sale Assets"), "as is, where is," pursuant to Section 363 of the Bankruptcy Code:

        (a)    Abbreviated New Drug Application 078176 Theroxidil (Minoxidil 2%).

        (b)    Abbreviated New Drug Application 076239 Theroxidil (Minoxidil 5%).

        (c)    Any identified reserve samples (i.e., "retains") relating to the foregoing.

        (d)    The Seller's Records consisting of stability data, Good Manufacturing Practice (GMP) documentation, internal audit reports, master production records, batch records, stability protocols and reports, deviation investigations, process validations, method validations, change controls, standard operating procedures, correspondence with any federal, state, local or foreign governmental authority and any documentation subject to inspection by the FDA or other governmental authority, in each case, (x) solely to the extent relating to the methods to be used in, and the controls to be used for, the manufacture, processing, packing, or holding of the items described in Sections 2.1(a) and 2.1(b) above as required under the Federal Food, Drug and Cosmetic Act as to the identity, strength, quality and purity characteristics to such items and (y) solely to the extent such Records remain subject to the provisions of Section 9.3.

        (e)    Bulk Women's Minoxidil 2% Finished Goods (PQM-WMXD2-BK) described in Exhibit A attached hereto.

        (f)    Packaging Dropper 20/410 White 1ml Medicine Dropped w/CRC Closure White (P799811) and Packaging Inserts (PQM-WMIN2-10) described in Exhibit A attached hereto.

**2.2**   **[Reserved].**

**2.3**   **Excluded Assets.** Notwithstanding anything herein to the contrary, the Sale Assets shall not include the following assets (the "Excluded Assets"):

        (a)    Cash now or subsequently held in bank accounts or otherwise by the Debtors or by the Trustee on behalf of the Debtors.

        (b)    Accounts receivable, deposits, or other debts or obligations owed to the Debtors by or from any party, including any right of setoff, recoupment or reconciliation.

**ATTACHMENT**

    (c)      Computer servers and storage devices.

    (d)      Any customer owned equipment or intellectual property either on loan or licensed to the Debtors, and other tangible or intangible assets which are the property of a party other than the Debtors.

    (e)      Any rights of the Seller under this Agreement (including the right to receive any Sale Price hereunder).

    (f)      Insurance policies, any claims thereunder (whether asserted prior to or after the date of the Closing) and the proceeds thereof.

    (g)      Any claims or causes of action which may be asserted by or on behalf of the Debtors against any party, including but not limited to claims or causes of action under Code §§ 544, 547, 548, 549, 550 and 553.

    (h)      Any other assets that are expressly excluded by the Trustee from the Sale.

**2.4**    **Assumption of FDA Fees.**  In addition to the Sale Price as defined below, Purchaser agrees to pay those current and past due fees due from Seller to the FDA with regard to the Sale Assets, together with any transfer fees resulting from the transaction contemplated herein. For the avoidance of doubt, neither Seller nor the Seller's estate shall have any obligation to pay, perform or discharge any of Seller's liabilities or obligations in respect of the Sale Assets (whether incurred before or after the Closing), including, any past due fees payable to the FDA or any other governmental authority or any fees payable in connection with the transfer of the Sale Assets or the recertification required to manufacture and sell the Sale Assets at the Purchaser's own facilities.

**2.5**    **Sale Free and Clear of Liens.**  Subject to consummation of the Sale and payment in full of the Sale Price (defined below) and the FDA fees assumed by Purchaser pursuant to Section 2.4, the Sale Assets shall be sold, transferred and conveyed free and clear of all Liens to the fullest extent permitted under Section 363 of the Bankruptcy Code, with all Liens transferred to proceeds of Sale with the same validity and priority as such Liens applied against the Sale Assets immediately prior to the consummation of the sale, pursuant to the Sale Approval Order.

**2.6**    **Sale Price.**  In consideration for the Sale Assets, subject to the other terms and conditions of this Agreement and the entry and effectiveness of the Sale Approval Order, Purchaser shall pay to Seller an amount in cash equal to the sum of $1,400,000.00 (the "Sale Price"). The Sale Price shall be paid in cash and in full on the Closing Date by wire transfer of immediately available U.S. funds to an account designated by Seller (subject to application of the Deposit Amount in accordance with Section 2.7 below).

