## IN THE UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
## WINSTON-SALEM DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **Product Quest Manufacturing, LLC,** *et al.,* [1] | ) | **Case No. B-18-50946C-7W** |
| | ) | **(Jointly Administered)** |
| Debtors. | ) | |
| | ) | |

### TRUSTEE'S MOTION FOR ORDER AUTHORIZING AND APPROVING THE PRIVATE SALE OF FLORIDA REAL AND TANGIBLE PERSONAL PROPERTY OWNED BY PRODUCT QUEST MANUFACTURING, LLC. JBTRS, LLC, AND PQ REAL ESTATE, LLC, FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES TO INDUSTRIAL ASSETS CORP., OR ITS DESIGNATED ASSIGNEE(S); APPROVING THE ASSET PURCHASE AGREEMENT; APPROVING FEES AND EXPENSES TO TIGER LIQUIDATION SERVICES; AND GRANTING RELATED RELIEF

C. Edwin Allman, III, Trustee in the Product Quest Manufacturing, LLC bankruptcy case (No. B-18-50946 C-7W), C. Edwin Allman, III, Trustee in the JBTRS, LLC bankruptcy case (No. B-18-50951 C-7W), and C. Edwin Allman, III as Trustee in the PQ Real Estate, LLC bankruptcy case (No. B-18-50952 C-7W), respectfully moves the Court for entry of an order, pursuant to 11 U.S.C. § 363 and Bankruptcy Rules 2002 and 6004 (i) authorizing the private sale of real and personal property more particularly described herein (the "Florida Property"), to Industrial Assets Corp. ("Purchaser") pursuant to an Asset Purchase Agreement between the Trustee and Industrial Assets Corp, a copy of which is attached hereto as **Exhibit 1** (the "Asset Purchase Agreement") and incorporated herein by reference; (ii) authorizing and approving the Asset Purchase Agreement; (iii) approving and authorizing the payment of fees and expenses of Tiger Liquidation Services Biopharma Partners ("Tiger") in connection with the sale; and (iv) granting certain related relief.  In support hereof, the Trustee respectfully represents as follows:

### Jurisdiction and Venue

1.	This Court has jurisdiction over this matter pursuant to 28 U.S.C. Sections 157 and 1334(b).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  Statutory predicates for the relief requested herein

---

[1] The Debtors in these cases, along with the associated case number, are: (i) Ei LLC (18-50945); (ii) Product Quest Manufacturing, LLC (18-50946); (iii) Scherer Labs International, LLC (18-50948); (iv) Product Quest Logistics, LLC (18-50950); (v) JBTRS, L.L.C. (18-50951); and (vi) PQ Real Estate LLC (18-50952).  The Debtors' service address is: 2865 N. Cannon Blvd., Kannapolis, North Carolina 28083.

are §§ 105(a) and 363 of the Bankruptcy Code, Bankruptcy Rules 2004 and 6004.

## Background

2.      On September 7, 2018 (the "Petition Date") each of the Debtors filed with the Court a Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code.  The cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).  On October 31, 2018, the cases were converted to Chapter 7 cases and C. Edwin Allman, III, was appointed to serve as Trustee.  Pursuant to Orders entered herein, the Trustee is authorized to continue to operate the Debtors' businesses in furtherance of a wind down of the Debtors' affairs and liquidation of the Debtors' assets. See:  Order Pursuant to 11 U.S.C. Section 721 Authorizing Trustee to Continue to Operate the Debtors in Connection with an Orderly Wind Down and Liquidation of the Estate on an Interim Basis and Notice of Hearing dated November 13, 2018 [*docket #294*] and Order Authorizing Trustee to Operate Debtor on an Interim Basis and Notice of Hearing dated October 30, 2018 [*docket #261*].

3.      Substantially all of the Debtors' assets are encumbered by liens in favor of the Debtors' secured lender, Madison Capital Funding LLC, as agent for the secured lenders in all of the cases ("Lender").  At the time of the Chapter 11 filing Lender was owed in excess of $150.0 million.

4.      Information regarding the Debtors' businesses, capital structure and circumstances leading to the Chapter 11 filings is as set forth in the Declarations of Michael J. Musso in Support of First Day Motions and Applications [*docket #13*].

5.      Mr. Musso's Declarations referenced above detail a massive recall and inventory quarantine of certain products manufactured by the Debtor Product Quest Manufacturing, LLC.  Upon information and belief, substantially all of the quarantined/recalled inventory is currently located in the facilities owned by JBTRS, LLC and PQ Real Estate, LLC and located at 330 Carswell Avenue, Holly Hill, Florida 32117, 343 Carswell Avenue, Holly Hill, Florida 32117, 344 Carswell Avenue, Holly Hill, Florida 32117, and 540 Carswell Avenue, Holly Hill, Florida 32117.  Based on correspondence from the FDA this product ultimately needs to be either destroyed or reconditioned to bring it into compliance with the law.  The Trustee is not in a position to recondition product nor does he have the financial ability to have the product destroyed.

6.      In an effort to create value for the Florida assets while, at the same time, ensuring that the recalled/quarantined product is properly disposed of, the Trustee engaged Tiger to solicit bulk sale offers for substantially all of the Florida real and tangible personal property and to include in the contract for such bulk sale adequate provisions concerning the disposition of the recalled/quarantined items.

7.      Principally as the results of Tiger's efforts, the Trustee has now reached an agreement with Industrial Assets Corp. for the sale of the Florida property under terms

satisfactory to the Trustee which require Purchaser to properly dispose of all of the recalled/quarantined inventory in a lawful manner.

<b>Summary of Terms of Asset Purchase Agreement</b>

8.      The Debtors or Seller in this Motion are:

(a) PQ Real Estate, LLC, an entity which has only one scheduled creditor—Lender.  P.Q. Real Estate owns real property in Holly Hill, Florida that it leased to Product Quest Manufacturing.  It owns no tangible personal property;

(b) JBTRS, LLC, is also an entity with only one scheduled creditor—Lender.  JBTRS owns improved and unimproved real property in Holly Hill, Florida. It owns no tangible personal property and its unimproved real property located at 331 Carswell Avenue, Holly Hill, Florida is excluded from this sale;

(c) Product Quest Manufacturing, LLC was an operating company with substantial personal property assets and liabilities.  Product Quest Manufacturing personal property located at 440 Fentress, a former leased facility, is not part of this sale.

9.      Generally, the property to be sold pursuant to this Motion (the "Florida Property" or the "Florida Properties") includes and is limited to all real and tangible personal property owned by the above three Debtors exclusive of real property located at 331 Carswell, which is being sold separately, personal property located at 440 Fentress, Holly Hill, a former leased location.   Specific exclusions are listed in the Asset Purchase Agreement but generally consist of records, contract rights, accounts receivable, intellectual property and assets previously sold or under contracts for sale.

9.      The Asset Purchase Agreement executed by the Trustee and Purchaser generally provides the following:

| | |
|---|---|
| **Seller:** | C. Edwin Allman, III, Trustee for Product Quest Manufacturing, LLC (Case No. 18-50946C-7W)<br>C. Edwin Allman, III, Trustee for JBTRS, LLC (Case No. 18-50951C-7W)<br>C. Edwin Allman, III, Trustee for PQ Real Estate, LLC (Case No. 18-50952C-7W) |
| **Purchaser:** | Industrial Assets Corp. or its designated Assignees |
| **Property Being Sold Florida Property or Florida Properties:** | JBTRS, LLC – All real and tangible personal property exclusive of property located at 331 Carswell Avenue, Holly Hill, FL 32117;<br>PQ Real Estate, LLC – All real and tangible personal property<br>Product Quest Manufacturing, LLC – All real and tangible |

| | personal property, exclusive of property located in leased locations, and in all cases subject to the Excluded Assets set forth in the Asset Purchase Agreement. |
|---|---|
| **Assumed Liabilities** | Purchaser shall assume full and complete responsibility to dispose of all bulk and finished goods inventory of the Debtors included in the Florida Property. |
| **Cash Purchase Price:** | $1,675,000.00 |
| **Other Consideration:** | See Assumed Liabilities Above: Purchaser agrees to dispose of all bulk and finished goods inventory in a lawful manner and such disposition is an integral part of this Agreement |
| **Closing:** | As soon as practicable, but in any event within three (3) days of the date on which the Sale Order becomes a Final Order unless otherwise agreed by Purchaser and Seller. |
| **Deposit:** | $251,250.00 |
| **Relief from Bankruptcy Rule 6004(h)** | The parties intend for the Sale Approval Order to provide for a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h). |
| **Sale Free and Clear of Liens, Claims and Encumbrances of any kind:** | The sale will be free and clear of all liens, claims and encumbrances with any liens attaching to the proceeds of sale to be held or distributed in accordance with existing cash collateral orders. |
| **Stalking Horse Provisions:** | In the event the Bankruptcy Court approves the sale of the Florida Property to a third party, under terms not materially different than the attached Asset Purchase Agreement, Purchaser shall be entitled to reimbursement of actual, reasonable and out-of-pocket expenses not to exceed $15,000.00 ("Expense Reimbursement") and a break-up fee of 3% ($50,250.00) ("Break-up Fee"), subject to Court approval. |

### Relief Requested

10.     By this Motion, the Trustee requests that the Court enter an Order authorizing and approving the sale of the Florida Property to Purchaser for the sum of $1,675,000.00 and approving and authorizing the Asset Purchase Agreement.

