## IN THE UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
## WINSTON-SALEM DIVISION

In re:                    )

**PRODUCT QUEST MANUFACTURING, LLC**  )

                    )    **Case No. B-18-50946C-7W**

           Debtor.  )

## MOTION FOR ORDER AUTHORIZING AND APPROVING THE PRIVATE SALE OF INTELLECTUAL PROPERTY FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES TO RANDOB LABS LTD. OR ITS DESIGNATED ASSIGNEE; APPROVING THE ASSET PURCHASE AGREEMENT; AND GRANTING RELATED RELIEF

C. Edwin Allman, III, Trustee in the above-entitled Chapter 7 case, respectfully moves the Court entry of an order, pursuant to 11 U.S.C. § 363 and Bankruptcy Rules 2002 and 6004 (i) authorizing the private sale of certain intangible personal property more particularly described herein (the "Sale Assets") to Randob Labs Ltd., or its designated assignee ("Purchaser") pursuant to an Asset Purchase Agreement between the Trustee and Purchaser, a copy of which is attached hereto as **Exhibit 1** and incorporated herein by reference (the "Asset Purchase Agreement"); (ii) authorizing and approving the Asset Purchase Agreement; and, (iii) granting certain related relief.  In support hereof, the Trustee respectfully represents as follows:

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  Statutory predicates for the relief requested herein are §§ 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2004 and 6004.

2.      On September 7, 2018 (the "Petition Date") the Debtor filed a voluntary Petition under Chapter 11 of the Bankruptcy Code along with five other related cases[1]. The cases were, for a time, jointly administered pursuant to Bankruptcy Rule 1015(b). On October 31, 2018, this case along with the related cases (collectively the "Related

---

[1] The Related Cases are as follows:  (i) Ei LLC (18-50945); (ii) Scherer Labs International, LLC (18-50948); (iii) Product Quest Logistics, LLC (18-50950); (iv) JBTRS, L.L.C. (18-50951); and (v) PQ Real Estate LLC (18-50952).

Cases") were converted to Chapter 7 cases and C. Edwin Allman, III, was appointed to serve as Trustee.

3.    Substantially all of the Debtor's assets are encumbered by liens in favor of the Debtor's secured lender, Madison Capital Funding LLC ("Lender") as agent for the secured lenders in all of the Related Cases. At the time of the Chapter 11 filing, Lender was owed in excess of One Hundred Fifty Million Dollars ($150,000,000.00).

4.    At the time of the Debtor's bankruptcy filing the Trustee believes that the Debtor was the owner of certain trademarks registered with the United States Patent and Trademark Office, certain common law trademarks, various formulas and certain other intellectual property assets. The Trustee has reached an agreement with Purchaser to sell all the Trustee's right, title and interest in the following intellectual property assets pursuant to the Asset Purchase Agreement attached to this Motion as **Exhibit 1**:

- Trademarks Registered with USPTO
  - Ear-Dry (application 75/117,240 registration 2,055,324)
  - E-R-O (application 72/117,353 registration 0,723,274)
  - Chiggerex (application 74/215,249 registration 1,742,691)

- Common Law Trademarks
  - Rhinall (Serial #73314165 – Status: Cancelled)
  - HuMist (Serial #73250033 – Status: Cancelled)
  - CHIGGER-TOX (Serial #77234521 – Status: Cancelled)
  - Chigger-Tox (Serial #73057066 – Status: Cancelled)
  - Scherer Labs (Class 5) (Serial #87166803 – Status: Abandoned)
  - Scherer Labs (Class 3) (Serial #87166820 – Status: Abandoned)
  - Dr. Scherer Established 1933 (Design Mark) (Serial #85526150 – Status: Abandoned)
  - Bite Relief

- All available records related to the Sale Assets, including but not limited to, batch records, manufacturing instructions and processes, marketing materials /collateral, stability data, sales data, customer contact list, vendor list, and raw material pricing.

- Formulas for the following:
  - Rhinall Spray / Drops (formula #1375PQ)
  - Mederma-Type* Scar Gel (formula #2-277PQ)
  - Therapeutic Mineral Ice-Type* Gel (formula #3-38PQ)
  - Ear Pain Relief (formula #5-101PQ)
  - Ear Dry Ear Drops (formula #5-105PQ)

2

- o Humist (formula #6-323PQ)
- o SPF 50 Water Babies Coppertone-Type* Sunscreen (formula #10-53PQ)
- o Solarcaine-Type* Burn Relief Aloe Extra Spray (formula #10-79PQ)
- o Kiehl's-Type* Diaper Rash Ointment (formula #12-213PQ)
- o Ear Wax Removal Solution (formula #13-243PQ)
- o Cortaid-Type* Intensive Therapy Cooling Spray (formula #16-65PQ)
- o Extra Strength Icy Hot-Type* Continuous Spray (formula #18-77PQ)
- o Neutrogena-Type* Pure & Free Baby Sunblock Stick SPF 60+ (formula #18-119PQ)
- o Proactiv-Type* Revitalizing Toner Step #2 (formula #24-40PQ)
- o Proactiv-Type* Renewing Cleanser Step #1 (formula #24-42PQ)
- o Proactive-Type* Repairing Treatment Step #3 (formula #24-44PQ)
- o Mederma-Type* Stretch Mark Cream (formula #24-54PQ)
- o Caladryl Clear-Type* Spray (formula #24-60PQ)
- o Ayr-Type* Saline Gel w/Aloe (formula #30-106PQ)
- o Nexcare-Type* Liquid Bandage Spray (formula #31-183PQ)
- o Eucalyptus Oil (formula #35-196PQ)
- o Caren Pretty SHHHH!-Type* Baby Wash FF (formula #36-94PQ)
- o Caren Pretty Baby SHHH!-Type* Body Lotion FF (formula #36-96PQ)
- o Carex-Type* No Rinse Shampoo and Conditioner (formula #37-335PQ)
- o Carex-Type* No-Rinse Body Bath (formula #37-157PQ)
- o Chest Rub (formula #44-11PQ)
- o Aspercreme-Type* With Lidocaine 4% (formula #44-43PQ
- o Acne Stick-Salicylic Acid 2% (formula #44-84PQ)
- o After Sun Gel w/ Liodcaine (formula #47-101PQ)
- o Chigger Tox (formula # 1374PQ)
- o Chiggerex Plus Relief Cream (formula #5-107PQ)
- o Chiggerex Plus Continuous Spray (formula #10-117PQ)
- o Chiggerex 2x Relief Cream (formula #30-156PQ)
- o Bite Balm (formula #11-185PQ)