**2.7**    **Deposit.**  Seller acknowledges that Purchaser has made a deposit an amount equal to $280,000.00 (the "Deposit Amount").

**ATTACHMENT**

(a)     If this Agreement is terminated pursuant to Sections 8.1(a), 8.1(b) or 8.1(c), the Deposit Amount submitted by the Purchaser shall be refunded to the Purchaser.

(b)     If the Sale to the Purchaser occurs in a manner approved by the Bankruptcy Court, then the Deposit Amount shall be applied at Closing as a credit toward the Sale Price.

(c)     If (x) the Sale Approval Order is entered by the Bankruptcy Court by the date that is 21 days from the date of this Agreement and (y) the Sale to the Purchaser does not occur, then the Deposit Amount shall be (i) retained by the Seller's estate as liquidated damages, if the Sale to the Purchaser shall fail to close by reason of a breach or default of the Purchaser and the Agreement is terminated pursuant to Section 8.1(d), or (ii) returned to the Purchaser, in the event that the Sale to the Purchaser shall fail to close by reason of a breach or default of the Seller and the Agreement is terminated pursuant to Section 8.1(e).

**2.8     Closing.**  The closing of the sale of the Sale Assets (the "Closing") must occur as soon as practicable but in any event within three (3) days of the date on which the Sale Approval Order becomes a Final Order (or such other date as the Trustee and the agent for its secured lenders may agree). The Closing will take place at a location to be mutually agreed upon by Purchaser and Seller.  The transfer of the Sale Assets shall be effective for all purposes as of 12:01 a.m. eastern time on the day following the Closing Date.

**2.9     [Reserved].**

**2.10    Deliveries by Seller.**  At the Closing, Seller shall deliver or cause to be delivered to Purchaser the following (each in form and substance reasonably satisfactory to Purchaser):

(a)     Duly executed bill of sale and (if applicable) a non-warranty deed transferring to Purchaser all right, title and interest in and to the Sale Assets free and clear of all Liens, without exception or condition except as provided herein, the form(s) of which are attached hereto as Exhibit B.

(b)     A copy of the Sale Approval Order.

(c)     A letter to the FDA sufficient to notify the FDA of the transfer of the Sale Assets in conformity with 21 CFR 314.72, the form of which is attached hereto as Exhibit C.

(d)     Such other instruments or documents as Purchaser may reasonably request to fully effect the transfer of the Sale Assets and to confer upon Purchaser the benefits contemplated by this Agreement.

**2.11    Deliveries by Purchaser.**  At the Closing, Purchaser shall deliver, or cause to be delivered, the following:

ATTACHMENT

    (a)    The Sale Price less the Deposit Amount, as described in Section 2.6.

    (b)    Such other instruments or documents as Seller may reasonably request to fully effect the transfer of the Sale Assets and to otherwise consummate the transactions contemplated by this Agreement.

**2.12**    **Transfer of Sale Assets.**  On or before the earlier of the date that is 3 days after entry of the Sale Approval Order and the Closing Date, Purchaser and Seller shall agree on the time and method in which Purchaser shall obtain possession of the Sale Assets. Upon consummation of the Closing, Seller shall make the Sale Assets available to Purchaser and Purchaser shall take possession of such Sale Assets in accordance such agreement.

**3.**    **Representations and Warranties of Purchaser.**

Purchaser hereby represents and warrants to Seller that the statements contained in this Article 3 are correct and complete as of the date hereof and as of the Closing Date:

    (a)    Purchaser has cash available or has existing borrowing facilities or unconditional, binding funding commitments that are sufficient to enable it to timely consummate a Sale hereunder, without incurrence of any obligation, commitment, restriction or liability of any kind which would impair or adversely affect the transactions contemplated by this Agreement.

    (b)    Purchaser has not taken any action that would cause Seller to have any obligation or liability to any Person for finders' fees, brokerage fees and commissions or like payments in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

    (c)    Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges the condition of the Sale Assets and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in Section 4 hereof, and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Sale Assets are being transferred on a "WHERE IS" and, as to condition, "AS IS" basis and "WITH ALL FAULTS." Without in any way limiting the foregoing, Seller hereby disclaims any warranty (express or implied) or merchantability or fitness for any particular purpose as to any portion of the Sale Assets.