### Basis for Relief Requested

11.     The Trustee's Agent, Tiger and to some degree, Lender have engaged in negotiations with third parties in an effort to find a bulk sale buyer for the Florida Property. The agreement reached with Purchaser is the culmination of that process. Consequently, Lender and Trustee believe that the price received for the Florida Property is fair and reasonable under the circumstances and should be approved.

12.     The sale is proposed in good faith after a period of negotiation among different capable perspective purchasers.  The Trustee submits that the sale transaction contemplated herein and in the Asset Purchase Agreement has been proposed in good faith.  Neither Purchaser nor any of its affiliates are insiders of the Debtors and the Asset Purchase Agreement was the product of good faith arm's length negotiations between Tiger, the Trustee and Lender on one hand and the Purchaser on the other, with all parties properly represented.  The Trustee believes and submits that the proposed sale is not the product of collusion or bad faith and the Trustee has seen no evidence that would suggest that the Asset Purchase Agreement is anything but the product of arm's length negotiations between the Purchaser, the Lender, and the Trustee and their respective professionals.  Purchaser is entitled to all of the benefits afforded by § 363(m) of the Bankruptcy Code.

### Sale Free and Clear of Liens

13.     Substantially all assets of the Debtors' bankruptcy estates are encumbered by liens in favor of Lender.  Of the Florida Property, only certain trailers and vehicles are unencumbered and the parties have ascribed values to the following assets:

| Vehicles | VIN# | Location | Titled to | TITLE YES/NO | LOCATION | Value |
|---|---|---|---|---|---|---|
| 2002 Ford pickup -F150 | 1FTRX172X2NA73818 | PQ | PQ | YES | 330 Carswell | $ 750.00 |
| 2007 INTER 4000 | 1HTMPAFM7H353817 | PQ | PQ | YES | 330 Carswell | $1,250.00 |
| 1987 GREAT DANE TRAILER | 1GRAA9622HS048720 | PQ | PQ | YES | 330 Carswell | $1,000.00 |
| 1992 STRICKLAND TRAILER | 1S12E9535NE343618 | PQ | | NO | 330 Carswell | $1,750.00 |
| 1989 STRICKLAND TRAILER | 1S11E8289LG324917 | PQ | PQ | YES | 343 Carswell | $1,100.00 |
| 1987 GREAT DANE TRAILER | 1GRAA9620JB024132 | PQ | PQ | PHOTO COPY ONLY | 330 Carswell | $1,000.00 |

Lender consents to the sale being free and clear of liens with such liens attaching to the proceeds of sale with the same priority and being administered in accordance with existing cash collateral orders of the Court.

14.     Although this is a bulk transaction, the parties have agreed to an allocation of the purchase price as follows:  JBTRS, LLC Assets -- $145,000, PQ Real Estate, LLC Assets -- $105,000, and Product Quest Manufacturing, LLC Assets -- $1,450,000.

### Higher Offer Acceptance and Procedure

15.     Provisions in the Asset Purchase Agreement deal with a third party purchaser emerging with a higher bid to acquire the Florida Property under terms set forth in the Asset Purchase Agreement.  Should a higher offer from a third party emerge at or prior to the hearing on approval of this Motion, the Trustee requests that the Court authorize and approve the highest and best offer submitted at the hearing provided (i) the successful purchaser acquires the Florida Property on terms specifically set forth in the Asset Purchase Agreement; and (ii) that such purchaser shall have submitted a deposit in the amount of 20% of the Total Enhanced Bid (as defined below) not later than forty-eight (48) hours prior to the

scheduled hearing into the Trustee's law firm trust account and electronically file a Notice of Intent to Bid with the Clerk of the Court using the CM/EMC system not later than forty-eight (48) hours prior to the scheduled hearing. In the event a higher bid is submitted at or before the hearing the Trustee may request a brief adjournment of the hearing to allow all qualified purchasers a final opportunity to increase their bid in order to ensure that the highest and best value is received for the Florida Property. The Trustee recommends that a higher bid must include an amount equal to the Expense Reimbursement (which may be estimated) not to exceed $15,000.00, the Break-up Fee of $50,250.00 (3%), and the Initial Overbid amount of $25,000.00 (the "Total Enhanced Bid").

### Tiger Fee

16.     On December 3, 2018, the Court entered an Order authorizing the Trustee to engage Tiger as a consultant and selling agent with respect to the Debtor's assets [Docket No. 329]. Initially, Tiger's work was focused on finding a turnkey buyer for the North Carolina and Florida Properties, the sale of certain inventory items and the collection of accounts receivable. A Consulting Agreement was executed and, on December 28, 2018, it was approved by the Court. Subsequent to its engagement, at the request of Lender and with the approval of the Trustee, an Addendum to the Consulting Agreement (Florida) was negotiated and agreed to between the parties. A copy of the Addendum is attached as Exhibit 2. As a consequence, Tiger assumed a greater role in connection with the sale of the Florida Properties and assumed exclusive control of the Florida bulk sale process. In that regard, Tiger expended considerable resources and efforts towards securing a sale of the Florida Properties under terms agreeable to Lender and the Trustee. The sale of the Florida Properties had a complicating factor due to the large volume of recalled/quarantined inventory which need to be disposed of in a lawful and appropriate manner.

17.     Tiger has performed its role in this process diligently and, pursuant to its agreement with the Trustee and Lender, and subject to this Court's approval, is entitled to a fee of $120,000.00 from the sale proceeds. In addition, Tiger has incurred expenses attributable to the Florida Property sale of$13,477.34, consisting of $11,400.00 for bonding cost and $2,077.34 Florida bulk sale expenses, which the Trustee requests be approved and authorized pursuant to this Motion for payment from the sale proceeds.

### Waiver of Bankruptcy Rule 6004(h)

18.     The Florida Property is not appreciating in value and certain of the inventory has expiration dates and is depreciating in value. The Asset Purchase Agreement contemplates a closing soon after entry of an order approving the sale and the purchase price is based upon a prompt closing so as to preserve the value of the inventory. Consequently, the Trustee requests that the Court waive the fourteen (14) day stay period provided in Bankruptcy Rule 6004(h) and that the approval order so provide.

WHEREFORE, the Trustee prays:

1.      That the Court approve the sale of the Florida Property to Industrial Assets Corp. or its assigns for the sum of $1,675,000.00;

2.      That the sale be free and clear of all liens, claims and encumbrances of any kind;

3.      That the fourteen (14) day stay set forth in Bankruptcy Rule 6004(h) be waived by the Court such that the sale may be timely closed;

4.      That the Court approve the sale of the Florida Property to an alternative purchaser should one arise with a higher bid on the terms set forth herein and that in connection therewith, the Court approve the Expense Reimbursement and the Break-up Fee and authorize the payment of same to Industrial Assets Corp. from the sale proceeds;

5.      That the Asset Purchase Agreement and Addendum (to the extent required) be approved;

6.      That the Purchaser is a good faith buyer within the meaning of 11 U.S.C. §363(m) and is entitled to full protections of §363(m);

7.      That from the closing proceeds Tiger receive an approved fee of $120,000.00 and expense reimbursement of $13,477.34;

8.      That the Trustee be authorized to take such action as may be necessary and appropriate to close the sale; and,

9.      For such other and further relief as the Court may deem just and appropriate.

Respectfully submitted, this the _____ day of February 2019.

/s/ C. Edwin Allman III
C. Edwin Allman, III, Trustee
North Carolina State Bar #8625

OF COUNSEL:
ALLMAN SPRY DAVIS LEGGETT & CRUMPLER, P.A.
380 Knollwood Street, Suite 700
Post Office Drawer 5129
Winston-Salem, NC 27113-5129
Telephone:   336-722-2300

ASDLC|386227v3

7

THIS ASSET PURCHASE AGREEMENT (together with the exhibits and schedules hereto, this "Agreement"), is made as of this ___ day of _____ 2019, by and between Industrial Assets Corp. or its designated assignees (the "Purchaser"), and Product Quest Manufacturing, LLC, JBTRS, LLC, and PQ Real Estate, LLC, each a Debtor in a Chapter 7 proceeding (collectively, the "Seller" or the "Debtors"), acting by and through their Trustee, C. Edwin Allman, III.