- The Scherer Labs GS1 Prefix (UPC Codes) as follows:

| Entity GLN | U.P.C. Co. Prefix | GS1 Co. Prefix | Company | Address |
|---|---|---|---|---|
| 0310341000004 | 30274 | 30274 | Scherer Laboratories Inc | 120 Interstate North Pkwy SE Atlanta, GA 30339-2164 |
| 0727510000008 | 727510 | 0727510 | Product Quest Manufacturing | 330 Carswell Ave. Holly Hill, FL 32117-4416 |

3

> Provided that, Seller makes no representation or warranty with respect to the accuracy or completeness of the formula, batch records, stability records, and other reports, evaluations, and records of the Seller related to the trademarks and formulas listed above.
>
> *These third-party owned trademarks are utilized herein solely to explain the type of product that is being conveyed, the parties understand and agree that Seller has no right, title or interest in and to these trademarks and no rights in these trademarks are intended to be conveyed to Purchaser by their use in this Motion.
>
> All of the above is referred to herein as the "Sale Assets."

The purchase price for the Sale Assets is Two Hundred Thousand Dollars ($200,000.00) payable in full in cash at closing.

5. Contemporaneously with the execution of the Asset Purchase Agreement the Purchaser has deposited with the Trustee's law firm the sum of Thirty Thousand Dollars ($30,000.00) in accordance with the Asset Purchase Agreement. Under the Asset Purchase Agreement closing is scheduled for as soon as possible but in any event not later than three (3) days following the date the sale approval order becomes a final order.

6. Purchaser's negotiations have been with the Trustee and Lender and no third party or broker is due a fee or commission as a result of the transaction contemplated herein. All negotiations have been conducted in good faith and therefore Purchaser is entitled to all the benefits afforded by § 363(m) of the Bankruptcy Code.

7. This Motion is noticed to various interested parties and should a third party buyer emerge with a bona fide offer on terms more particularly set forth in the Asset Purchase Agreement, the Trustee prays that the Court consider such offer and approve the sale of the Sale Assets to the highest offeror.

8. The Sale Assets are encumbered a lien in favor of Madison and Madison has consented to the sale free and clear of its lien with such liens attaching to the proceeds of sale to be administered pursuant to the final cash collateral order entered by this Court on November 19, 2018 [*docket #310*].

WHEREFORE, the Trustee prays:

1.    That the Court approve the sale of the Sale Assets as are more particularly described in the Asset Purchase Agreement to Randob Labs Ltd. or its designated assignee(s), for the sum of Two Hundred Thousand Dollars ($200,000.00) unless a qualified higher offer is submitted to the Court at the hearing in which case the Court is asked to approve the sale of the assets described herein to the entity offering the highest price for such assets in strict accordance with the Asset Purchase Agreement;

2.    That the sale be free and clear of all liens, with all liens attaching to the proceeds of the sale;

3.    That the Asset Purchase Agreement be approved;

4.    That the Court finds the Purchaser to be a good faith buyer within the meaning of 11 U.S.C. § 363(m) and is entitled to the full protections of § 363(m);

5.    That the Trustee be authorized to take such action as may be necessary and appropriate to close the sale; and,

6.    For such other and further relief as the Court may deem just and appropriate.

Respectfully submitted, this the 13th day of June, 2019.

/s/ C. Edwin Allman III
C. Edwin Allman, III, Trustee
North Carolina State Bar #8625

OF COUNSEL:
ALLMAN SPRY DAVIS LEGGETT & CRUMPLER, P.A.
380 Knollwood Street, Suite 700
Post Office Drawer 5129
Winston-Salem, NC 27113-5129
Telephone:   336-722-2300

THIS ASSET PURCHASE AGREEMENT (together with the exhibits and schedules hereto, this "Agreement"), is made as of this 12 day of June 2019, by and between Randob Labs Ltd. or its designated assignees (the "Purchaser"), and Product Quest Manufacturing, LLC, a Debtor in a Chapter 7 case (the "Seller" or the "Debtor"), acting by and through its Trustee, C. Edwin Allman, III.

## WITNESSETH

WHEREAS, the Debtor filed a voluntary petition with the United States Bankruptcy Court for the Middle District of North Carolina (the "Bankruptcy Court") for relief under Chapter 11, title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"); and

WHEREAS, on October 30, 2018, an Order was entered converting the Chapter 11 case of the Debtor to a Chapter 7 case and appointing C. Edwin Allman, III, to serve as Trustee (Dkt. 55) (the "Order"); and

WHEREAS, Purchaser desires to purchase from Seller certain assets as more fully described herein, free and clear of all Liens (a "Sale"), subject to final approval by the Bankruptcy Court.

NOW, THEREFORE, for and in consideration of the representations, warranties, covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1. **Certain Definitions.**

As used herein, the following terms shall have the following meanings:

"Alternative Transaction" means a transaction pursuant to which the Trustee enters into one or more agreements to sell, transfer or otherwise dispose of the Sale Assets to one or more Persons other than Purchaser to the extent (i) the aggregate cash consideration for the Sale Assets exceeds the sum of the Sale Price plus the Initial Overbid and (ii) such transaction is actually consummated.

"Business Day" means any day that is not a Saturday, Sunday, or legal federal holiday in which banks are closed or state holiday in the State of North Carolina.

"Closing Date" means such date as the Closing occurs hereunder.

"FDA" means the United States Food and Drug Administration.

"FDA Law and Regulation" means the Food Drug and Cosmetic Act, 21 U.S.C. 301 *et seq.*, and all applicable regulations promulgated by the FDA.

"Final Order" means an order of the Bankruptcy Court or other court of competent jurisdiction: (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion or alter or amend judgment, motion for rehearing or motion for new trial

Exhibit 1

has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (c) as to which no stay is in effect; provided, however, that the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within ten (10) days of the entry of the order at issue.

"Governmental Authority" means any nation or government, any state, province or other political subdivision thereof exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Initial Overbid" means $10,000.

"Inventory" means "inventory" (as that term is defined in the Uniform Commercial Code).