**4.**    **Representations and Warranties of Seller.**

Seller hereby represents and warrants to Purchaser that the statements contained in this Article 4 are correct and complete as of the date hereof and as of the Closing Date:

**ATTACHMENT**

(a)     At the Closing Seller shall have and convey to Purchaser, good, valid and marketable title to the Sale Assets, free and clear of all Liens.

(b)     Seller has not taken any action that would cause Purchaser to have any obligation or liability to any Person for finders' fees, brokerage fees and commissions or like payments in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

(c)     Except as expressly set forth herein, Seller makes no representation or warranty, express or implied, at law or in equity, with respect to Seller and the Sale Assets or any other information provided to Purchaser, its agents or representatives in connection with or in expectation of the transactions contemplated by this Agreement.   Seller does not make any representations or warranties regarding information, documents, projections, forecasts or other material made available to Purchaser, its agents or representatives in connection with or in expectation of the transactions contemplated in this Agreement except to the extent such information is expressly and specifically included in a representation or warranty contained in this Article.

## 5.     **Bankruptcy Court Approval.**

**5.1**     Seller and Purchaser acknowledge and agree that the Bankruptcy Court's entry of the Sale Approval Order is required in order for Seller and Purchaser to consummate the transactions contemplated hereby and that the requirement that the Sale Approval Order be entered is a condition that cannot be waived by any party hereto. The parties agree that the Bankruptcy Court shall have exclusive jurisdiction to hear, determine and enter final orders with respect to any dispute arising out of this Agreement.

**5.2**     Seller shall seek: (i) the Bankruptcy Court's approval of this Agreement and Seller's performance under this Agreement generally; and (ii) the entry of the Sale Approval Order.  Seller shall use its best efforts to obtain a waiver of the fourteen (14) day period imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure by the Bankruptcy Court in the Sale Approval Order.  Purchaser shall take such actions as are reasonably requested by Seller to assist Seller in obtaining a finding by the Bankruptcy Court that Purchaser is deemed to have purchased the Sale Assets in good faith pursuant to section 363(m) of the Bankruptcy Code.

**5.3**     If the Sale Approval Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Approval Order or other such order), subject to rights otherwise arising from this Agreement, Seller and Purchaser shall use their commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

**ATTACHMENT**

**5.4**    Notwithstanding anything contained herein to the contrary, but subject to Section 8.2, from the date of this Agreement (and any prior time) and until the entry of the Sale Approval Order, Seller is permitted to cause their respective representatives to initiate contact with, solicit, or encourage submission of any inquiries, proposals, or offers by any Person in connection with any sale or other disposition of the Sale Assets. The Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Sale Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Sale Assets to prospective buyers.

## 6.    Conditions Precedent to Obligations of Purchaser.

The obligation of Purchaser to consummate the transactions contemplated herein is subject to the satisfaction, at or before the Closing, of each of the following conditions:

**6.1**    The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on the Closing Date. Seller shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date.

**6.2**    The Bankruptcy Court shall have entered the Sale Approval Order in form reasonably satisfactory to Purchaser containing findings that (i) Purchaser is a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arms' length purchaser; (ii) the Sale Price is fair and reasonable; (iii) this Agreement was negotiated at arms' length; and (iv) the sale of the Sale Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code, and which Sale Approval Order is a Final Order.

**6.3**    Purchaser shall have received all documents and other items to be delivered by Seller under Section 2.10.

## 7.    Conditions Precedent to the Obligations of Seller.

The obligation of Seller to consummate the transactions contemplated herein is subject to the satisfaction, at or before the Closing, of each of the following conditions:

**7.1**    The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on the Closing Date. Purchaser shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Purchaser on or before the Closing Date.

**7.2**    The Bankruptcy Court shall have entered the Sale Approval Order containing findings that (i) Purchaser is a "good faith purchaser" within the meaning of

-8-

**ATTACHMENT**

Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arms' length purchaser; (ii) the Sale Price is fair and reasonable; (iii) this Agreement was negotiated at arms' length; and (iv) the sale of the Sale Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code, and which Sale Approval Order is a Final Order.