## W I T N E S S E T H

WHEREAS, the Debtors filed voluntary petitions with the United States Bankruptcy Court for the Middle District of North Carolina (the "Bankruptcy Court") for relief under Chapter 11, title 11, United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code"); and

WHEREAS, the Debtors in these cases are: (i) Ei LLC (Case No. 18-50945); (ii) Product Quest Manufacturing, LLC (Case No. 18-50946); (iii) Scherer Labs International, LLC (Case No. 18-50948); (iv) Product Quest Logistics, LLC (Case No. 18-50950); (v) JBTRS, L.L.C. (Case No. 18-50951); and (vi) PQ Real Estate LLC (Case No. 18-50952), which have been administratively consolidated as Case No. 18-50946 (the "Bankruptcy Case"); and

WHEREAS, on October 10, 2018, the Debtors filed the Conditional Motion to Convert Case to Chapter 7 (Dkt. 186), and on October 11, 2018, the Bankruptcy Administrator filed the Motion to Convert Case to Chapter 7 or For Appointment of a Chapter 11 Trustee ("Motion to Convert") (Dkt. 192); and

WHEREAS, the Bankruptcy Court granted the Motion to Convert and C. Edwin Allman, III was appointed to serve as the Trustee; and

WHEREAS, Purchaser desires to purchase from Seller certain assets as more fully described herein, free and clear of all Liens (a "Sale"), subject to final approval by the Bankruptcy Court.

NOW, THEREFORE, for and in consideration of the representations, warranties, covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.   **Certain Definitions.**

As used herein, the following terms shall have the following meanings:

"2018 Real Estate Taxes" means $55,933.52.

"Applicable Disposal Requirements" means, with respect to the disposal of any of the Sale Assets, any applicable FDA Law and Regulation, Environmental Laws, any obligation arising under an administrative or regulatory action, proceeding, investigation or inspection by or

EXHIBIT 1

on behalf of a Governmental Authority, warning letter, untitled letter, Form 483, notice of violation letter, consent decree, request for information or other notice, response, or commitment made to or with the FDA, EPA or any other Governmental Authority administering FDA Law and Regulation or Environmental Law.

"Alternative Transaction" means a transaction pursuant to which the Trustee enters into one or more agreements to sell, transfer or otherwise dispose of the Sale Assets to one or more Persons other than Purchaser to the extent (i) the aggregate cash consideration for the Sale Assets exceeds the sum of the Sale Price plus the Bid Protections plus the Initial Overbid and (ii) such transaction is actually consummated.

"Bid Protections" means, collectively, the Expense Reimbursement and the Break-up Fee protections set forth in this Agreement.

"Bulk Inventory" means all Inventory other than Finished Goods Inventory, Packaging Inventory and Raw Materials.

"Business Day" means any day that is not a Saturday, Sunday, or legal federal holiday in which banks are closed or state holiday in the State of North Carolina.

"Closing Date" means such date as the Closing occurs hereunder.

"Environmental Laws" means all applicable present or future federal, state or local laws, statutes, common law duties, rules, regulations, ordinances and codes, together with all administrative orders, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case relating to any matter arising out of or relating to pollution or protection of the environment, including any of the foregoing relating to the presence, use, production, generation, handling, transport, treatment, storage, disposal, distribution, discharge, release, control or cleanup of, or exposure to, any Sale Assets.

"EPA" means the United States Environmental Protection Agency.

"FDA" means the United States Food and Drug Administration.

"FDA Law and Regulation" means the Food Drug and Cosmetic Act, 21 U.S.C. 301 *et seq.*, and all applicable regulations promulgated by the FDA.

"Final Order" means an order of the Bankruptcy Court or other court of competent jurisdiction:  (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion or alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (c) as to which no stay is in effect; provided, however, that the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within ten (10) days of the entry of the order at issue.

"Finished Goods Inventory" means Inventory that consists of finished goods that may be sold to third parties.

EXHIBIT 1

"Governmental Authority" means any nation or government, any state, province or other political subdivision thereof exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Initial Overbid" means $25,000.

"Inventory" means "inventory" (as that term is defined in the Uniform Commercial Code).

"Lien" means any lien, security interest, pledge, hypothecation, encumbrance or other interest or claim (including, but not limited to, any and all "claims," as defined in Section 101(5) of the Bankruptcy Code, and any and all rights and claims under any bulk transfer statutes and similar laws) in or with respect to any of the Sale Assets (including, but not limited to, any options or rights to purchase such Sale Assets and any mechanics' or tax liens), whether arising by agreement, by statute or otherwise and whether arising prior to, on or after the commencement of the Bankruptcy Case.

"Packaging Inventory" means Inventory consisting of packaging or shipping materials or components.

"Person" means any individual, corporation, partnership, joint venture, trust, association, limited liability company, unincorporated organization, other entity, or governmental body or subdivision, agency, commission or authority thereof.

"Raw Materials" means Inventory consisting of goods that are raw materials and have not yet been processed or combined with any other raw materials.

"Real Estate" means real property assets at 330 Carswell, Holly Hill, FL 32117, 343 Carswell, Holly Hill, FL 32117, 344 Carswell, Holly Hill, FL 32117, and 540 Carswell, Holly Hill, FL 32117.

"Real Estate Per Diem Amount" means the 2018 Real Estate Taxes divided by 365 days which taxes are assessed on a calendar basis.

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials, including, without limitation, stability data or documentation and GMP documentation.

"Sale Approval Order" means an order of the Bankruptcy Court approving the transactions contemplated hereby and the definitive documentation related hereto.

"Trustee" means C. Edwin Allman, III or such other person as may be appointed as trustee for the Debtors.

## 2.    Sale and Purchase of Assets.

**2.1    Sale Assets.** Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, Seller shall sell, assign, convey, transfer and deliver to Purchaser, and Purchaser shall, by Purchaser's payment of the Sale Price,

EXHIBIT 1

purchase and acquire from Seller, on behalf of the Debtors' bankruptcy estate, all of Seller's right, title and interest in and to the Real Estate described on Schedule 2.1 and all personal property on the Real Estate the categories of which are identified on Schedule 2.1 (collectively, the "Personal Property") with the exception of the excluded personal property and Excluded Assets specifically identified on Schedule 2.2 and defined in Section 2.3 of this Agreement (collectively, the "Sale Assets"), "as is, where is," pursuant to Section 363 of the Bankruptcy Code.

**2.2    Assumed Contracts.**    Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, Seller shall assume and assign to Purchaser, and Purchaser shall assume all prospective obligations under those certain executory contracts or unexpired leases, if any, described on Schedule 2.3 (collectively, the "Assumed Contracts"), "as is, where is," pursuant to Section 363 of the Bankruptcy Code.  The Purchaser shall not receive the benefit of any rights under contracts or leases of the Seller except and only to the extent such contracts and leases are expressly listed on Schedule 2.3 and are able to be assumed and assigned to Purchaser in accordance with the terms of this Agreement and the related filings with the Bankruptcy Court.

**2.3    Excluded Assets.**  Notwithstanding anything herein to the contrary, the Sale Assets shall not include the following assets (the "Excluded Assets"):

(a)    Cash now or subsequently held in bank accounts or otherwise by the Debtors or by the Trustee on behalf of the Debtors.

(b)    Accounts receivable, deposits, or other debts or obligations owed to the Debtors by or from any party, including any right of setoff, recoupment or reconciliation.

(c)    Minoxidil ANDAs (2% and 5%), Chiggerex and Scherer Labs brands and all Debtor owned formulations and all other intellectual property.

(d)    Computer servers and storage devices unless (i) the Trustee and the Debtors have downloaded or otherwise acquired a copy of all information, data and Records maintained or stored thereon and (ii) such computer servers and storage devices remain subject to the provisions of Section 9.3.

(e)    Licenses and permits of any nature, other than executory contracts or unexpired leases which are expressly listed on Schedule 2.3 and which are able to be assigned and assumed pursuant to Section 365 of the Bankruptcy Code.

(f)    Any customer owned equipment or intellectual property either on loan or licensed to the Debtors, and other tangible or intangible assets which are the property of a party other than the Debtors.

(g)    Unless otherwise agreed in writing by the Trustee, any identified reserve samples (i.e., "retains"); provided, however, any reserve samples that are owned by the Debtors as of the Closing Date shall not constitute Excluded Assets so long as (i) as of the Closing Date, such reserve samples are not subject to any

ASDLC|386360                                    -4-

EXHIBIT 1

agreements by the Trustee to transfer such reserve samples to any third Person and (ii) the Debtors are not otherwise required to maintain such reserve samples by the FDA, any other governmental authority or applicable law.

(h)  Any rights of the Seller under this Agreement (including the right to receive any Sale Price hereunder).

(i)  Any assets located at 331 Carswell, Holly Hill, FL 32117 and 440 Fentress, Daytona Beach, FL 32114.

(j)  The Debtors' Records; provided, however, any of the Debtors' Records remaining at 330 Carswell Avenue, Holly Hill, FL 32117, 343 Carswell Avenue, Holly Hill, FL 32117, 344 Carswell Avenue, Holly Hill, FL 32117, and 540 Carswell Avenue, Holly Hill, FL 32117 shall not constitute Excluded Assets if and to the extent such Records remain subject to the provisions of Section 9.3.

(k)  Insurance policies, any claims thereunder (whether asserted prior to or after the date of the Closing) and the proceeds thereof.