"Lien" means any lien, security interest, pledge, hypothecation, encumbrance or other interest or claim (including, but not limited to, any and all "claims," as defined in Section 101(5) of the Bankruptcy Code, and any and all rights and claims under any bulk transfer statutes and similar laws) in or with respect to any of the Sale Assets (including, but not limited to, any options or rights to purchase such Sale Assets and any mechanics' or tax liens), whether arising by agreement, by statute or otherwise and whether arising prior to, on or after the commencement of the Bankruptcy Case.

"Person" means any individual, corporation, partnership, joint venture, trust, association, limited liability company, unincorporated organization, other entity, or governmental body or subdivision, agency, commission or authority thereof.

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials, including, without limitation, stability data or documentation and GMP documentation related to the Scherer and Chiggerex Lot Assets set forth on Schedule 2.1(a).

"Sale Approval Order" means an order of the Bankruptcy Court approving the transactions contemplated hereby and the definitive documentation related hereto.

"Scherer and Chiggerex Lots" means the specific formulas described on Schedule 2.1(a).

"Trustee" means C. Edwin Allman, III or such other person as may be appointed as trustee for the Debtor.

## 2.    Sale and Purchase of Assets.

2.1    **Sale Assets.**  Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, Seller shall sell, assign, convey, transfer and deliver to Purchaser, and Purchaser shall, by Purchaser's payment of the Sale Price, purchase and acquire from Seller, on behalf of the Debtor's bankruptcy estate, all of Seller's right, title and interest in and to the

Exhibit 1

assets described on Schedule 2.1(a) only and no other assets are being conveyed including but not limited to the exception of the Excluded Assets specifically identified on Schedule 2.1(b) and defined in Section 2.3 of this Agreement (collectively, the "Sale Assets"), "as is, where is," pursuant to Section 363 of the Bankruptcy Code.

**2.2**   **Bankruptcy Sale.** Debtor and its Trustee represent and warrant that the Sale Assets listed on Schedule 2.1(a) have been excluded from previous asset sales and auctions in the bankruptcy cases involving Debtor and Debtor and its Trustee represent and warrant that the Sale Assets were not conveyed or have not been promised to be conveyed to any other third-party following the conversion of this case to Chapter 7.

**2.3**   **Excluded Assets.** Notwithstanding anything herein to the contrary, the Sale Assets shall not include the following assets (the "Excluded Assets"):

(a)   Cash now or subsequently held in bank accounts or otherwise by the Debtors or by the Trustee on behalf of the Debtors.

(b)   Accounts receivable, deposits, or other debts or obligations owed to the Debtors by or from any party, including any right of setoff, recoupment or reconciliation.

(c)   Minoxidil ANDAs (2% and 5%) and all Debtor owned formulation and other intellectual property, other than listed on Schedule 2.1.

(d)   Computer servers and storage devices unless (i) the Trustee and the Debtors have downloaded or otherwise acquired a copy of all information, data and Records maintained or stored thereon and (ii) such computer servers and storage devices remain subject to the provisions of Section 9.3.

(e)   Licenses and permits of any nature, other than executory contracts or unexpired leases which are expressly listed on Schedule 2.3 and which are able to be assigned and assumed pursuant to Section 365 of the Bankruptcy Code.

(f)   Any customer owned equipment or intellectual property located on the Landis Premises or Kannapolis Premises either on loan or licensed to the Debtor, and other tangible or intangible assets which are the property of a party other than the Debtor, including, without limitation, the equipment and other assets referenced in that certain UCC financing statement (#20170011093F) filed by Scioderm, Inc. against the Seller on February 2, 2017.

(g)   Unless otherwise agreed in writing by the Trustee, any identified reserve samples (i.e., "retains"); provided, however, any reserve samples that are owned by the Debtor as of the Closing Date shall not constitute Excluded Assets so long as (i) as of the Closing Date, such reserve samples are not subject to any agreements by the Trustee to transfer such reserve samples to any third Person

Exhibit 1

and (ii) the Debtor is not otherwise required to maintain such reserve samples by the FDA, any other governmental authority or applicable law.

(h)     Any rights of the Seller under this Agreement (including the right to receive any Sale Price hereunder).

(i)     The Debtor's Records; provided, however, any of the Debtor's Records shall not constitute Excluded Assets if and to the extent such Records remain subject to the provisions of Section 9.3.

(j)     Insurance policies, any claims thereunder (whether asserted prior to or after the date of the Closing) and the proceeds thereof.

(k)     Any claims or causes of action which may be asserted by or on behalf of the Debtor against any party, including but not limited to claims or causes of action under Code §§ 544, 547, 548, 549, 550 and 553.

(l)     Any other assets that are expressly excluded by the Trustee from the Sale.

**2.4     Assumed Liabilities.**  Purchaser and Debtor acknowledge and agree that Purchaser is not assuming any liability or obligation of Debtor for the Sale Assets of any kind or nature, whether known or unknown as of the Closing Date, whether fixed or contingent, including (a) any liabilities under any contracts of Debtor, (b) any debt for money borrowed, however arising, and (c) any losses that may be imposed by any governmental body or other legal entity or person arising from or related to any actual, alleged, possible or potential violation of, failure to comply with, or liability under, any legal requirement incurred in connection with the Sale Assets prior to the Closing Date.  Consistent therewith, the Sale Assets transferred to Purchaser pursuant to this Agreement shall be free and clear of all such liabilities and obligations of Debtor, as well as any and all other liens or encumbrances of any kind of nature whatsoever.

**2.5     Transfer of Liens.**  Subject to consummation of the Sale and payment in full of the Sale Price (defined below), the Sale Assets shall be sold, transferred and conveyed free and clear of all Liens, including rights or claims based on any successor or transferee liability, to the fullest extent permitted under Section 363 of the Bankruptcy Code, with all Liens transferred to proceeds of Sale with the same validity and priority as such Liens applied against the Sale Assets immediately prior to the consummation of the sale, pursuant to the Sale Approval Order.  Seller and Trustee shall work with Madison Capital Funding to arrange for a release of its liens on the Sale Assets hereunder that may be included in their UCC-1 liens against the Sale Assets named in the Order.  Purchaser will prepare a draft UCC-3 release with respect to the Sale Assets that are included in the UCC-1 filed by Madison Capital Funding and a draft of the Trademark Release Agreement referenced in Section 2.10(b) below (collectively, the "Madison Lien Release Documents").  Purchaser will reimburse the reasonable out of pocket costs of Madison Capital Funding in reviewing the draft Madison Lien Release Documents

Exhibit 1

and upon consummation of the Closing, Purchaser will be responsible for filing the Madison Lien Release Documents and the costs and expenses associated with such filings.