7.3     Seller shall have received or concurrently receive the Sale Price and other items to be delivered by Purchaser under Section 2.11.

8.     **Termination of Agreement.**

8.1     This Agreement may be terminated only as follows:

(a)     By mutual written agreement of both Seller and Purchaser at any time.

(b)     By Seller or Purchaser, if the Bankruptcy Court does not enter the Sale Approval Order by that date that is thirty (30) days from the date of this Agreement.

(c)     By Seller or Purchaser, if the Closing shall not have occurred on or prior to ten (10) days after the entry of the Sale Approval Order becoming a Final Order, for any reason other than such party's breach of this Agreement.

(d)     By the Seller, if Purchaser shall have breached or failed to perform in any material respect any of its respective representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform cannot be or has not been cured prior to the date that is ten (10) days from the date that Purchaser is notified by the Seller of such breach or failure to perform; provided, however, that the Seller shall not have a right to terminate this Agreement under this Section if the Seller is then in material breach of this Agreement.

(e)     By Purchaser, if the Seller shall have breached or failed to perform in any material respect any of its respective representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform cannot be or has not been cured prior to the date that is ten (10) days from the date that the Seller is notified by Purchaser of such breach or failure to perform; provided, however, that Purchaser shall not have a right to terminate this Agreement under this Section if Purchaser is then in material breach of this Agreement.

9.     **Miscellaneous Provisions.**

9.1     **Transaction Expenses.**     Except as expressly provided for herein (including Section 8.2), each party shall pay all fees, costs and expenses incurred by it with respect

**ATTACHMENT**

to this Agreement, whether or not the transactions contemplated hereby are consummated.

**9.2     Further Assurances.**  Purchaser and Seller shall, from time to time after the Closing, without further consideration, execute and deliver such instruments and take such further actions as may be reasonably necessary or desirable to carry out the provisions hereof and the transactions contemplated hereby.

**9.3     Availability of Records.**  From and after the Closing, Purchaser shall promptly provide to Seller (after reasonable notice and during normal business hours and without charge to the Debtors or the Trustee) access to all Records included in the Sale Assets for periods prior to the Closing, and shall preserve such Records and provide such access until the latest of (i) 45 days after the Closing Date, (ii) the required period for retention pursuant to any governmental authority or applicable law, (iii) the conclusion of all bankruptcy proceedings relating to the Bankruptcy Case and (iv) the resolution of any claims under insurance policies.  Such access shall include access to any information in electronic form to the extent reasonably available.  Purchaser acknowledges that Debtors and the Trustee have the right to retain originals or copies of all of Records included in the Sale Assets for periods prior to the Closing.  Prior to destroying any Records included in the Sale Assets for periods prior to the Closing, Purchaser shall notify the Trustee thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Purchaser shall permit Debtors and the Trustee to retain such Records, at the Debtors' cost and expense.

**9.4     Notifications.**  From the date of this Agreement until the earlier of the Closing or the termination of this Agreement, Seller shall give Purchaser prompt written notice of the occurrence of any of the following events:

   (a)     Any loss, taking, condemnation, damage or destruction of or to any of the Sale Assets.

   (b)     The commencement of any proceeding or litigation at law or in equity or any other commission, agency or administrative or regulatory body or authority against Seller which would prohibit the Sale of the Sale Assets pursuant to an order of the Bankruptcy Court.

   (c)     Any other materially adverse developments with respect to the Sale Assets.

   (d)     Any event, occurrence or fact that causes any of the representations or warranties to be untrue at any time in any material respect; _provided_, that no disclosure by Seller pursuant to this section shall be deemed to amend or supplement any provision of this Agreement or to prevent or cure any misrepresentation, breach of warranty or breach of covenant.

**9.5     Survival.**  The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and neither of the parties nor any of its respective officers, directors, representatives, employees, advisors

-10-

**ATTACHMENT**

or agents shall have any liability to the other after the Closing for any breach thereof. The parties hereto agree that only the covenants contained in this Agreement that are expressly required to be performed at or after the Closing Date shall survive the Closing hereunder, and each of the parties hereto shall be liable to the other after the Closing Date for any breach thereof.