(l)  Any claims or causes of action which may be asserted by or on behalf of the Debtors against any party, including but not limited to claims or causes of action under Code §§ 544, 547, 548, 549, 550 and 553.

(m)  Any other assets that are expressly excluded by the Trustee from the Sale.

**2.4**  **Assumed Liabilities.**  Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, Purchaser shall, by Purchaser's payment of the Sale Price, assumes and agrees to pay, perform and discharge all of Sellers' liabilities and obligations in respect of the Sale Assets (whether incurred before or after the Closing), including, without limitation, any obligation to dispose of the Sale Assets in accordance with all Applicable Disposal Requirements.

**2.5**  **Transfer of Liens.**  Subject to consummation of the Sale and payment in full of the Sale Price (defined below), the Sale Assets shall be sold, transferred and conveyed free and clear of all Liens to the fullest extent permitted under Section 363 of the Bankruptcy Code, with all Liens transferred to proceeds of Sale with the same validity and priority as such Liens applied against the Sale Assets immediately prior to the consummation of the sale, pursuant to the Sale Order.

**2.6**  **Sale Price.**  In consideration for the Sale Assets, subject to the other terms and conditions of this Agreement and the entry and effectiveness of the Sale Approval Order, Purchaser shall pay to Seller an amount in cash equal to the sum of One Million Six Hundred Seventy-Five Thousand Dollars ($1,675,000.00) (the "Sale Price").  The Sale Price shall be paid in cash and in full on the Closing Date by wire transfer of immediately available U.S. funds to an account designated by Seller (subject to application of the Deposit Amount in accordance with Section 2.7 below).

EXHIBIT 1

**2.7**    **Deposit.**    Upon execution and delivery of this Agreement to Seller, Purchaser shall deposit an amount equal to fifteen percent (15%) of the Purchase Price, in the amount of Two Hundred Fifty-One Thousand Two Hundred Fifty Dollars ($251,250.00) (the "Deposit Amount") in the form of a wire transfer or cashier's check to be held in a non-interest-bearing segregated account designated by the Trustee and pending completion of the Closing (but subject to the provisions set forth below).

(a)    If this Agreement is terminated pursuant to Sections 8.1(a), 8.1(b), 8.1(c) or 8.1(g), the Deposit Amount submitted by the Purchaser shall be refunded to the Purchaser.

(b)    If (x) the Sale Approval Order is entered by the Bankruptcy Court by March 11, 2019 and the Closing occurs or (y) the Sale to the Purchaser occurs in a manner otherwise approved by the Bankruptcy Court, then the Deposit Amount shall be applied at Closing as a credit toward the Sale Price.

(c)    If (x) the Sale Approval Order is entered by the Bankruptcy Court by March 11, 2019 and (y) the Sale to the Purchaser does not occur, then the Deposit Amount shall be (i) retained by the Debtors' estate as liquidated damages, if the Sale to the Purchaser shall fail to close by reason of a breach or default of the Purchaser and the Agreement is terminated pursuant to Section 8.1(d), or (ii) returned to the Purchaser, in the event that the Sale to the Purchaser shall fail to close by reason of a breach or default of the Seller and the Agreement is terminated pursuant to Section 8.1(e).

**2.8**    **Closing.**    The closing of the sale of the Sale Assets (the "Closing") must occur as soon as practicable but in any event within 3 days of the date on which the Sale Approval Order becomes a Final Order (or such later date as the Trustee and the agent for its secured lenders may agree). The Closing will take place at a location to be mutually agreed upon by Purchaser and Seller.  The transfer of the Sale Assets shall be effective for all purposes as of 12:01 a.m. eastern time on the day following the Closing Date.

**2.9**    **Prorated Items and Personal Property Taxes.**    At Closing, ad valorem taxes with respect to the Real Estate included in the Sale Assets for the calendar year shall be prorated based on the number of days in the year prior to Closing (which shall be the responsibility of the Seller) and the number of days in the year occurring on or after Closing (which shall be the responsibility of the Purchaser).  Seller's share of any prorated ad valorem taxes, calculated by the number of days in 2019 prior to the day of Sale Approval Order multiplied by the Real Estate Per Diem Amount, shall be credited against the Sale Price and Purchaser shall thereafter assume and hold Seller harmless from such obligations.  Seller shall be responsible for 2018 personal property taxes as part of the bankruptcy court proceedings. Seller shall file a final personal property tax return for January 1, 2019, by April 1, 2019, which will reflect applicable changes to the Seller's valuation of personal property. The 2019 personal property tax will be prorated with Seller responsible for the portion of the personal property tax due for 2019 based on the applicable tax rate applied to the applicable changes to the Seller's valuation of the personal property for the time period through Closing, and Purchaser shall be responsible

EXHIBIT 1

for the portion of the personal property tax due for 2019 based on the applicable tax rate applied to the applicable changes to the Seller's valuation of the personal property for the time period after Closing.

**2.10    Deliveries by Seller.**  At the Closing, Seller shall deliver or cause to be delivered to Purchaser the following (each in form and substance reasonably satisfactory to Purchaser):

    (a)    Duly executed bills of sale and (if applicable) a non-warranty deed or deeds transferring to Purchaser or its designated assignees all right, title and interest in and to the Sale Assets free and clear of all Liens, without exception or condition except as provided herein.

    (b)    A copy of the Sale Approval Order.

    (c)    Such other instruments or documents as Purchaser may reasonably request to fully effect the transfer of the Sale Assets and to confer upon Purchaser the benefits contemplated by this Agreement.

**2.11    Deliveries by Purchaser.**  At the Closing, Purchaser shall deliver, or cause to be delivered, the following:

    (a)    The Sale Price less the Deposit Amount, as described in Section 2.6.

    (b)    Such other instruments or documents as Seller may reasonably request to fully effect the transfer of the Sale Assets and to otherwise consummate the transactions contemplated by this Agreement.

**2.12    Disposal of Assets.**  After the Closing Date, Purchaser shall properly dispose of all Bulk Inventory and all Finished Goods Inventory in accordance with all Applicable Disposal Requirements.

**3.    Representations and Warranties of Purchaser.**

Purchaser hereby represents and warrants to Seller that the statements contained in this Article 3 are correct and complete as of the date hereof and as of the Closing Date:

    (a)    Purchaser has cash available or has existing borrowing facilities or unconditional, binding funding commitments that are sufficient to enable it to timely consummate a Sale hereunder, without incurrence of any obligation, commitment, restriction or liability of any kind which would impair or adversely affect the transactions contemplated by this Agreement.

    (b)    Purchaser has not taken any action that would cause Seller to have any obligation or liability to any Person for finders' fees, brokerage fees and commissions or like payments in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

EXHIBIT 1

(c)     To the extent any executory contracts or unexpired leases are designated by Purchaser to be assumed and assigned to Purchaser at Closing, Purchaser can provide (and will provide competent evidence at the hearing related to the Sale Approval Order sufficient to establish and the Bankruptcy Court to find that Purchaser has provided) adequate assurance of future performance.

(d)     Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges the condition of the Sale Assets and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in Section 4 hereof, and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Sale Assets are being transferred on a "WHERE IS" and, as to condition, "AS IS" basis and "WITH ALL FAULTS." Without in any way limiting the foregoing, Seller hereby disclaims any warranty (express or implied) or merchantability or fitness for any particular purpose as to any portion of the Sale Assets.

4.      **Representations and Warranties of Seller**.

Seller hereby represents and warrants to Purchaser that the statements contained in this Article 4 are correct and complete as of the date hereof and as of the Closing Date:

(a)     At the Closing Seller shall have and convey to Purchaser, good, valid and marketable title to the Sale Assets, free and clear of all Liens.

(b)     Seller has not taken any action that would cause Purchaser to have any obligation or liability to any Person for finders' fees, brokerage fees and commissions or like payments in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

(c)     Except as expressly set forth herein, Seller makes no representation or warranty, express or implied, at law or in equity, with respect to Seller and the Sale Assets or any other information provided to Purchaser, its agents or representatives in connection with or in expectation of the transactions contemplated by this Agreement.  Seller does not make any representations or warranties regarding information, documents, projections, forecasts or other material made available to Purchaser, its agents or representatives in connection with or in expectation of the transactions contemplated in this Agreement except to the extent such information is expressly and specifically included in a representation or warranty contained in this Article.

(d)     None of the Personal Property that is on the premises of the Real Estate as of February 7, 2019, except for the excluded assets identified specifically on Schedule 2.2 and the Excluded Assets identified on Section 2.3 has been sold or removed from said Real Estate.

EXHIBIT 1

5.    **Bankruptcy Court Approval.**

**5.1**    Seller and Purchaser acknowledge and agree that the Bankruptcy Court's entry of the Sale Approval Order is required in order for Seller and Purchaser to consummate the transactions contemplated hereby and that the requirement that the Sale Approval Order be entered is a condition that cannot be waived by any party hereto. The parties agree that the Bankruptcy Court shall have exclusive jurisdiction to hear, determine and enter final orders with respect to any dispute arising out of this Agreement.