**2.6     Sale Price.**  In consideration for the Sale Assets, subject to the other terms and conditions of this Agreement and the entry and effectiveness of the Sale Approval Order, Purchaser shall pay to Seller an amount in cash equal to the sum of Two Hundred Thousand Dollars ($200,000.00) (the "Sale Price").  The Sale Price shall be paid in cash and in full on the Closing Date by wire transfer of immediately available U.S. funds to an account designated by Seller (subject to application of the Deposit Amount in accordance with Section 2.7 below).

**2.7     Deposit.**  Upon execution and delivery of this Agreement to Seller, Purchaser shall deposit an amount equal to fifteen percent (15%) of the Sale Price, in the amount of Thirty Thousand Dollars ($30,000.00) (the "Deposit Amount") in the form of a wire transfer or cashier's check to be held in a non-interest-bearing segregated account designated by the Trustee and pending completion of the Closing (but subject to the provisions set forth below).

(a)     If this Agreement is terminated for any reason other than for a breach or default of the Purchaser pursuant to Sections 8.1(a), 8.1(b), 8.1(c) or 8.1(f), the Deposit Amount submitted by the Purchaser shall be refunded to the Purchaser.

(b)     If (A) the Sale Approval Order is entered by the Bankruptcy Court by July ___, 2019 and the Closing occurs or (B) the Sale to the Purchaser occurs in a manner otherwise approved by the Bankruptcy Court, then the Deposit Amount shall be applied at Closing as a credit toward the Sale Price.

(c)     If (A) the Sale Approval Order is entered by the Bankruptcy Court by July _____, 2019 and (B) the Sale to the Purchaser does not occur, then the Deposit Amount shall be (i) retained by the Debtor's estate as liquidated damages, if the Sale to the Purchaser shall fail to close by reason of a breach or default of the Purchaser and the Agreement is terminated pursuant to Section 8.1(d), or (ii) returned to the Purchaser, in the event that the Sale to the Purchaser shall fail to close by reason of a breach or default of the Seller and the Agreement is terminated pursuant to Section 8.1(e).

**2.8     Closing.**  The closing of the sale of the Sale Assets (the "Closing") must occur as soon as practicable but in any event within 3 days of the date on which the Sale Approval Order becomes a Final Order (or such later date as the Trustee and the agent for its secured lenders may agree but in all events with three (3) days of the Final Order). The Closing will take place at a location to be mutually agreed upon by Purchaser and Seller.  The transfer of the Sale Assets shall be effective for all purposes as of 12:01 a.m. eastern time on the day following the Closing Date.

**2.9     [Reserved]**

Exhibit 1

**2.10   Deliveries by Seller.** At the Closing, Seller shall deliver or cause to be delivered to Purchaser the following (each in form and substance reasonably satisfactory to Purchaser):

(a)   Duly executed bills of sale and (if applicable) a non-warranty deed or deeds transferring to Purchaser or its designated assignees all right, title and interest in and to the Sale Assets free and clear of all Liens, without exception or condition except as provided herein.

(b)   A Trademark Assignment Agreement, prepared by the Buyer, for all of USPTO-registered and common law trademarks, which can be utilized for transferring the trademarks to Purchaser by filing of same with USPTO. Seller and Trustee shall work with Madison Capital Funding to arrange for a Trademark Release Agreement, to be filed with USPTO, for a release of its liens on the USPTO-registered trademarks that are part of the Sale Assets, namely: E-R-O, CHIIGEREZ and EAR-DRY.

(c)   A GSI Prefix Transfer Letter, prepared by the Buyer. authorizing the transfer of the GSI Prefixes that are part of the Sale Assets, as detailed on Schedule 2.1(a) hereto.

(d)   A copy of the Sale Approval Order.

(e)   Such other instruments or documents as Purchaser may reasonably request to fully effect the transfer of the Sale Assets and to confer upon Purchaser the benefits contemplated by this Agreement.

**2.11   Deliveries by Purchaser.** At the Closing, Purchaser shall deliver, or cause to be delivered, the following:

(a)   The Sale Price less the Deposit Amount, as described in Section 2.6.

(b)   Such other instruments or documents as Seller may reasonably request to fully effect the transfer of the Sale Assets and to otherwise consummate the transactions contemplated by this Agreement.

**2.12   Transfer of Sale Assets.** On or before the earlier of the date that is 3 days after entry of the Sale Approval Order and the Closing Date, Purchaser and Seller shall agree to the time and method in which Purchaser shall obtain possession of the Sale Assets. Upon consummation of the Closing, Seller shall make the Sale Assets available to Purchaser, at the Purchaser's sole expense, and Purchaser shall take possession of such Sale Assets in accordance with such agreement.

**3.   Representations and Warranties of Purchaser.**

Purchaser hereby represents and warrants to Seller that the statements contained in this Article 3 are correct and complete as of the date hereof and as of the Closing Date:

Exhibit  1

(a)    Purchaser has cash available or has existing borrowing facilities or unconditional, binding funding commitments that are sufficient to enable it to timely consummate a Sale hereunder, without incurrence of any obligation, commitment, restriction or liability of any kind which would impair or adversely affect the transactions contemplated by this Agreement.

(b)    Purchaser has not taken any action that would cause Seller to have any obligation or liability to any Person for finders' fees, brokerage fees and commissions or like payments in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

(c)    Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges the condition of the Sale Assets and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in Section 4 hereof, and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Sale Assets are being transferred on a "WHERE IS" and, as to condition, "AS IS" basis and "WITH ALL FAULTS." Without in any way limiting the foregoing, Seller hereby disclaims any warranty (express or implied) or merchantability or fitness for any particular purpose as to any portion of the Sale Assets.

4.    **Representations and Warranties of Seller**.

Seller hereby represents and warrants to Purchaser that the statements contained in this Article 4 are correct and complete as of the date hereof and as of the Closing Date:

(a)    At the Closing Seller shall have and convey to Purchaser, all of its right, title and interest in the Sale Assets, free and clear of all Liens. Since the conversion to Chapter 7, neither Seller nor Trustee has taken any action to diminish or adversely affect Seller's title to the Sale Assets.