**9.6    Jurisdiction.**    The parties agree that the Bankruptcy Court shall retain the exclusive and sole jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the implementation or the breach hereof.   The parties consent to the core jurisdiction of the Bankruptcy Court, to the constitutional authority of the Bankruptcy Court to enter a final judgment, and agree to have waived any right to a jury trial in connection with any disputes related to or arising out of this Agreement.

**9.7    Notices.**    All notices, consents or other communications required or permitted hereunder shall be given in writing and hand delivered or addressed and sent by Federal Express or other recognized overnight courier, or by certified or registered mail, postage prepaid, and return receipt requested, as follows or to such other address as may hereafter be designated by any party by the giving of notices in accordance with this Section 9.7:

>    (a)    If to Seller:    C. Edwin Allman, III, Trustee, PO Box 5129, Winston-Salem, NC 27113 email: ceallman@allmanspry.com

>    (b)    With a copy to:    Dimitri G. Karcazes, counsel for Madison Capital Funding LLC, as Agent for the Lenders to the Seller, 55 East Monroe Street, Suite 3300, Chicago, IL 60603 email: dimitri.karcazes@goldbergkohn.com

>    (c)    If to Purchaser: Joel Meyerson, Pure Source LLC, 9750 N.W. 17th Street, Miami, Florida 33172, email: joel@thepuresource.com.

>    (d)    With a copy to: Michael S. Fox, counsel for Pure Source LLC, Olshan Frome Wolosky LLP, 1325 Avenue of the Americas, New York, New York 10019, email: mfox@olshanlaw.com.

>    (e)    All notices, consents or other communications shall be deemed given when actually delivered (in the case of hand delivery by Federal Express or other recognized overnight courier) or five days after mailing in accordance with this Section 9.7.

**9.8    Governing Law.**    To the extent not governed by the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina, without giving effect to rules governing the conflict of laws.

**9.9    Waiver.**    The waiver by a party of a breach of any covenant, agreement or undertaking contained herein shall be made only by a written waiver in each case.   No waiver of any breach of any covenant, agreement or undertaking contained herein shall operate as a waiver of any prior or subsequent breach of the same covenant, agreement or undertaking or as a waiver of any breach of any other covenant, agreement or undertaking.

-11-

**ATTACHMENT**

**9.10    Severability.** If any provision of this Agreement shall be held invalid, illegal or unenforceable, in whole or in part, the validity, legality, and enforceability of the remaining part of such provision, and the validity, legality and enforceability of all other provisions hereof or thereof, shall not be affected thereby.

**9.11    Counterparts.** This Agreement may be executed in one or more counterparts (whether manually signed or by facsimile or other electronic means), each such counterpart shall be deemed an original, and all such counterparts shall constitute one and the same agreement.

**9.12    Captions; References.** The headings, titles or captions of the Articles and Sections of this Agreement are inserted only to facilitate reference, and they shall not define, limit, extend or describe the scope or intent of this Agreement or any provision hereof, and they shall not constitute a part hereof or affect the meaning or interpretation of this Agreement or any part hereof.

**9.13    Amendments.** This Agreement may not be amended, changed, modified, altered or terminated unless the parties hereto mutually agree in writing to such amendment, change, modification, alteration or termination.

**9.14    Remedies Cumulative; Specific Performance.** Except as otherwise expressly provided in this Agreement, no remedy herein conferred is exclusive of any other available remedy and each and every such remedy shall be cumulative and be in addition to every other remedy given by agreement or now or hereafter existing at law or in equity or by statute. Except as otherwise expressly provided in this Agreement, in addition to any and all other remedies that may be available at law, in the event of any breach of this Agreement each party shall be entitled to seek specific performance of the agreements and obligations hereunder and to such other injunctive or equitable relief as may be granted by a court of competent jurisdiction.