**5.2**    Seller shall seek: (i) the Bankruptcy Court's approval of this Agreement (including the Bid Protections) and Seller's performance under this Agreement generally; and (ii) the entry of the Sale Approval Order.  Purchaser shall take such actions as are reasonably requested by Seller to assist Seller in obtaining a finding by the Bankruptcy Court that Purchaser is deemed to have purchased the Sale Assets in good faith pursuant to section 363(m) of the Bankruptcy Code.

**5.3**    If the Sale Approval Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Approval Order or other such order), subject to rights otherwise arising from this Agreement, Seller and Purchaser shall use their commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion; provided, however, Purchaser shall not be required to expend any  money or to modify any of the terms of this Agreement in order to obtain such resolution.

**5.4**    Notwithstanding anything contained herein to the contrary, but subject to Section 8.2, from the date of this Agreement (and any prior time) and until the entry of the Sale Approval Order, Seller is permitted to cause their respective representatives to initiate contact with, solicit, or encourage submission of any inquiries, proposals, or offers by any Person in connection with any sale or other disposition of the Sale Assets. The Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Sale Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Sale Assets to prospective buyers.  Seller agrees to promptly advise Purchaser of any offers it receives for the Sale Assets including, without limitation any offers for an Alternative Transaction or offers for any specific items of the Sale Assets and the amount thereof.

6.    **Conditions Precedent to Obligations of Purchaser**.

The obligation of Purchaser to consummate the transactions contemplated herein is subject to the satisfaction, at or before the Closing, of each of the following conditions:

EXHIBIT 1

**6.1**     The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on the Closing Date. Seller shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date.

**6.2**     The Bankruptcy Court shall have entered the Sale Approval Order in form reasonably satisfactory to Purchaser containing findings that (i) Purchaser is a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arms' length purchaser; (ii) the Sale Price is fair and reasonable; (iii) this Agreement was negotiated at arms' length; and (iv) the sale of the Sale Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code, and which Sale Approval Order is a Final Order.

**6.3**     Purchaser shall have received all documents and other items to be delivered by Seller under Section 2.10.

## 7.     Conditions Precedent to the Obligations of Seller.

The obligation of Seller to consummate the transactions contemplated herein is subject to the satisfaction, at or before the Closing, of each of the following conditions:

**7.1**     The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on the Closing Date.  Purchaser shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Purchaser on or before the Closing Date.

**7.2**     The Bankruptcy Court shall have entered the Sale Approval Order containing findings that (i) Purchaser is a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arms' length purchaser; (ii) the Sale Price is fair and reasonable; (iii) this Agreement was negotiated at arms' length; and (iv) the sale of the Sale Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code, and which Sale Approval Order is a Final Order.

**7.3**     Seller shall have received or concurrently receive the Sale Price and other items to be delivered by Purchaser under Section 2.11.

## 8.     Termination of Agreement; Bid Protections.

**8.1**     This Agreement may be terminated only as follows:

(a)     By mutual written agreement of both Seller and Purchaser at any time.

EXHIBIT 1

(b)     By Seller or Purchaser, if the Bankruptcy Court does not enter the Sale Approval Order by that date that is Forty-five (45) days from the date of this Agreement.

(c)     By Seller or Purchaser, if the Closing shall not have occurred on or prior to Thirty (30) days after the entry of the Sale Approval Order, for any reason other than such party's breach of this Agreement.

(d)     By the Seller, if Purchaser shall have breached or failed to perform in any material respect any of its respective representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform has not been cured prior to the date that is ten (10) days from the date that Purchaser receives notice by the Seller of such breach or failure to perform; provided, however, that the Seller shall not have the right to terminate this Agreement under this Section  (i) if such breach or failure to perform cannot be cured within ten (10) days of Purchaser's receipt of such notice but can be cured within twenty (20) days of such notice and Purchaser is proceeding diligently to cure such breach or failure within such twenty (20) day period, or (ii) if the Seller is then in material breach of this Agreement.

(e)     By Purchaser, if the Seller shall have breached or failed to perform in any material respect any of its respective representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform cannot be or has not been cured prior to the date that is ten (10) days from the date that the Seller is notified by Purchaser of such breach or failure to perform; provided, however, that Purchaser shall not have a right to terminate this Agreement under this Section if Purchaser is then in material breach of this Agreement.

(f)     Automatically and without any action or notice by Seller or Purchaser, immediately upon entry of a Final Order by the Bankruptcy Court approving an Alternative Transaction unless Purchaser is designated a "back-up bidder" under such Final Order.

(g)     Automatically and without any action or notice by Seller or Purchaser, immediately upon the consummation of an Alternative Transaction.

(h)     To the extent that this Agreement is terminated pursuant to Section 8.1(g), then in consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification, diligence, and quantification of the Sale Assets of Seller, subject to bankruptcy court approval, Seller shall pay to Purchaser (x) an amount necessary to reimburse Purchaser for its actual expenses in the diligence, negotiation and preparation of documents related to the transactions contemplated by this Agreement, not to exceed Fifteen Thousand Dollars ($15,000.00) in the aggregate (the "Expense Reimbursement") and (y) a break-up fee in an amount equal to three percent (3.0%) of the Sale Price (the "Break-up Fee").   The Expense

EXHIBIT 1

Reimbursement and Break-up Fee shall not be applicable for any other termination of this Agreement.

9. **Miscellaneous Provisions**

**9.1   Transaction Expenses.**   Except as expressly provided for herein (including Section 8.2), each party shall pay all fees, costs and expenses incurred by it with respect to this Agreement, whether or not the transactions contemplated hereby are consummated.

**9.2   Further Assurances.**   Purchaser and Seller shall, from time to time after the Closing, without further consideration, execute and deliver such instruments and take such further actions as may be reasonably necessary or desirable to carry out the provisions hereof and the transactions contemplated hereby.

**9.3   Availability of Records.**   From and after the Closing, Purchaser shall promptly provide to Seller (after reasonable notice and during normal business hours and without charge to the Debtors or the Trustee) access to all Records included in the Sale Assets for periods prior to the Closing, and shall preserve such Records and provide such access until the date that is sixty (60) days following the Closing Date.  Prior to destroying any Records included in the Purchased Assets for periods prior to the Closing, Purchaser shall notify the Trustee thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Purchaser shall permit Debtors and the Trustee to retain such Records, at the Debtors' cost and expense.

**9.4   Notifications.**   From the date of this Agreement until the earlier of the Closing or the termination of this Agreement, Seller shall give Purchaser prompt written notice of the occurrence of any of the following events:

(a)   Any loss, taking, condemnation, damage or destruction of or to any of the Sale Assets.

(b)   The commencement of any proceeding or litigation at law or in equity or any other commission, agency or administrative or regulatory body or authority against Seller which would prohibit the Sale of the Sale Assets pursuant to an order of the Bankruptcy Court.

(c)   Any other materially adverse developments with respect to the Sale Assets.

(d)   Any event, occurrence or fact that causes any of the representations or warranties to be untrue at any time in any material respect; provided, that no disclosure by Seller pursuant to this section shall be deemed to amend or supplement any provision of this Agreement or to prevent or cure any misrepresentation, breach of warranty or breach of covenant.

EXHIBIT 1

**9.5** **Survival.** The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and neither of the parties nor any of its respective officers, directors, representatives, employees, advisors or agents shall have any liability to the other after the Closing for any breach thereof. The parties hereto agree that only the covenants contained in this Agreement that are expressly required to be performed at or after the Closing Date shall survive the Closing hereunder, and each of the parties hereto shall be liable to the other after the Closing Date for any breach thereof.

**9.6** **Jurisdiction.** The parties agree that the Bankruptcy Court shall retain the exclusive and sole jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the implementation or the breach hereof. The parties consent to the core jurisdiction of the Bankruptcy Court, to the constitutional authority of the Bankruptcy Court to enter a final judgment, and agree to have waived any right to a jury trial in connection with any disputes related to or arising out of this Agreement.

**9.7** **Notices.** All notices, consents or other communications required or permitted hereunder shall be given in writing and hand delivered or addressed and sent by Federal Express or other recognized overnight courier, or by certified or registered mail, postage prepaid, and return receipt requested, as follows or to such other address as may hereafter be designated by any party by the giving of notices in accordance with this Section 9.7:

> (a) If to Seller: C. Edwin Allman, III, Trustee, PO Box 5129, Winston-Salem, NC 27113 email: ceallman@allmanspry.com

> (b) With a copy to: Dimitri G. Karcazes, counsel for Madison Capital Funding LLC, as Agent for the Lenders to the Seller, 55 East Monroe Street, Suite 3300, Chicago, IL 60603 email: dimitri.karcazes@goldbergkohn.com

> (c) If to Purchaser: Steven R. Mattes, CEO, and Venice Gamble, Industrial Assets Corp., 11426 Ventura Boulevard, Studio City, CA 91604 email: smattes@industrialassets.com; and vgamble@industrialassets.com.

> (d) With a copy to: Weisman & Goldman, P.C., 1725 Boulevard of the Allies, Pittsburgh, PA 15219, Attn. James L. Weisman, Esq. email: jweisman@wgbglaw.com.