(b)    Seller has not taken any action that would cause Purchaser to have any obligation or liability to any Person for finders' fees, brokerage fees and commissions or like payments in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

(c)    Seller is selling all of its rights, title and interest in the Records, formulations, reports, evaluations, or similar information related to the Sale Assets, without any representation or warranty, including but not limited to, batch records, manufacturing instructions and processes, marketing materials /collateral, stability data, sales data, customer contact list, vendor list, packaging specifications and artwork and raw material pricing, as further detailed on Schedule 2.1(a).

(d)    Seller intends to sell all intellectual property related to the trademarks and trade names as part of the Sale Assets and Seller shall not, directly or indirectly,

Exhibit 1

create, register, license, file for intellectual property rights, market, sell, sponsor, manufacture, distribute, invent, design or develop a trademark or formula that competes with the Sale Assets conveyed to Purchaser hereunder, including but not limited to any product with a similar or identical name, formula, packaging, or marketing. At all times after the Closing, Seller shall not have any rights to any of the Sale Assets trademarks, registered or common law, or their related intellectual property and agrees not to register or use any name, slogan or trademark incorporating the Sale Assets trademark or intellectual property or any variations thereof or any name or phrase that could be deemed similar, as a corporate name, a domain name or for any other purpose whatsoever.

(e)    Except as expressly set forth herein, Seller makes no representation or warranty, express or implied, at law or in equity, with respect to Seller and the Sale Assets or any other information provided to Purchaser, its agents or representatives in connection with or in expectation of the transactions contemplated by this Agreement. Seller does not make any representations or warranties regarding information, documents, projections, forecasts or other material made available to Purchaser, its agents or representatives in connection with or in expectation of the transactions contemplated in this Agreement except to the extent such information is expressly and specifically included in a representation or warranty contained in this Article.

## 5. __Bankruptcy Court Approval.__

**5.1**    Seller and Purchaser acknowledge and agree that the Bankruptcy Court's entry of the Sale Approval Order is required in order for Seller and Purchaser to consummate the transactions contemplated hereby and that the requirement that the Sale Approval Order be entered is a condition that cannot be waived by any party hereto. The parties agree that the Bankruptcy Court shall have exclusive jurisdiction to hear, determine and enter final orders with respect to any dispute arising out of this Agreement.

**5.2**    Seller shall promptly seek: (i) the Bankruptcy Court's approval of this Agreement and Seller's performance under this Agreement generally; and (ii) the entry of the Sale Approval Order. Purchaser shall take such actions as are reasonably requested by Seller to assist Seller in obtaining a finding by the Bankruptcy Court that Purchaser is deemed to have purchased the Sale Assets in good faith pursuant to section 363(m) of the Bankruptcy Code.

**5.3**    If the Sale Approval Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Approval Order or other such order), subject to rights otherwise arising from this Agreement, Seller and Purchaser shall use their commercially reasonable efforts to prosecute such appeal,

-8-

Exhibit 1

petition or motion and obtain an expedited resolution of any such appeal, petition or motion; provided, however, Purchaser shall not be required to expend any money or to modify any of the terms of this Agreement in order to obtain such resolution.

**5.4**    Notwithstanding anything contained herein to the contrary, from the date of this Agreement (and any prior time) and until the entry of the Sale Approval Order, Seller is permitted to cause their respective representatives to initiate contact with, solicit, or encourage submission of any inquiries, proposals, or offers by any Person in connection with any sale or other disposition of the Sale Assets. The Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Sale Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Sale Assets to prospective buyers.  Seller agrees to promptly advise Purchaser of any offers it receives for the Sale Assets including, without limitation any offers for an Alternative Transaction or offers for any specific items of the Sale Assets and the amount thereof.  If an Alternative Transaction arises, an auction may be conducted by the Trustee with the Sale Assets being sold to the highest bidder, in compliance with this Agreement and any order from the Bankruptcy Court.

**5.5**    Notwithstanding the above, except as specifically required by the Bankruptcy Code or Bankruptcy Court, no party shall make any press release or similar public announcement with respect to this Agreement.

## 6.    <u>Conditions Precedent to Obligations of Purchaser</u>.

The obligation of Purchaser to consummate the transactions contemplated herein is subject to the satisfaction, at or before the Closing, of each of the following conditions:

**6.1**    The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on the Closing Date. Seller shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date.

**6.2**    The Bankruptcy Court shall have entered the Sale Approval Order in form reasonably satisfactory to Purchaser containing findings that (i) Purchaser is a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arms' length purchaser; (ii) the Sale Price is fair and reasonable; (iii) this Agreement was negotiated at arms' length; and (iv) the sale of the Sale Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code, and which Sale Approval Order is a Final Order.

Exhibit 1

**6.3** Purchaser shall have received all documents and other items to be delivered by Seller under Section 2.10.

## 7. <u>Conditions Precedent to the Obligations of Seller</u>.

The obligation of Seller to consummate the transactions contemplated herein is subject to the satisfaction, at or before the Closing, of each of the following conditions:

**7.1** The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on the Closing Date. Purchaser shall have performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by Purchaser on or before the Closing Date.

**7.2** The Bankruptcy Court shall have entered the Sale Approval Order containing findings that (i) Purchaser is a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arms' length purchaser; (ii) the Sale Price is fair and reasonable; (iii) this Agreement was negotiated at arms' length; and (iv) the sale of the Sale Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code, and which Sale Approval Order is a Final Order.

**7.3** Seller shall have received or concurrently receive the Sale Price and other items to be delivered by Purchaser under Section 2.11.

## 8. <u>Termination of Agreement</u>

**8.1** This Agreement may be terminated only as follows:

(a) By mutual written agreement of both Seller and Purchaser at any time.

(b) By Seller or Purchaser, if the Bankruptcy Court does not enter the Sale Approval Order by that date that is Forty-five (45) days from the date of this Agreement; provided that if the Bankruptcy Court has asked for extensions or delays that do not exceed an additional Forty-five (45) day period, this Agreement may not be terminated.

(c) By Seller or Purchaser, if the Closing shall not have occurred on or prior to ten (10) days after the entry of the Sale Approval Order, for any reason other than such party's breach of this Agreement.

(d) By the Seller, if Purchaser shall have breached or failed to perform in any material respect any of its respective representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to

Exhibit 1

perform has not been cured prior to the date that is ten (10) days from the date that Purchaser receives notice by the Seller of such breach or failure to perform; provided, however, that the Seller shall not have the right to terminate this Agreement under this Section (i) if such breach or failure to perform cannot be cured within ten (10) days of Purchaser's receipt of such notice but can be cured within twenty (20) days of such notice and Purchaser is proceeding diligently to cure such breach or failure within such twenty (20) day period, or (ii) if the Seller is then in material breach of this Agreement.