**9.15    Binding Nature; Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interest or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other party; provided, however, that the Seller's rights under this Agreement, including, without limitation, the Seller's rights to enforce this Agreement, have been assigned for collateral security purposes to the Seller's secured lenders (and the agent therefor) and Purchaser acknowledges such assignment and the rights of the Seller's secured lenders (and the agent therefor) to enforce the rights of Seller under this Agreement as well as the right of Seller to designate the secured lenders to directly receive any amounts owed to Seller under this Agreement. Nothing contained herein, express or implied, is intended to confer on any Person other than the parties hereto or their successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

**9.16    No Third-Party Beneficiaries.** This Agreement is a contract solely between Purchaser and Seller. No third party beneficiaries, (including, without limitation, employees and customers of Seller) are intended hereunder and none shall be inferred

-12-

**ATTACHMENT**

herein; and no party other than Purchaser or Seller may assert any right, make any claim or otherwise attempt to enforce any provision of or under this Agreement; provided, however, that the Seller's secured lenders (and the agent therefor) are express third party beneficiaries for purposes of Section 2.8, Section 9.15, this Section 9.16 and Section 9.17 and Purchaser acknowledges the rights of Seller's secured lenders (and the agent therefor) as a result thereof.

**9.17** **Release and Waiver**. Effective upon the Closing, except as set forth in this Agreement, the Purchaser hereby irrevocably waives, releases, and discharges Seller, solely in Seller's capacity as the owner of the Sale Assets, each of Seller's Affiliates (in each such Person's capacity as an Affiliate of such Seller), and Seller's secured lenders (and the agent therefor) (in such Person's capacity as a lender (or agent for such lender) of Seller) from any and all liabilities or debts to its business and the Purchaser of any nature or kind whatsoever (including in respect of rights of contribution or indemnification).

**[signatures on following page]**

-13-

**ATTACHMENT**

**IN WITNESS WHEREOF**, the parties have caused their duly authorized officers to execute this Agreement as of the day and year first above written.

**PURE SOURCE, LLC**

Purchaser

_____

By: Joel Meyerson, Managing Member

**EI LLC**
For itself acting as "Seller"

By:_____
   C. Edwin Allman, III, Trustee

Signature Page to Asset Purchase Agreement

**ATTACHMENT**

Exhibit A

| Minoxidil | (excludes all reject status) | | | | |
|---|---|---|---|---|---|
| Type | Sub Type | Item | Desc | Qty | U/M |
| Finished Goods | Finished Goods | PGM-WMX02-BK | BULK WOMEN'S MINOXIDIL 2% (30 DAY) | 33,264 | EA |
| Packaging | Dropper | P799831 | 20/410 White 1ml Medicine Dropper w/CRC Closure White | 34,000 | EA |
| Packaging | Inserts | PGM-WMIN2-10 | WOMEN'S MINOXIDIL 2% GENERIC INSERTS | 31,826 | EA |

ATTACHMENT

## BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

This Bill of Sale and Assignment and Assumption Agreement (this "Agreement") is made and entered into effective as of        , 2019 by and between Pure Source, LLC ("Purchaser") and Ei LLC ("Seller"). Seller and Purchaser may each be referred to herein as a "Party" and collectively as the "Parties."

### RECITALS

WHEREAS, Seller and Purchaser have entered into that certain Asset Purchase Agreement, dated as of January 16, 2019 (as the same may be amended, restated, supplemented or modified from time to time, the "Asset Purchase Agreement"); and

WHEREAS, pursuant to the Asset Purchase Agreement, Seller has agreed to sell the Sale Assets, and Purchaser has agreed to purchase the Sale Assets and assume the FDA Fees,

WHEREAS, Purchaser has agreed to accept assignment of the Sale Assets and assume the FDA Fees, all on the terms and conditions set forth in the Asset Purchase Agreement.

### AGREEMENT

NOW, THEREFORE, for consideration of the mutual agreements and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    _Definitions_. Unless otherwise specifically provided herein, capitalized terms used in this Agreement and not otherwise defined herein shall have the respective meanings ascribed thereto in the Asset Purchase Agreement.

2.    _Conveyance and Acceptance_. In accordance with the provisions of the Asset Purchase Agreement, Seller hereby sells, transfers, conveys, assigns and delivers to Purchaser all of Seller's right, title and interest in and to the Sale Assets, and Purchaser hereby purchases and accepts the Sale Assets, in each case, free and clear of all Liens.