> (e) All notices, consents or other communications shall be deemed given when actually delivered (in the case of hand delivery by Federal Express or other recognized overnight courier) or five days after mailing in accordance with this Section 9.7.

**9.8** **Governing Law.** To the extent not governed by the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina, without giving effect to rules governing the conflict of laws.

**9.9** **Waiver.** The waiver by a party of a breach of any covenant, agreement or undertaking contained herein shall be made only by a written waiver in each case. No

EXHIBIT 1

waiver of any breach of any covenant, agreement or undertaking contained herein shall operate as a waiver of any prior or subsequent breach of the same covenant, agreement or undertaking or as a waiver of any breach of any other covenant, agreement or undertaking.

**9.10    Severability.** If any provision of this Agreement shall be held invalid, illegal or unenforceable, in whole or in part, the validity, legality, and enforceability of the remaining part of such provision, and the validity, legality and enforceability of all other provisions hereof or thereof, shall not be affected thereby.

**9.11    Counterparts.** This Agreement may be executed in one or more counterparts (whether manually signed or by facsimile or other electronic means), each such counterpart shall be deemed an original, and all such counterparts shall constitute one and the same agreement.

**9.12    Captions; References.** The headings, titles or captions of the Articles and Sections of this Agreement are inserted only to facilitate reference, and they shall not define, limit, extend or describe the scope or intent of this Agreement or any provision hereof, and they shall not constitute a part hereof or affect the meaning or interpretation of this Agreement or any part hereof.

**9.13    Amendments.** This Agreement may not be amended, changed, modified, altered or terminated unless the parties hereto mutually agree in writing to such amendment, change, modification, alteration or termination.

**9.14    Remedies Cumulative; Specific Performance.** Except as otherwise expressly provided in this Agreement, no remedy herein conferred is exclusive of any other available remedy and each and every such remedy shall be cumulative and shall be in addition to every other remedy given by agreement or now or hereafter existing at law or in equity or by statute. Except as otherwise expressly provided in this Agreement, in addition to any and all other remedies that may be available at law, in the event of any breach of this Agreement each party shall be entitled to seek specific performance of the agreements and obligations hereunder and to such other injunctive or equitable relief as may be granted by a court of competent jurisdiction.

**9.15    Binding Nature; Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interest or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other party; provided, however, that the Seller's rights under this Agreement, including, without limitation, the Seller's rights to enforce this Agreement, have been assigned for collateral security purposes to the Seller's secured lenders (and the agent therefor) and Purchaser acknowledges such assignment and the rights of the Seller's secured lenders (and the agent therefor) to enforce the rights of Seller under this Agreement as well as the right of Seller to designate the secured lenders to directly receive any amounts owed to Seller under this Agreement. Nothing contained herein, express or implied, is intended to confer on any Person other than the parties hereto or their successors and assigns, any

EXHIBIT 1

rights, remedies, obligations or liabilities under or by reason of this Agreement. Notwithstanding anything to the contrary contained in this Agreement, Purchaser shall have the right without the prior consent of the Seller to assign its rights and obligations to purchase the Sale Assets in whole or in part to one or more single purpose limited liability companies upon notice to Seller prior to Closing and to allocate the Purchase Price for the specific Sale Assets assigned to such assignees which right shall be specifically provided for in the Sale Approval Order; provided that, Purchaser shall not be relieved of its obligations to purchase the Sale Assets if such assignee or assignees fail to purchase the Sale Assets in breach of this Agreement.

**9.16    No Third-Party Beneficiaries.**  This Agreement is a contract solely between Purchaser and Seller.  No third party beneficiaries, (including, without limitation, employees and customers of Seller) are intended hereunder and none shall be inferred herein; and no party other than Purchaser or Seller may assert any right, make any claim or otherwise attempt to enforce any provision of or under this Agreement; provided, however, that the Seller's secured lenders (and the agent therefor) are express third party beneficiaries for purposes of Section 2.8, Section 9.15, this Section 9.16 and Section 9.17 and Purchaser acknowledges the rights of Seller's secured lenders (and the agent therefor) as a result thereof.

**9.17    Release and Waiver.**  Effective upon the Closing, except as set forth in this Agreement, the Purchaser hereby irrevocably waives, releases, and discharges Seller, solely in Seller's capacity as the owner of the Sale Assets, each of Seller's Affiliates (in each such Person's capacity as an Affiliate of such Seller), and Seller's secured lenders (and the agent therefor) (in such Person's capacity as a lender (or agent for such lender) of Seller) from any and all liabilities or debts to its business and the Purchaser of any nature or kind whatsoever (including in respect of rights of contribution or indemnification).

**9.18    Time of the Essence.**  Purchaser and Seller agree that time is of the essence throughout this Agreement and every provision hereof in which time is an element.  No extension of time for performance of any obligations or acts shall be deemed an extension of time for performance of any other obligations or acts.  If any date for performance falls on a Saturday, Sunday or legal holiday in the States of Florida, California and New York or the Commonwealth of Pennsylvania then the time for performance shall b extended to the next Business Day.

**[signatures on following page]**

EXHIBIT 1

**IN WITNESS WHEREOF**, the parties have caused their duly authorized officers to execute this Agreement as of the day and year first above written.

**INDUSTRIAL ASSETS CORP. and its designated assignees**

Purchaser

By: _____

Name: Steven Mattes

Title:   President & Chief Executive Officer

**PRODUCT QUEST MANUFACTURING, LLC**

For itself and for the other Debtors collectively acting as "Seller"

By: _____

C. Edwin Allman, III, Trustee

Signature Page to Asset Purchase Agreement

## SCHEDULE 2.1 – SALE ASSETS

Real Property

- 330 Carswell Avenue, Holly Hill, FL 32117
- 343 Carswell Avenue, Holly Hill, FL 32117
- 344 Carswell Avenue, Holly Hill, FL 32117
- 540 Carswell Avenue, Holly Hill, FL 32117

Personal Property

- All personal property including, but not limited to, inventory, machinery & equipment, vehicles, trailers and other assets on the Real Estate and not specifically excluded personal property identified on Schedule 2.2 or defined as an Excluded Asset in Section 2.3 of this Agreement.

EXHIBIT 1

### SCHEDULE 2.2 – EXCLUDED ASSETS

- Cash now or subsequently held in bank accounts or otherwise by the Debtors or by the Trustee on behalf of the Debtors.

- 

- Accounts receivable, deposits, or other debts or obligations owed to the Debtors by or from any party, including any right of setoff, recoupment or reconciliation.

- 

- Minoxidil ANDAs (2% and 5%), Chiggerex and Scherer Labs brands and all Debtor owned formulations and all other intellectual property.

- Computer servers and storage devices unless (i) the Trustee and the Debtors have downloaded or otherwise acquired a copy of all information, data and Records maintained or stored thereon and (ii) such computer servers and storage devices remain subject to the provisions of Section 9.3.

- 

- Licenses and permits of any nature, other than executory contracts or unexpired leases which are expressly listed on Schedule 2.3 and which are able to be assigned and assumed pursuant to Section 365 of the Bankruptcy Code.

- 

- Any customer owned equipment or intellectual property either on loan or licensed to the Debtors, and other tangible or intangible assets which are the property of a party other than the Debtors.

- 

- Unless otherwise agreed in writing by the Trustee, any identified reserve samples (i.e., "retains"); provided, however, any reserve samples that are owned by the Debtors as of the Closing Date shall not constitute Excluded Assets so long as (i) as of the Closing Date, such reserve samples are not subject to any agreements by the Trustee to transfer such reserve samples to any third Person and (ii) the Debtors are not otherwise required to maintain such reserve samples by the FDA, any other governmental authority or applicable law.

- 

- Any rights of the Seller under this Agreement (including the right to receive any Sale Price hereunder).

- 

- Any assets located at 331 Carswell, Holly Hill, FL 32117 and 440 Fentress, Daytona Beach, FL 32114.

- The Debtors' Records; provided, however, any of the Debtors' Records remaining at 330 Carswell Avenue, Holly Hill, FL 32117, 343 Carswell Avenue, Holly Hill, FL 32117, 344 Carswell Avenue, Holly Hill, FL 32117, and 540 Carswell Avenue, Holly Hill, FL

EXHIBIT 1

32117 shall not constitute Excluded Assets if and to the extent such Records remain subject to the provisions of Section 9.3.

- Insurance policies, any claims thereunder (whether asserted prior to or after the date of the Closing) and the proceeds thereof.

- Any claims or causes of action which may be asserted by or on behalf of the Debtors against any party, including but not limited to claims or causes of action under Code §§ 544, 547, 548, 549, 550 and 553.

EXHIBIT 1

## **SCHEDULE 2.3 – ASSUMED CONTRACTS**

- None

EXHIBIT 1

## ADDENDUM TO CONSULTING AGREEMENT (FLORIDA)

This Addendum to Consulting Agreement, dated as of January ___, 2019 (the "Addendum"), is made by and between by and between Tiger Liquidity Services BioPharma Partners (the "Consultant"), and Product Quest Manufacturing, LLC, et al. (collectively, the "Bankruptcy Estates" or the "Debtors"), acting by and through the Trustee (as defined below) (collectively, the Consultant and the Trustee shall be referred to as the "Parties").