(e)     By Purchaser, if the Seller shall have breached or failed to perform in any material respect any of its respective representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform cannot be or has not been cured prior to the date that is ten (10) days from the date that the Seller is notified by Purchaser of such breach or failure to perform; provided, however, that Purchaser shall not have a right to terminate this Agreement under this Section if Purchaser is then in material breach of this Agreement.

(f)     Automatically and without any action or notice by Seller or Purchaser, immediately upon the consummation of an Alternative Transaction.

9.    **Miscellaneous Provisions**

9.1    **Transaction Expenses.**  Except as expressly provided for in Section 8.1, each party shall pay all fees, costs and expenses incurred by it with respect to this Agreement, whether or not the transactions contemplated hereby are consummated.

9.2    **Further Assurances.**  Purchaser and Seller shall, from time to time after the Closing, without further consideration, execute and deliver such instruments and take such further actions as may be reasonably necessary or desirable to carry out the provisions hereof and the transactions contemplated hereby.

9.3    **Availability of Records.**  From and after the Closing, Purchaser shall promptly provide to Seller (after reasonable notice and during normal business hours and without charge to the Debtor or the Trustee) access to all Records included in the Sale Assets, as detailed on Schedule 2.1(a), for periods prior to the Closing, and shall preserve such Records and provide such access until the date that is sixty (60) days following the Closing Date.  Prior to destroying any Records included in the Sale Assets for periods prior to the Closing, Purchaser shall notify the Trustee thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Purchaser shall permit Debtor and the Trustee to retain such Records, at the Debtor's cost and expense.

Exhibit 1

**9.4**   **Notifications.**   From the date of this Agreement until the earlier of the Closing or the termination of this Agreement, Seller shall give Purchaser prompt written notice of the occurrence of any of the following events:

(a)   Any loss, taking, condemnation, damage or destruction of or to any of the Sale Assets.

(b)   The commencement of any proceeding or litigation at law or in equity or any other commission, agency or administrative or regulatory body or authority against Seller which would prohibit the Sale of the Sale Assets pursuant to an order of the Bankruptcy Court.

(c)   Any other materially adverse developments with respect to the Sale Assets.

(d)   Any event, occurrence or fact that causes any of the representations or warranties to be untrue at any time in any material respect; provided, that no disclosure by Seller pursuant to this section shall be deemed to amend or supplement any provision of this Agreement or to prevent or cure any misrepresentation, breach of warranty or breach of covenant.

**9.5**   **Survival.**   The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and neither of the parties nor any of its respective officers, directors, representatives, employees, advisors or agents shall have any liability to the other after the Closing for any breach thereof.  The parties hereto agree that only the covenants contained in this Agreement that are expressly required to be performed at or after the Closing Date shall survive the Closing hereunder, and each of the parties hereto shall be liable to the other after the Closing Date for any breach thereof.

**9.6**   **Jurisdiction.**   The parties agree that the Bankruptcy Court shall retain the exclusive and sole jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the implementation or the breach hereof.  The parties consent to the core jurisdiction of the Bankruptcy Court, to the constitutional authority of the Bankruptcy Court to enter a final judgment, and agree to have waived any right to a jury trial in connection with any disputes related to or arising out of this Agreement.

**9.7**   **Notices.**   All notices, consents or other communications required or permitted hereunder shall be given in writing and hand delivered or addressed and sent by Federal Express or other recognized overnight courier, or by certified or registered mail, postage prepaid, and return receipt requested, as follows or to such other address as may hereafter be designated by any party by the giving of notices in accordance with this Section 9.7:

(a)   If to Seller:   C. Edwin Allman, III, Trustee, PO Box 5129, Winston-Salem, NC 27113 email: ceallman@allmanspry.com

Exhibit 1

(b)    With a copy to:    Dimitri G. Karcazes, counsel for Madison Capital Funding LLC, as Agent for the Lenders to the Seller, 55 East Monroe Street, Suite 3300, Chicago, IL 60603 email: dimitri.karcazes@goldbergkohn.com

(c)    If to Purchaser:  Jim Creagan, President, Randob Labs, Ltd., 45 Quaker Avenue, STE 207, Cornwall, NY 12518, jim@randob.com

(d)    With a copy to: counsel for Randob Labs, Ltd: Catania, Mahon, Milligram and Rider, PLLC, One Corwin Court, Newburgh, NY 12550, Attn: Shay A. Humphrey email: shumphrey@cmmrlegal.com

(e)    All notices, consents or other communications shall be deemed given when actually delivered (in the case of hand delivery by Federal Express or other recognized overnight courier) or five days after mailing in accordance with this Section 9.7.

**9.8    Governing Law.**  To the extent not governed by the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina, without giving effect to rules governing the conflict of laws.

**9.9    Waiver.**  The waiver by a party of a breach of any covenant, agreement or undertaking contained herein shall be made only by a written waiver in each case. No waiver of any breach of any covenant, agreement or undertaking contained herein shall operate as a waiver of any prior or subsequent breach of the same covenant, agreement or undertaking or as a waiver of any breach of any other covenant, agreement or undertaking.

**9.10    Severability.**  If any provision of this Agreement shall be held invalid, illegal or unenforceable, in whole or in part, the validity, legality, and enforceability of the remaining part of such provision, and the validity, legality and enforceability of all other provisions hereof or thereof, shall not be affected thereby.

**9.11    Counterparts.**  This Agreement may be executed in one or more counterparts (whether manually signed or by facsimile or other electronic means), each such counterpart shall be deemed an original, and all such counterparts shall constitute one and the same agreement.

**9.12    Captions; References.**  The headings, titles or captions of the Articles and Sections of this Agreement are inserted only to facilitate reference, and they shall not define, limit, extend or describe the scope or intent of this Agreement or any provision hereof, and they shall not constitute a part hereof or affect the meaning or interpretation of this Agreement or any part hereof.

**9.13    Amendments.**  This Agreement may not be amended, changed, modified, altered or terminated unless the parties hereto mutually agree in writing to such amendment, change, modification, alteration or termination.