3.    _Assumption of FDA Fees_. Purchaser hereby assumes, and will hereafter pay, discharge or perform when due all those current and past due fees due from Seller to the FDA with regard to the Sale Assets, together with any transfer fees resulting from the transaction contemplated herein.

4.    _Asset Purchase Agreement Controls_. Notwithstanding any other provision of this Agreement to the contrary, nothing contained herein shall in any way supersede, modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions, including warranties, covenants, agreements, conditions, representations or, in general any of the rights and remedies, or any of the obligations of Purchaser or Seller set forth in the Asset Purchase Agreement. This Agreement is subject to and governed entirely in

_Bill of Sale - Page 1 of 4_
_ASDLC\385417_

EXHIBIT B
ATTACHMENT

accordance with the terms and conditions of the Asset Purchase Agreement. Nothing contained herein is intended to modify or supersede any of the provisions of the Asset Purchase Agreement.

5.    Miscellaneous.

a)    This Agreement may be amended, modified, superseded or canceled, and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the parties or, in the ease of a waiver, by or on behalf of the party waiving compliance. No course of dealing between the parties shall be effective to amend of waive any provision of this Agreement,

b)    This Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and permitted assigns.

c)    In the event that any provision contained in this Agreement shall for any reason be held to be illegal, invalid or unenforceable in any jurisdiction, such provision shall be ineffective as to such jurisdiction to the extent of such invalidity, illegality or unenforceability without invalidating or affecting the remaining provisions hereof or affecting the validity, legality or enforceability of such provision in any other jurisdiction. Upon such a determination, the patties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

d)    This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when each party hereto shall have received counterparts hereof signed by each of the other parties hereto. if any signature is delivered by facsimile transmission or by PDF or similar electronic means, such signature shall create a valid and binding obligations of the party executing (or on whose behalf the signature is executed) with the same force and effect as if such facsimile or PDF electronic signature were an original thereof.

2

*Bill of Sale - Page 2 of 4*
*ASDLC\385417*

EXHIBIT B
ATTACHMENT

IN WITNESS WHEREOF, the Parties hereto have each caused this Agreement to be duly executed as of the Closing Date,

Purchaser
Pure Source, LLC


By: _____
Name: _____
Title:_____

EI LLC
For itself acting as "Seller"


By:    _____
     C . Edwin Allman, III, Trustee

*Bill of Sale - Page 3 of 4*
*ASDLC\385417*

EXHIBIT B
ATTACHMENT

Form of Seller Change in Ownership Letter
[Seller's Letterhead]

[Date], 2019
[Address of FDA Contact]

Re:   ANDA 078176 Theroxidil (Minoxidil 2%) and ANDA 076239 Theroxidil
(Minoxidil 5%) [Product Name] Transfer of ANDA Ownership

Dear Sir/Madame:

With this letter, we wish to notify the Food and Drug Administration ("FDA") consistent with 21 C.F.R. § 314.72(a)(1) that, effective _____, 2019, Ei LLC has transferred all rights to the above-referenced Abbreviated New Drug Application(s) ("ANDA") to Pure Source, LLC (the "Purchaser").

Written acknowledgement of the change in ANDA ownership would be appreciated. Please contact [Seller contact's name, phone number and email address] or [Purchaser contact's name, phone number and email address] if you have any comments or questions regarding this letter.

This submission is being provided in electronic format. For technical issues unrelated to the content of this submission, please contact [name] at [phone number].

Sincerely,
[Seller]

*Bill of Sale - Page 4 of 4*
*ASDLC\385417*

EXHIBIT B
ATTACHMENT

PARTIES OF INTEREST:

Pursuant to the Order Establishing Administrative Procedures entered in Product Quest Manufacturing, LLC (Case No. B-18-50946C-7W) on September 14, 2018 [*docket #59*], the parties served with this Order are set out on the Master Service List filed in Ei LLC (Case No. B-18-50945C-7W) on January 25, 2019 [*docket #67*].

7

ASDLC|385517