WITNESSETH

**WHEREAS**, the Debtors filed voluntary petitions with the United States Bankruptcy Court for the Middle District of North Carolina (the "Bankruptcy Court") for relief under Chapter 11, title 11, United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"); and

**WHEREAS**, the Debtors in the cases are: (i) Ei LLC (Case No. 18-50945); (ii) Product Quest Manufacturing, LLC (Case No. 18-50946); (iii) Scherer Labs International, LLC (Case No. 18-50948); (iv) Product Quest Logistics, LLC (Case No. 18-50950); (v) JBTRS, L.L.C. (Case No. 18-50951); and (vi) PQ Real Estate LLC (Case No. 18-50952), which have been administratively consolidated as Case No. 18-50946 (the "Bankruptcy Cases"); and

**WHEREAS**, On October 10, 2018, the Debtors filed the Conditional Motion to Convert Case to Chapter 7 (Dkt. 186), and on October 11, 2018, the Bankruptcy Administrator filed the Motion to Convert Case to Chapter 7 or For Appointment of a Chapter 11 Trustee ("Motion to Convert") (Dkt. 192); and

**WHEREAS**, the Bankruptcy Court granted the Motion to Convert and C. Edwin Allman, III ("Trustee") was appointed to serve as the trustee; and

**WHEREAS**, in connection with the Bankruptcy Cases, the Bankruptcy Court has entered orders regarding the use of cash collateral, including, without limitation,    that certain Order Authorizing Debtors to: (a) Use Cash Collateral On an Emergency Basis Pending a Final Hearing; and (b) Grant Adequate Protection and Provide Security and Other Relief to Agent and Lenders, entered on September 18, 2018 (Dkt. 79), that certain Second Order Authorizing Debtors to: (a) Use Cash Collateral On an Emergency Basis Pending a Final Hearing; and (b) Grant Adequate Protection and Provide Security and Other Relief to Agent and Lenders, entered on September 28, 2018 (Dkt. 135) and that certain Third Order Authorizing Debtors to: (a) Use Cash Collateral On an Emergency Basis Pending a Final Hearing; and (b) Grant Adequate Protection and Provide Security and Other Relief to Agent and Lenders, entered on November 1, 2018 (Dkt. 270), that certain Order Authorizing Chapter 7 Trustee to (a) Use Cash Collateral; and (b) Grant Adequate Protection and Provide Security and Other Relief to Agent and Lenders, entered on November 19, 2018 (Dkt. 310) (such orders (together with any orders regarding the

EXHIBIT 2

use of cash collateral), as amended, supplemented or modified from time to time, collectively, the "Cash Collateral Order"); and

WHEREAS, the Parties entered into that certain Consulting Agreement dated as of November 21, 2018 (the "Agreement") pursuant to which the Trustee retained Consultant to provide consulting and other sale related services, inclusive, if necessary, of auction and brokerage services, with respect to the sale and disposition of certain excess assets; and

WHEREAS, the Parties desire to modify the services provided with regard to the Florida Assets (as described below); and

WHEREAS, the Parties are willing to modify such services upon the terms and conditions and in the manner set forth in this Addendum.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## 1.    DEFINITIONS

For the purposes of this Addendum, the terms listed below shall have the respective meanings indicated:

1.1    "Agent" shall mean Madison Capital Funding LLC, in its capacity as administrative agent for certain lenders party to the Prepetition Credit Agreement.

1.2    "Florida Approval Order" shall mean one or more orders of the Bankruptcy Court after notice to parties in interest, including any party shown having or asserting a lien on any of the Florida Assets, in form reasonably acceptable to Consultant authorizing the Trustee to (a) retain Consultant's services on the terms set forth herein, (b) pay Consultant its compensation and reimburse the Florida Sale Expenses on the terms set forth herein, (c) enter into and consummate the transactions set forth herein, and (d) transfer title to the Florida Assets free and clear of liens, claims and encumbrances.

1.3    Except as set forth below, "Florida Assets" shall mean all of the Bankruptcy Estates' Inventory and Equipment located at the Florida Facilities and the Florida Real Property.

1.4    "Florida Real Property" and "Florida Facilities" shall refer to the real property located at 331 Carswell Avenue, Holly Hill, FL 32117.

1.5    "Florida Sale Expenses" shall mean, with respect to the Florida Sale Process, direct operating expenses incurred in connection with same as agreed by the parties.

EXHIBIT 2

1.6    "Florida Sale Process" shall mean the bulk sale of the Florida Assets to be managed and conducted by Consultant on behalf of the Trustee as set forth herein.  The bulk sale of the Florida Assets and the compensation payable to Consultant related thereto is subject to Bankruptcy Court approval on notice and hearing in the form of the supplemental Florida Approval Order.  In the event that no bulk buyer for the Florida Assets should materialize or be approved by the Trustee and Agent on or before such date as may be agreed to by the Trustee and Agent, then the Florida Assets would revert to the Sale process set forth in the Agreement and no fee under this Addendum would be payable (but Consultant would be eligible for the fee set forth in the Agreement upon the Sale or Auction of the Florida Assets).

1.7    "Florida Sale Term" shall mean the period of time beginning with the execution of this Addendum and ending on the earlier of the Removal Date or the date on which the Florida Assets revert to the Sale process set forth in the Agreement (as described in the definition of Florida Sale Process).

1.8    "Removal Date" shall be mean a date agreed upon between Consultant, the Trustee, and the Agent with respect to the removal of the personal property at the Florida Facilities.

1.9    "Services" shall mean the services to be performed by Consultant pursuant to Section 2.2 of this Addendum.

Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the Agreement or the Cash Collateral Order, as applicable.

## 2.    RETENTION; SERVICES PROVIDED

2.1    Subject to the entry of the Florida Approval Order, the Trustee hereby retains Consultant, and Consultant hereby agrees to serve, as an independent consultant to Trustee in connection with the conduct of the Florida Sale Process as set forth herein.  With respect to the Florida Assets, Consultant shall serve as Trustee's sole and exclusive consultant relative thereto throughout the Florida Sale Term.

2.2    On the terms and conditions set forth herein, commencing after execution of this Addendum, Consultant shall pursue and manage a "turnkey/bulk" sale of the Florida Assets and provide the following Services with respect thereto:

(i)    oversee the Florida Sale Process to identify the highest and best offer, negotiate the terms subject to the agreement of the Trustee and the Agent of such offer, and assist with the close of such transaction for the sale of the Florida Assets;

(ii)    identify parties likely to be interested in purchasing the Florida Assets;

*Florida Addendum to*
*Consulting Agreement*
*Page 3 of 9*

EXHIBIT 2

(iii)   determine and produce commercially reasonable materials to distribute to parties identified as likely to be interested in purchasing the Florida Assets;

(iv)   host potential buyers at the Florida Facilities and coordinate responses to due diligence requests as applicable;

(v)   obtain the commitment of the buyer to be responsible for all costs and to assume all liabilities to dispose of certain "quarantined" finished goods and bulk inventory identified by the Trustee and Agent, including obtaining a copy of removal protocol acceptable to the Trustee and the Agent from such buyer;

(vi)   verify, on behalf of the Bankruptcy Estates, the removal by the buyer of such inventory described in subclause (v);

(vii)   provide such other related service deemed necessary or prudent by the Trustee, Consultant and Agent under the circumstances presented; and

(viii)   provide the Trustee and the Agent with reporting and reconciliation of accounting information relating to the Florida Sale Process in form reasonably acceptable to the Parties and Agent.

2.3   Any sale of the Florida Assets would be subject to the agreement of the Agent and the Trustee and approval of the Bankruptcy Court after notice and an opportunity to be heard.

2.4   Consultant shall sell the Florida Assets "as is", without any representations of any kind or nature whatsoever, including as to merchantability or fitness, and without warranty or agreement as to the condition of such Florida Assets.  The Trustee acknowledges that Consultant is acting solely in the capacity of Consultant for the Trustee and has no knowledge with respect to the fitness or usability of any of the Florida Assets.

**3.   EXPENSES**

3.1   Florida Sale Expenses shall be agreed to between the parties and Consultant shall not exceed such agreed upon amount in the aggregate without the prior written approval of the Trustee and the Agent.  For the avoidance of doubt, the aggregate amount of Florida Sale Expenses and Sale Expenses shall not exceed the amounts set forth in the Budget attached to the Agreement.  Florida Sale Expenses shall be subtracted from the proceeds of sale as set forth in Section 4 hereof.  To the extent that Florida Sale Expenses must be paid in advance of receipt of proceeds of the sale of the Florida Assets, subject to satisfaction of the conditions precedent hereunder, Consultant shall be responsible for the payment of such Florida Sale Expenses subject to recovery as provided below.