Exhibit 1

**9.14**   **Remedies Cumulative; Specific Performance.**   Except as otherwise expressly provided in this Agreement, no remedy herein conferred is exclusive of any other available remedy and each and every such remedy shall be cumulative and shall be in addition to every other remedy given by agreement or now or hereafter existing at law or in equity or by statute.  Except as otherwise expressly provided in this Agreement, in addition to any and all other remedies that may be available at law, in the event of any breach of this Agreement each party shall be entitled to seek specific performance of the agreements and obligations hereunder and to such other injunctive or equitable relief as may be granted by a court of competent jurisdiction.

**9.15**   **Binding Nature; Assignment.**   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interest or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other party; provided, however, that the Seller's rights under this Agreement, including, without limitation, the Seller's rights to enforce this Agreement, have been assigned for collateral security purposes to the Seller's secured lenders (and the agent therefor) and Purchaser acknowledges such assignment and the rights of the Seller's secured lenders (and the agent therefor) to enforce the rights of Seller under this Agreement as well as the right of Seller to designate the secured lenders to directly receive any amounts owed to Seller under this Agreement.   Nothing contained herein, express or implied, is intended to confer on any Person other than the parties hereto or their successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.   Notwithstanding anything to the contrary contained in this Agreement, Purchaser shall have the right without the prior consent of the Seller to assign its rights and obligations to purchase the Sale Assets in whole or in part to one or more single purpose limited liability companies upon notice to Seller prior to Closing and to allocate the Sale Price for the specific Sale Assets assigned to such assignees which right shall be specifically provided for in the Sale Approval Order; provided that, Purchaser shall not be relieved of its obligations to purchase the Sale Assets if such assignee or assignees fail to purchase the Sale Assets in breach of this Agreement.

**9.16**   **No Third-Party Beneficiaries.**   This Agreement is a contract solely between Purchaser and Seller.  No third party beneficiaries, (including, without limitation, employees and customers of Seller) are intended hereunder and none shall be inferred herein; and no party other than Purchaser or Seller may assert any right, make any claim or otherwise attempt to enforce any provision of or under this Agreement; provided, however, that the Seller's secured lenders (and the agent therefor) are express third party beneficiaries for purposes of Section 2.8, Section 9.16, this Section 9.17 and Section 9.18 and Purchaser acknowledges the rights of Seller's secured lenders (and the agent therefor) as a result thereof.

**9.17**   **Release and Waiver.**  Effective upon the Closing, except as set forth in this Agreement, the Purchaser hereby irrevocably waives, releases, and discharges

-14-

Exhibit 1

Seller, solely in Seller's capacity as the owner of the Sale Assets, each of Seller's Affiliates (in each such Person's capacity as an Affiliate of such Seller), and Seller's secured lenders (and the agent therefor) (in such Person's capacity as a lender (or agent for such lender) of Seller) from any and all liabilities or debts to its business and the Purchaser of any nature or kind whatsoever (including in respect of rights of contribution or indemnification).

**9.18    Time of the Essence**.  Purchaser and Seller agree that time is of the essence throughout this Agreement and every provision hereof in which time is an element.  No extension of time for performance of any obligations or acts shall be deemed an extension of time for performance of any other obligations or acts.  If any date for performance falls on a Saturday, Sunday or legal holiday in the States of North Carolina then the time for performance shall be extended to the next Business Day.

**9.19    Force Majeure**. If either party is delayed or prevented from fulfilling any of its obligations under this Agreement by force majeure, such party shall not be liable under this Agreement for the delay or failure, provided due diligence is used by that party in resuming performance. "Force majeure" means any cause beyond the reasonable control of the party, including, but not limited to, an act of God, act or omission of civil or military authorities of a state or nation, fire, strike, flood, riot, wars, delay of transportation, or inability due to any of these causes to obtain necessary labor, materials  or facilities.

**[signatures on following page]**

Exhibit 1

IN WITNESS WHEREOF, the parties have caused their duly authorized officers to execute this Agreement as of the day and year first above written.

RANDOB LABS, LTD. and its designated assignees

Purchaser

By:

Name: James J Crengan

Title: President

PRODUCT QUEST MANUFACTURING, LLC

Debtor or "Seller"

By:

C. Edwin Allman, III, Trustee

Signature Page to Asset Purchase Agreement

Exhibit 1

## SCHEDULE 2.1(a) – SALE ASSETS

- Trademarks Registered with USPTO
  - Ear-Dry (application 75/117,240 registration 2,055,324)
  - E-R-O (application 72/117,353 registration 0,723,274)
  - Chiggerex (application 74/215,249 registration 1,742,691)

- Common Law Trademarks
  - Rhinall (Serial #73314165 – Status: Cancelled)
  - HuMist (Serial #73250033 – Status: Cancelled)
  - CHIGGER-TOX (Serial #77234521 – Status: Cancelled)
  - Chigger-Tox (Serial #73057066 – Status: Cancelled)
  - Scherer Labs (Class 5) (Serial #87166803 – Status: Abandoned)
  - Scherer Labs (Class 3) (Serial #87166820 – Status: Abandoned)
  - Dr. Scherer Established 1933 (Design Mark) (Serial #85526150 – Status: Abandoned)
  - Bite Relief (Serial # 78537599– Status: Abandoned)

- All available records related to the Sale Assets, including but not limited to, batch records, manufacturing instructions and processes, marketing materials /collateral, stability data, sales data, customer contact list, vendor list, and raw material pricing.

- Formulas for the following:
  - Rhinall Spray / Drops (formula #1375PQ)
  - Mederma-Type* Scar Gel (formula #2-277PQ)
  - Therapeutic Mineral Ice-Type* Gel (formula #3-38PQ)
  - Ear Pain Relief (formula #5-101PQ)
  - Ear Dry Ear Drops (formula #5-105PQ)
  - Humist (formula #6-32PQ)
  - SPF 50 Water Babies Coppertone-Type* Sunscreen (formula #10-53PQ)
  - Solarcaine-Type* Burn Relief Aloe Extra Spray (formula #10-79PQ)
  - Kiehl's-Type* Diaper Rash Ointment (formula #12-213PQ)
  - Ear Wax Removal Solution (formula #13-243PQ)
  - Cortaid-Type* Intensive Therapy Cooling Spray (formula #16-65PQ)
  - Extra Strength Icy Hot-Type* Continuous Spray (formula #18-77PQ)
  - Neutrogena-Type* Pure & Free Baby Sunblock Stick SPF 60+ (formula #18-119PQ)
  - Proactiv-Type* Revitalizing Toner Step #2 (formula #24-40PQ)
  - Proactiv-Type* Renewing Cleanser Step #1 (formula #24-42PQ)
  - Proactive-Type* Repairing Treatment Step #3 (formula #24-44PQ)
  - Mederma-Type* Stretch Mark Cream (formula #24-54PQ)