*Florida Addendum to*
*Consulting Agreement*
*Page 4 of 9*

EXHIBIT 2

## 4.    CONSULTANT'S FEES

4.1    Base Fee.  In the event that a sale of the Florida Assets to a bulk buyer is approved by the Bankruptcy Court and consummated pursuant to the Florida Sale Process, Consultant shall be entitled to a base fee of $120,000 payable from the proceeds of such sale.

4.2    Incentive Fee.  In the event that the gross cash consideration paid pursuant to the sale of the Florida Assets (excluding any deduction taken for real estate taxes) to a bulk buyer pursuant to the Florida Sale Process exceeds $2,250,000, Consultant shall be entitled to an additional incentive fee equal to 15% of the amount by which the gross cash consideration exceeds $2,250,000, payable from the proceeds of such sale.  By way of example, if the cash purchase price paid is $2,350,000, then Consultant's applicable incentive fee would be $15,000.

4.3    All proceeds of the sale of the Florida Assets shall (within 5 business days of receipt by Consultant) be turned over to the Trustee to be deposited in the Blocked Accounts and applied in accordance with the Cash Collateral Order, net of the base fee earned, any incentive fee earned and any Florida Sale Expenses then due, as applicable.  To the extent any such earned fees or Florida Sale Expenses are due but not yet paid in accordance with the immediately preceding sentence, Consultant may seek payment of such amounts from Trustee and Trustee shall promptly pay such applicable fees and expenses that are due in accordance with the terms of this Agreement and the Cash Collateral Order.

4.4    The Excluded Purchasers referenced in the Agreement shall not apply to the Florida Assets.

## 5.    REPRESENTATIONS AND WARRANTIES OF CONSULTANT

5.1    Consultant hereby represents, warrants and covenants in favor of the Trustee that Consultant has taken all necessary action required to authorize the execution, performance and delivery of this Addendum, and to consummate the transactions contemplated hereby.

## 6.    REPRESENTATIONS AND WARRANTIES OF TRUSTEE

6.1    Trustee hereby represents, warrants and covenants in favor of Consultant that, subject to the Cash Collateral Order and the entry of the Florida Approval Order, the Trustee has taken all necessary action required to authorize the execution, performance and delivery of this Addendum, has taken all steps necessary and has good and valid authority to consummate the transactions contemplated hereby, including the conduct of the Florida Sale Process.

*Florida Addendum to*
*Consulting Agreement*
*Page 5 of 9*

EXHIBIT 2

## 7.    MISCELLANEOUS

7.1    Consultant shall provide such materials, reports, analyses and other information, to the Trustee, Agent or any lender, as reasonably requested, regarding the activities of Consultant, the Florida Assets, the Florida Sale Process, and prospective purchasers.

7.2    The Trustee shall be solely liable for any expenses incurred in connection with the maintenance or operation of the Florida Facilities, including but not limited to occupancy costs, utilities, security, local telephone, trash services, property taxes and any other related costs.

7.3    Consultant shall prepare all reporting forms, certificates, reports and other documentation required in connection with the payment of applicable sales taxes to the appropriate taxing authorities and the Trustee shall process all of the foregoing. The Trustee shall pay the same to the appropriate taxing authorities in accordance with applicable law.

7.4    To the extent applicable, the Trustee shall deliver the corresponding certificates of title (clean and ready for endorsement) for titled assets included in the Florida Assets no later than the entry of the Florida Approval Order.

7.5    The Trustee and Consultant shall determine whether any personal property taxes are or will be payable with respect to the Florida Assets. Consultant shall not be responsible or liable for the payment of any personal property taxes associated with the Florida Assets. To the extent of any liability, the Trustee agrees that Consultant may withhold from the distribution of any proceeds from the sale of the Florida Assets the amount of any personal property taxes owed, pending evidence of payment thereof by Company.

7.6    Any notice or other communication under this Addendum shall be in writing and may be delivered personally, sent by facsimile or by prepaid registered or certified mail, or by electronic mail, addressed as follows:

      (i)    in the case of Consultant:

          Tiger Capital Group
          340 Westlake Blvd., Suite 260
          Westlake Village, CA 91362
          Attn: Mark P. Naughton
          Senior General Counsel
          Email: mnaughton@tigergroup.com

      (ii)    in the case of Trustee:

          C. Edwin Allman, III, Trustee
          Allman Spry Davis Leggett & Crumpler, P.A.
          380 Knollwood Street, Suite 700

*Florida Addendum to*
*Consulting Agreement*
*Page 6 of 9*

EXHIBIT 2

Winston-Salem, NC 27103
Email: ceallman@allmanspry.com

(iii)    in the case of Agent:

Madison Capital Funding LLC
30 South Wacker, Suite 3700
Chicago, IL 60606
Attn: Rick Stone
Email: richard_stone@mcfllc.com

Goldberg Kohn Ltd.
55 East Monroe, Suite 3300
Chicago, IL 60603
Attn: Dimitri G. Karcazes
Email: Dimitri.Karcazes@goldbergkohn.com

7.7    This Addendum shall be governed by and interpreted in accordance with the internal laws of the State of North Carolina without reference to any conflict of laws provisions.

7.8    Consultant's services involve the orchestration of a sales and marketing effort of the Florida Assets. Consultant is not guaranteeing any result from the Florida Sale Process and nothing contained in this Addendum shall be construed as a warranty on the part of Consultant that any result will be achieved.

7.9    Throughout the Florida Sale Term, Consultant shall have the right to the non-exclusive use and occupancy of, the Florida Facilities to conduct the Florida Sale Process and to allow the removal of assets therefrom, without interruption. Consultant is not a cleaning, demolition, data destruction or hazardous waste company. Except as otherwise set forth in Section 2.2, Consultant shall not be responsible for i) removal of unsold or abandoned items, ii) trash and debris, iii) paperwork, or iv) hazardous materials.

7.10    Notwithstanding any of the terms of this Addendum to the contrary, except in the case of negligent or intentional acts or omissions of the Consultant or any of its agents, employees, representatives, principals or Supervisors, Consultant's maximum liability for (i) any breach of covenants, agreements and/or indemnifications set forth herein, and (ii) any and all damages of any type or nature whatsoever, whether in contract, tort or otherwise, that may be sustained by the Trustee or any other person or entity that arises from or is otherwise related to this Addendum or the Florida Sale Process shall be limited to the aggregate amounts actually received by Consultant as compensation under this Addendum.

*Florida Addendum to*
*Consulting Agreement*
*Page 7 of 9*

EXHIBIT 2

7.11    Except as otherwise set forth in Section 2.2, Consultant has no obligation whatsoever to store, handle, treat, dispose, transport or remove any hazardous substance and shall have no liability to any party with regard to the removal or remediation of any such hazardous substances.

7.12    In the event any term or provision contained within this Addendum shall be deemed illegal or unenforceable, then such offending term or provision shall be considered deleted from this Addendum and the remaining terms shall continue to be in full force and effect.

7.12    This Addendum constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior negotiations and understandings, and can only be modified by a writing signed by the Trustee and Consultant or as may be directed by the Bankruptcy Court.

7.13    This Addendum may be executed in several counterparts, each of which when so executed shall be deemed to be an original and such counterparts, together, shall constitute one and the same instrument.  Delivery by facsimile of this Addendum or an executed counterpart hereof shall be deemed a good and valid execution and delivery hereof or thereof.

7.14    Nothing contained hereof shall be deemed to create any relationship between Consultant and the Trustee other than an agency relationship.  It is stipulated that the parties are not partners or joint venturers.

7.15    The Trustee and Consultant each acknowledge and agree that (i) this Addendum may not be amended, modified or terminated without the prior written consent of Agent and (ii) Agent is a third-party beneficiary of the terms of this Addendum and is entitled to enforce the terms of this Addendum.

7.16.    Notwithstanding anything to the contrary contained in this Agreement, the terms of this Addendum (including with respect to the payment of any amounts hereunder and the treatment of sale proceeds) are subject to the provisions of the Cash Collateral Order (including any budget referred to therein).  In the event of any inconsistency between the Cash Collateral Order and this Addendum, the terms of the Cash Collateral shall govern and control.

7.17    Except as expressly modified in this Addendum, the terms of the Agreement shall remain in full force and effect.  In the case of an inconsistency between the Agreement and this Addendum, the Addendum shall control for any issue relating to the Florida Assets and the Agreement shall control otherwise.

*Florida Addendum to*
*Consulting Agreement*
*Page 8 of 9*

EXHIBIT 2

**IN WITNESS WHEREOF**, the parties have caused their duly authorized officers to execute this Agreement as of the day and year first above written.

**TIGER LIQUIDITY SERVICES BIOPHARMA PARTNERS**
By:

Name: Mark P. Naughton

Title:  Authorized Agent, Senior General Counsel of Tiger Capital Group, LLC

**PRODUCT QUEST MANUFACTURING, LLC**
For itself and for the other Debtors

By:  _____
C. Edwin Allman, III, Trustee

*Florida Addendum to*
*Consulting Agreement*
*Page 9 of 9*

EXHIBIT 2