Purchaser Initials: _____    Date: 6/12/19
Seller Initials: _____    Date: 6-12-19

Exhibit 1

- o   Caladryl Clear-Type* Spray (formula #24-60PQ)
- o   Ayr-Type* Saline Gel w/Aloe (formula #30-106PQ)
- o   Nexcare-Type* Liquid Bandage Spray (formula #31-183PQ)
- o   Eucalyptus Oil (formula #35-196PQ)
- o   Caren Pretty SHHH!-Type* Baby Wash FF (formula #36-94PQ)
- o   Caren Pretty Baby SHHH!-Type* Body Lotion FF (formula #36-96PQ)
- o   Carex-Type* No Rinse Shampoo and Conditioner (formula #37-335PQ)
- o   Carex-Type* No-Rinse Body Bath (formula #37-157PQ)
- o   Chest Rub (formula #44-11PQ)
- o   Aspercreme-Type* With Lidocaine 4% (formula #44-43PQ
- o   Acne Stick-Salicylic Acid 2% (formula #44-84PQ)
- o   After Sun Gel w/ Liodcaine (formula #47-101PQ)
- o   Chigger Tox (formula # 1374PQ)
- o   Chiggerex Plus Relief Cream (formula #5-107PQ)
- o   Chiggerex Plus Continuous Spray (formula #10-117PQ)
- o   Chiggerex 2x Relief Cream (formula #30-156PQ)
- o   Bite Balm (formula #11-185PQ)

-   The Scherer Labs GS1 Prefix (UPC Codes) as follows:

| Entity GLN | U.P.C. Co. Prefix | GS1 Co. Prefix | Company | Address |
|---|---|---|---|---|
| 0310341000004 | 30274 | 30274 | Scherer Laboratories Inc | 120 Interstate North Pkwy SE Atlanta, GA 30339-2164 |
| 0727510000008 | 727510 | 0727510 | Product Quest Manufacturing | 330 Carswell Ave. Holly Hill, FL 32117-4416 |

Provided that, Seller makes no representation or warranty with respect to the accuracy or completeness of the formula, batch records, stability records, and other reports, evaluations, and records of the Seller related to the trademarks and formulas listed above.

*These third-party owned trademarks are utilized herein solely to explain the type of product that is being conveyed, the parties understand and agree that Seller has no right, title or interest in and to these trademarks and no rights in these trademarks are intended to be conveyed to Purchaser by their use in this Schedule.

Purchaser Initials: _____    Date: 6/12/19
Seller Initials: _____    Date: 6-12-19

## SCHEDULE 2.1(b) – EXCLUDED ASSETS

- Cash now or subsequently held in bank accounts or otherwise by the Debtor or by the Trustee on behalf of the Debtor.

- Accounts receivable, deposits, or other debts or obligations owed to the Debtor by or from any party, including any right of setoff, recoupment or reconciliation.

- Minoxidil ANDAs (2% and 5%) and all Debtor owned formulation and other intellectual property, other than listed on Schedule 2.1

- Computer servers and storage devices unless (i) the Trustee and the Debtor have downloaded or otherwise acquired a copy of all information, data and Records maintained or stored thereon and (ii) such computer servers and storage devices remain subject to the provisions of Section 9.3.

- Licenses and permits of any nature, other than executory contracts or unexpired leases which are expressly listed on Schedule 2.3 and which are able to be assigned and assumed pursuant to Section 365 of the Bankruptcy Code.

- Any customer owned equipment or intellectual property located on the Landis Premises or Kannapolis Premises either on loan or licensed to the Debtor, and other tangible or intangible assets which are the property of a party other than the Debtor, including, without limitation, the equipment and other assets referenced in that certain UCC financing statement (#20170011093F) filed by Scioderm, Inc. against the Seller on February 2, 2017.

- Unless otherwise agreed in writing by the Trustee, any identified reserve samples (i.e., "retains"); provided, however, any reserve samples that are owned by the Debtor as of the Closing Date shall not constitute Excluded Assets so long as (i) as of the Closing Date, such reserve samples are not subject to any agreements by the Trustee to transfer such reserve samples to any third Person and (ii) the Debtor is not otherwise required to maintain such reserve samples by the FDA, any other governmental authority or applicable law.

- Any rights of the Seller under this Agreement (including the right to receive any Sale Price hereunder).

Exhibit 1

- The Debtor's Records; provided, however, any of the Debtor's Records shall not constitute Excluded Assets if and to the extent such Records remain subject to the provisions of Section 9.3.

- Insurance policies, any claims thereunder (whether asserted prior to or after the date of the Closing) and the proceeds thereof.

- Any claims or causes of action which may be asserted by or on behalf of the Debtor against any party, including but not limited to claims or causes of action under Code §§ 544, 547, 548, 549, 550 and 553.

Exhibit 1

## SCHEDULE 2.3 – ASSUMED CONTRACTS

- None

Exhibit 1

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that on this date he caused to be served a copy of the attached Application on the parties named in the Service List filed by the Trustee with the Court on June 10, 2019 [*docket #503*] in the manner set forth in said document.

In addition, the undersigned does hereby certify that on this date he caused to be served a copy of the attached Motion on the additional parties set out below, by regular first class U.S. Mail, postage prepaid, as follows:

Jim Creagan, President
Randob Labs, Ltd.
45 Quaker Avenue, Suite 207
Cornwall, NY 12518

Shay A. Humphrey, Esq.
Catania, Mahon, Milligram and Rider, PLLC
One Corwin Court
Newburgh, NY 12550

This the 13th day of June, 2019.

/s/ C. Edwin Allman III
C. Edwin Allman, III, Trustee
North Carolina State Bar #8625

OF COUNSEL:
ALLMAN SPRY DAVIS LEGGETT & CRUMPLER, P.A.
380 Knollwood Street, Suite 700
Post Office Drawer 5129
Winston-Salem, NC 27113-5129
Direct Dial:   (336) 631-1433 | Facsimile:  (336) 722-8720

ASDLC|394986_v1